ACCEPTED
03-13-00855-CV
8058852
THIRD COURT OF APPEALS
AUSTIN, TEXAS
12/2/2015 4:03:19 PM
JEFFREY D. KYLE
CLERK

## No. 03-13-00855-CV

## IN THE
## COURT OF APPEALS FOR THE
## THIRD CIRCUIT
## AT AUSTIN

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
12/2/2015 4:03:19 PM
JEFFREY D. KYLE
Clerk

## KENNETH LOBELL
**Appellant**

**v.**

## CAPITAL TRANSPORT, LLC
**Appellee**

## ON APPEAL FROM THE 146TH DISTRICT COURT
## OF BELL COUNTY, TEXAS

## MOTION TO SUPPLEMENT RECORD

**WONDERLY & PEPPER, P.C.**
Matthew L. Pepper
State Bar No. 24066817
25211 Grogan's Mill Rd., Suite 450
The Woodlands, Texas 77380
(281) 367-2266
(281) 292-6072 (Fax)

ATTORNEYS FOR APPELLANT,
KENNETH LOBELL

<u>NO. 03-13-00855-CV</u>

<u>IN THE</u>
<u>COURT OF APPEALS FOR THE</u>
<u>THIRD CIRCUIT</u>
<u>AT AUSTIN</u>

<u>KENNETH LOBELL</u>
<u>Appellant</u>

<u>v.</u>

<u>CAPITAL TRANSPORT</u>
<u>Appellee</u>

<u>ON APPEAL FROM THE 146TH DISTRICT COURT</u>
<u>OF BELL COUNTY, TEXAS</u>

<u>BRIEF FOR APPELLANT</u>
<u>KENNETH LOBELL</u>

<u>TO THE COURT OF APPEALS:</u>

The Appellant's Special Appearance for lack of personal jurisdiction was overruled by the Trial Court without any evidence that Appellant Kenneth Lobell, submitted himself to the jurisdiction of Texas. Appellees could show no regular or systematic contacts or purposeful availment that Mr. Lobell or his corporations made with the state of Texas. All of the corporate defendants were dismissed. The same

should be true of Appellant Mr. Lobell. At all times pertinent to this case he was acting as a principal for his corporations who have already been dismissed. The was no evidence submitted by the Appellees that Mr. Lobell was the alter ego of the other. Accordingly , the Trial Court's ruling on Mr. Lobell's special appearance for lack of personal jurisdiction overtuned and Appellant be dismissed.

At oral argument of this matter on October 22, 2015, in Burton, Texas, the panel expressed interest in seeing the actual transcript of the proceeding in the North Dakota Federal Court in order to help them understand the facts of the case at bar. To that end appellant, Kenneth Lobell, desires to supplement the record so that the panel may have the benefit of the sworn record (Exhibit "A") in that matter at their disposal.

Accordingly, Appellant suggests that by supplementing the record by reviewing the sworn testimony from the North Dakota Federal Court proceedings the supplementing materials will help the Court recognize that Mr. Lobell's special appearance for lack of jurisdiction should be maintained and the Trial Court's decision on his special appearance should be reversed.

## PRAYER

For the reasons stated above, Appellant, Kenneth Lobell respectfully prays that this Court grant this Motion to Supplement the record and ultimately reverse the judgment of the Trial Court and sustain his special Exception of lack of jurisdiction; and, further, that this Court grant to Appellant, Kenneth Lobell, such other and further relief to which she may be justly entitled.

Respectfully Submitted,

WONDERLY & PEPPER, P.C.

BY: _____

Matthew L. Pepper
State Bar No. 24066817
25211 Grogan's Mill Rd., Suite 450
The Woodlands, Texas 77380
(281) 367-2266
(281) 292-6072 (Facsimile)
ATTORNEYS FOR APPELLANT,
Kenneth Lobell

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing has been forwarded to all parties and/or counsel of record by certified mail, return receipt requested, on this 2th day of December, 2015.

_____

## CERTIFICATE OF COMPLIANCE

In accordance with Texas Rule of Appellate Procedure 10.1(5) I hereby certify that I conferred with opposing counsel and he opposes the Motion set forth herein and objects to the introduction of the sworn testimony taken in the Federal Court proceeding related to this matter.

_____

FEB 0 1 2013

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHWESTERN DIVISION

Kenneth H. Lobell,                    )
a/k/a/ Kenny Lobell,                  )
                                      )
                 Plaintiff,           )
                                      )
        vs.                           )     File No. 4:12-cv-156
                                      )
Capital Transport, LLC,               )
Capital Oil Field Services,           )
and Chad Denton,                      )
                                      )
                 Defendants.          )

TRANSCRIPT OF PROCEEDING

Taken at
United States Courthouse
Bismarck, North Dakota
January 9, 2013

BEFORE THE HONORABLE DANIEL L. HOVLAND
-- UNITED STATES DISTRICT COURT JUDGE --

*SANDRA E. EHRMANTRAUT*
*Certified Realtime Reporter*
*Bismarck, North Dakota*
*(701) 530-2337*

APPEARANCES

MR. MATTHEW L. PEPPER
Attorney at Law
Compass Bank Building
25211 Grogan's Mill Road, Suite 450
The Woodlands, Texas 77380

AND

MR. JORDON J. EVERT
Furuseth Law Firm, PC
612 Fourth Street East
P. O. Box 417
Williston, North Dakota 58802-0417

AND

MR. SCOTT K. PORSBERG
Smith, Bakke & Oppegard
116 North Second Street
P. O. Box 460
Bismarck, North Dakota 58502-0460

FOR THE PLAINTIFF

- - - - - - - - - -

MR. STEPHEN R. COCHELL
The Cochell Law Firm, P.C.
7026 Old Katy Road, Suite 259
Houston, Texas 77096

AND

MR. CHRISTOPHER J. NYHUS
MR. BENJAMIN WARD KEUP
Pearce & Durick
314 East Thayer Avenue
P. O. Box 400
Bismarck, North Dakota 58502-0400

FOR THE DEFENDANTS

- - - - - - - - - -

2

PLAINTIFF'S WITNESSES

Page No.

Kenneth Lobell

Direct Examination by Mr. Pepper                9
Cross-Examination by Mr. Cochell                36
Redirect Examination by Mr. Pepper             85
Recross-Examination by Mr. Cochell             86

Walter Morales

Direct Examination by Mr. Pepper                88
Cross-Examination by Mr. Cochell                92
Redirect Examination by Mr. Pepper             100

Chad Denton

Direct Examination by Mr. Pepper               101
Cross-Examination by Mr. Cochell               126
Examination by The Court                       144
Recross-Examination by Mr. Cochell             146
Redirect Examination by Mr. Pepper             148

Randy Baker

Direct Examination by Mr. Pepper               152
Cross-Examination by Mr. Cochell               158
Redirect Examination by Mr. Pepper             187
Recross-Examination by Mr. Cochell             189

Myer Stabinski

Direct Examination by Mr. Pepper               191
Cross-Examination by Mr. Cochell               196
Redirect Examination by Mr. Pepper             203
Recross-Examination by Mr. Cochell             204
Redirect Examination by Mr. Pepper             205

DEFENSE WITNESS

Chad Hansen

Direct Examination by Mr. Cochell              206
Cross-Examination by Mr. Pepper                225
Redirect Examination by Mr. Cochell            231

- - - - - - - - - -

3

## PLAINTIFF'S EXHIBITS

| No. | Description | Offered | Received |
|-----|-------------|---------|----------|
| 1 | Complaint and Notice of Lis Pendens from Williams County, North Dakota, dated October 18, 2012 (10 pages) | 27 | 27 |
| 2 | Warranty Deed dated 9/27/11 (2 pages) | 12 | 12 |
| 3 | Williston Herald publication, Talkin' the Bakken, dated April 2012 | 10 | 10 |
| 4 | Weekly Draws (2 pages) | 13 | 15 |
| 5 | Copy of check from William Baker to Capital Transport dated 8/2/11 for $61,385.62 | 22 | 22 |
| 6 | Plaintiffs' Original Petition and Request for Temporary and Injunctive Relief filed in Bell County, Texas, (35 pages) | 104 | 105 |
| 7 | Plaintiffs' First Amended Original Petition and Request for Temporary and Injunctive Relief in Bell County, Texas, filed 10/1/12 | 114 | 114 |
| 8 | Form 205, Certificate of Formation, Limited Liability Company for Capital Oil Field Services, LLC, State of Texas (2 pages) | 117 | 117 |
| 9 | Uniform Offer to Purchase dated May 9, 2011, from Capital Riggers Lodge to Mark Schmidt | 104 | 105 |

- - - - - - - - -

4

## DEFENDANTS' EXHIBITS

| No. | Description | Offered | Received |
|-----|-------------|---------|----------|
| 51 | E-mail dated 7/11/11 attaching Capital Lodging Investment Packet (25 pages) | 50 | 51 |
| 52 | E-mail dated 7/11/11 attaching Capital Lodging Proposal (7 pages) | 51 | 52 |
| 53 | E-mails dated December 2012 and unsigned Affidavit of Chad Hansen (12 pages) | 72 | 72 |
| 54 | Williston Herald article dated 10/17/11 | 140 | 140 |
| 55 | Affidavit of Randy Baker dated 11/14/12 | 170 | 170 |
| 58 | E-mail dated 7/25/11 from Randy Baker (2 pages) | 170 | 170 |
| 59 | E-mail dated 10/16/11 from Chad Hansen to Rick Watson with attached letter to N.D. Dept. of Health (2 pages) | 177 | 177 |
| 60 | Responses to Original Petition and Request for Temporary & Injunctive Relief filed 7/9/12 | 188 | 189 |
| 61 | Affidavit of Myer Buster Stabinski dated 11/14/12 (2 pages) | 206 | 206 |
| 62 | Capital Transport Statement of Work | 206 | 206 |
| 63 | E-mails dated December 2012 and unsigned Affidavit of Chad Hansen (12 pages) | 223 | 224 |

- - - - - - - - - - - - -

(The above-entitled matter came before the Court, The Honorable Daniel L. Hovland, United States District Court Judge, presiding, commencing at 10:03 a.m., Wednesday, January 9, 2013, in the United States Courthouse, Bismarck, North Dakota; with counsel appearing on behalf of the respective parties as hereinbefore indicated. The following proceedings were had and made of record in open court:)

- - - - - - - - - - -

THE COURT: Good morning. We will open the record in the case entitled United States -- or, I'm sorry, *Kenneth Lobell versus Capital Transport, et al.* I'm used to opening the record in criminal cases. I would ask that counsel who are here, along with those seated with them at counsel table, first identify themselves for the record. We'll start with the plaintiffs.

MR. EVERT: Thank you, Your Honor. Jordon Evert, and would you prefer that we remain seated so we --

THE COURT: Whatever you're most comfortable with. It doesn't matter.

MR. EVERT: Okay. Thank you.

MR. PEPPER: Your Honor, Matthew Pepper on behalf of the plaintiff, Kenneth Lobell.

MR. PORSBERG: And Scott Porsberg on behalf of the plaintiff, Mr. Lobell.

THE COURT: And Mr. Lobell, that is --

MR. LOBELL: Kenneth Lobell.

THE COURT: Okay. And then we'll start with the defendants.

MR. COCHELL: Yes, sir. Good morning, Your Honor. Stephen Cochell appearing on behalf of Mr. Denton.

MR. DENTON: Chad Denton.

MR. NYHUS: Your Honor, I'm Chris Nyhus from Pearce and Durick, local counsel for Mr. Denton, and I'd like to introduce Ben Keup, K-E-U-P. He's an attorney at our firm, and maybe after the proceedings are over, we would move his admission into federal court.

THE COURT: Oh, okay. Very well. Well, welcome to all of you and particularly the out-of-state counsel that are here. This is scheduled as a hearing on a motion for a temporary injunction and cancellation of a lis pendens filed on November 15, 2012. I have reviewed all of the pleadings and submissions of the parties before today. We had a telephone conversation last week about the scope of this hearing. The plaintiffs certainly have the burden of presenting evidence, first of all, to support their request for injunctive relief and cancellation of lis pendens, so we'll start with the plaintiffs.

MR. PEPPER: Thank you, Your Honor. Your Honor, we begin our case and, first of all, I wanted to ask if Your Honor would like to have a beginning oral argument, or would you like

7

us to just simply --

THE COURT: I don't really need it, but if you want to provide a short summary, you're more than welcome to do so.

MR. PEPPER: Your Honor, at this point I think we'll just proceed.

THE COURT: Okay.

MR. PEPPER: Your Honor, I call to the stand Mr. Kenneth Lobell.

MR. COCHELL: Your Honor, we request sequestration of the witnesses who are here for this hearing.

THE COURT: Sequestration in a civil proceeding?

MR. COCHELL: That they be excluded from the courtroom during --

THE COURT: No, I understand. I know what sequestration is, but it's rather unusual in connection with a motion for preliminary injunctive relief at this early stage, but I'll grant the motion.

MR. COCHELL: Thank you, Your Honor. That means the witnesses who are in the courtroom need to be outside the courtroom until they're called as witnesses in the case. Thank you.

KENNETH LOBELL,

having been first duly sworn, was examined and testified as follows:

8

## DIRECT EXAMINATION

BY MR. PEPPER:

Q.   Mr. Lobell, could you please state your name and address for the record?

A.   It's Kenneth Lobell, 473 Walnut, New Orleans, 70118.

Q.   Mr. Lobell, can you give the Court a brief idea of what the man camp up in Tioga is?

A.   It's one of the largest, if not the largest man camp. We house anywhere from 1,700 to maybe right under 2,000. We feed them. We house them. It's temporary stays, long stays for oil field workers.

MR. PEPPER:  Your Honor, may I approach?

THE COURT:  Certainly, and you don't need to ask permission to do so in this case.

MR. PEPPER:  Just good manners, Your Honor.

THE COURT:  Yep, absolutely.

Q.   (MR. PEPPER CONTINUING)  Mr. Lobell, I'm going to show you a document which we have identified as P-3. It's a magazine that's published by the Williston Herald. Do you recognize this magazine?

A.   I do.

Q.   Now, does this magazine describe in detail some of the general aspects that you were describing about the man camp?

A.   It does. They did an issue on us just because we're a little bit different than most man camps. We provide services

as if we wanted to be there. They got individual housing, a little bit higher grade of food and things of that nature, so they did a story on us because of the size and the quality.

Q. And is this a widely published newspaper?

A. It's pretty -- it's all through this area, North Dakota.

MR. PEPPER: Your Honor, in connection with the witness's testimony, I'd like to offer and file, introduce into evidence P-3, which is the magazine article regarding the man camp that describes it in detail.

MR. COCHELL: No objection, Your Honor.

THE COURT: Exhibit P-3 will be received.

MR. COCHELL: Your Honor, I am having difficulty hearing both the witness and counsel when he's -- when counsel in particular, when he's up at the podium, so if perhaps counsel could speak a little louder, that would help.

MR. PEPPER: Sure.

MR. COCHELL: Nobody has ever made that complaint about me.

THE COURT: All right.

THE WITNESS: Can you hear me okay?

MR. COCHELL: Or just speak a little closer in the mike.

THE COURT: Just pull that microphone as close as you can, please.

MR. COCHELL: Thank you.

**Q.** (MR. PEPPER CONTINUING) Mr. Lobell, when did you sign a purchase agreement to buy the property on which the man camp sits?

**A.** July 25, 2011.

**Q.** And ultimately did you buy the property and receive a warranty deed?

**A.** I did.

**Q.** Before you purchased the property, did you have a title search done on the property?

**A.** The law firm did that, did the title work.

**Q.** And did Mr. Denton or any other entity show up in the search as having ownership interest in the property other than the sellers from whom you purchased the property?

**A.** No.

MR. COCHELL: Objection, calls for hearsay.

THE COURT: Overruled.

**Q.** (MR. PEPPER CONTINUING) Your answer?

**A.** No, the gentleman that had it, had it for a hundred -- a hundred years. The same family had it. It was farmland.

**Q.** I'm going to show you what we have marked as Exhibit P-2. Do you recognize this document?

**A.** I do. It's a Warranty Deed with my -- my Warranty Deed.

**Q.** I was going to ask, is that the Warranty Deed that you received from the sellers?

**A.** Yes, sir.

11

MR. PEPPER: Okay. Your Honor, in connection with the witness's testimony, I'd like to offer and file and introduce into evidence Exhibit P-2, which is the Warranty Deed for the property on which the man camp sits.

MR. COCHELL: No objection, Your Honor.

THE COURT: Exhibit P-2 is received.

MR. PEPPER: Your Honor, would you like me to start giving these exhibits to the clerk?

THE COURT: Sure.

Q. (MR. PEPPER CONTINUING) Mr. Lobell, after you bought the property, did you -- what was the property -- what did the property look like when you bought it?

A. Just barren farmland, no water to it, no sewer to it, no electric to it.

Q. Was there any -- any other access to water, sewer or electric near it?

A. No, it was coming, but it wasn't near.

Q. So after you bought the property, did you make improvements to the property?

A. Absolutely.

Q. What did you have to do to make this site ready?

A. We basically had to build a small city. We had to put sewer, we had to put -- well, we ran off of generators for upwards of six months. We put a well, and then we put a dome, which we fed and did the laundry in the -- for all the clients,

12

and then we basically put individual module homes.

Q. And in connection with your operation of the business, did you keep records of the money that you spent on the improvements?

A. Every day.

Q. And did you keep a summary of -- an ongoing summary of the improvements that you made to the property?

A. Every week we had a weekly draw that we -- it would get sent down from Tioga to me. The bank in New Orleans would wire the money to Tioga to pay the bills.

Q. Okay. And did you keep a written summary of those --

A. I did.

Q. -- bills that were paid?

A. I did.

Q. Mr. Lobell, I'm going to show you an exhibit, which is marked as P-4, which is a copy of the weekly ledger that you had testified about. Now, you testified that you kept these records in the normal course of business, is that correct?

A. Correct. These summaries are taken off of the draw sheets sent to me by Tioga every week.

Q. Okay.

A. Now, this is only until, I think -- it's only until the first week of November of '12. There's still more.

MR. PEPPER: Your Honor, in connection with the witness's testimony, I'd like to offer and file and introduce

13

into evidence P-4, which is a copy of the monthly ledger -- or the weekly ledger report in summary fashion.

MR. COCHELL: Your Honor, we just want to ask a few questions on voir dire on this particular document.

THE COURT: You may inquire.

MR. COCHELL: Mr. Lobell, who actually keeps the records of weekly draws in your organization?

THE WITNESS: Well, the original draws come to me. I keep them, and then we have a balance -- we have -- I have an accountant and Walter Morales has an accounting group, so we have two groups keeping them.

MR. COCHELL: Okay. And who actually generated this document that's marked as Exhibit 4?

THE WITNESS: I did.

MR. COCHELL: You did?

THE WITNESS: I did.

MR. COCHELL: Okay. So you got on the computer and you somehow put it together, is that correct, sir?

THE WITNESS: What I did, I took the weekly draw and I took -- at the bottom of the draw every week, that's the exact number I sent to Tioga that we had to pay, whether we bought amenities or for services rendered or we paid employees.

MR. COCHELL: So this is your personal summary of the draws and not something that's generated -- this is not generated on a weekly basis, this summary, is that correct,

14

sir?

THE WITNESS: No. No, on a weekly basis you'll have a whole sheet of everybody that's paid out of that number.

MR. COCHELL: We object to the admission of four. It's not a proper summary. It's not kept in the ordinary course of business. We haven't seen the underlying documents.

THE COURT: The objection is noted, overruled. Exhibit P-4 will be received.

Q. (MR. PEPPER CONTINUING) All right. Mr. Lobell, looking at page 1 of Exhibit 4, let's start with the first week, 7/22/11, and the second week, 7/29/11. What was going on in that period in July?

A. I think that was -- it was basically monies put into that to pay Mr. Stabinski and Randy Baker and, I think, Mr. Hansen. That was just some money upfront. When they first came to me, they had no money, and so that was the money that we had put in just to support them to start the project.

Q. How far along did you keep putting money into this project before you started to see any income coming from the project?

A. I think it's at least -- I think we had our first tenants move in sometime in late February.

Q. So the entries for July, August, September, October, November and December of 2011 and then probably January and February were monies that were just out-of-pocket, without any money coming in?

15

**A.** Absolutely. We had some problems because everything just up there is a whole different animal. You couldn't get the subs. I think everybody went into it thinking that, okay, everybody could do what they said they could do, but at that point it was just -- the subs would quit. They would basically charge you too much. Again, we had trouble getting some equipment. You had to run off of generators.

The housing that was particularly picked in the very beginning was not suitable for the climate, so we had to go back and revamp. Mr. Baker had to go up to Indiana and some other places to redesign all the houses. It went from like $60,000 a home to 140,000 a home, so it was just -- it was a learning curve for everybody. I've never been in this business and nor have they been in the business, so we thought we would just build it no problem, but it was just -- it got out of hand.

THE COURT: So who is Mr. Baker?

THE WITNESS: Mr. Baker, Your Honor, is the gentleman who brought me the deal with Mr. Stabinski, Myer -- Randy Baker and Myer Stabinski. I think I saw that gentleman on July 15th, actually. Mr. Stabinski, Myer Stabinski, worked with myself with the BP claim in New Orleans. I was friends with him. He called me in sometime late June, asked if I wanted to put up $6 million into the project. And I immediately told him -- I said, "I won't lend you the money, Myer," I said, "because, you

16

know, I won't do that. I just don't do that in my profession." And he said, "Will you just look at the deal because we're going to lose the property?" And I said, "Yes, I would." And he said, "I'm going to send Mr. Baker down to talk to you about the project."

THE COURT: All right.

MR. PEPPER: And, Your Honor, just as matter of housekeeping at this point, I think a couple of people have filed into the courtroom that may be witnesses. So that we don't have a violation of the sequestration rule, I'm going to ask that some of them identify themselves so they can be seated outside.

THE COURT: Well, both counsel should know who's going to be called as witnesses and what those people look like, so I would ask that you inform those people that you intend to call as witnesses, that they need to remain outside the courtroom until they're called.

MR. PEPPER: Is there a Walter Morales? That would be the only one that I wasn't sure. I had never seen Mr. Morales.

THE COURT: All right.

Q.   (MR. PEPPER CONTINUING) All right. Mr. Lobell, getting back to those monies that were initially put in to build the camp out of -- out of the vast prairie, did Mr. Denton ever contribute any money to the sums that you've spent here?

A.   Absolutely not.

Q.   When did you first talk to Mr. Denton?

A.   I think Mr. Denton -- first of all, you've got to understand I didn't even know who Mr. Denton was, and I got a call.  He was -- introduced himself, I think, on July -- I want to say 23rd.  I think he knows better than I do.  He introduced himself, that he could help with the camp because he had a transportation company and he does trucking.  And he wanted to run the checking account and everything through his company and he could help do that, and I said no.  I said, "I'm opening up new companies because I don't know who you are.  I don't know who Mr. Baker is.  I know who Mr. Stabinski is."  I said, "I've opened up Capital Lodge and Capital Transport in my own name in Louisiana."  And I said, "Thank you, and you know, if I need your services, I would call you."

Q.   Prior to that time, were you aware of any relationship with Mr. Denton and Mr. Baker?

A.   I knew of a person that was involved because when Randy Baker came to me, he said there was a gentleman who was supposed to put up the money for the camp and he was going to buy -- he was going to purchase the land, and he didn't.  In fact, when I was talking to Mr. Baker, that day their contract expired and that's why they were nervous, that they thought they would lose the land.

And they -- Mr. Baker introduced himself as he did

18

the whole thing, he did the budget, he did the project, he did the layout. He's in construction business. He was the gentleman that told me that I only had to put up $6 million. And I said, "I think you're all going to be wrong, but, you know, let's look at it." I said, "I don't want any partners. I will pay you all the salaries, and if it works out, we'll work out something if you're all right." But I said, "You don't have a job, you don't have a job, so I don't know if you all know how to do a man camp, if you're all qualified."

Q. Did Mr. Denton tell you that Mr. Baker owed him some money?

A. Well, in a roundabout way. The first introduction to Mr. Denton was to tell me that I had to watch the guys that came to see me. He said that they work for him and they were not of the -- not very ethical and that they didn't know what they were doing, so I said, "Chad, I don't understand that." I said, "I know Myer. I never met Mr. Baker, but if he is, you know, the proof is going to be in the pudding because I own the company. If he doesn't do what he's supposed to do, then he won't have a job." I then met Mr. Baker -- I mean Mr. Denton again. I think he had went up to -- when he found out that I was going to do the deal and I had no partners -- and, Judge, tell me if I'm talking -- I'm just trying to set a scenario, so if you don't want me to say anything, just tell me.

MR. COCHELL: I'm still having trouble hearing you.

19

Could you maybe just speak a little closer to the microphone, sir?

THE WITNESS: Sure. I'm from New Orleans, so that might be my accent.

MR. COCHELL: Well --

THE WITNESS: I understand.

MR. COCHELL: -- I've heard a few Louisiana accents before.

THE WITNESS: I got you. No, what happened was Mr. Denton had then -- after I spoke to him, going up to North Dakota to -- at that point saying to ask Mr. Baker and Mr. Stabinski and Mr. Hansen to sign partnership papers, and he said he was a partner with them. I said, "If you're a partner with them, Chad, I don't know that." I said, "I've never met you, so I'm only dealing with those people." He then went up to North Dakota and insisted they sign partnership papers. Neither Mr. Hansen, Mr. Baker or Mr. Stabinski agreed to do it. He then got mad. Then he called me, said, "Kenny, I'd like to have lunch with you." I said, "Well, okay. I have no problem with that, Chad. Come see me."

So he and his girlfriend came down. We had lunch. He proceeded to say again how the guys were no good and that you had to watch them and that they owed him money. I said, "Chad, I can assure you, if they owe you money, I'll ask them -- I'll reimburse you money. I'll lend them the money."

20

Well, I called Mr. Baker. He said they did owe him about $60,000. I said, "Randy, if that's the case, I'm going to lend you the money because, you know, if this gentleman put up money for you all and you all owe him money, I want you to pay him back." Immediately I sent him, Mr. Baker, $61,000. He wrote a check to Mr. Denton, and then that's the last I really heard of Mr. Denton until the lawsuit.

THE COURT: So you mentioned a Mr. Hansen for the first time. Who's he?

THE WITNESS: Well, he's another gentleman I never met, but what happened, when Mr. Baker came to me with Mr. Stabinski, they said they had another gentleman that was involved with the camp, and went on paying him $10,000 a month. Well, I thought I was lending him $10,000 a month, but they wanted $10,000 a month as salaries. I told Mr. Baker and Stabinski, I said, "I'll pay you all. I'm going to watch this whole thing from an outsider looking in. I don't know who anybody is in here, but if you all are coming to me with a deal and you say this guy is important, then I'll do it." Mr. Hansen worked with Mr. Baker. I've only talked to Mr. Hansen twice in my life. And so Mr. Hansen was part of their little partnership.

Whatever Chad Denton and Myer Stabinski and Mr. Baker and Hansen had, they were trying to form some -- they were moving oil rigs, and this whole deal came about because

21

Mr. Baker and Mr. Stabinski was going six miles -- I mean, hours a day, driving three hours there and three hours back, and they came up with the idea. Mr. Denton was having to move oil rigs, but they needed somewhere to stay. It was Mr. Baker's idea to get the man camp, so he went and tried to find everything. And then Mr. Denton came in, said he was going to put the money up for the -- for those three to form a partnership.

Q. (MR. PEPPER CONTINUING) And so in conjunction with your discussion with Mr. Denton, did you forward the money to Capital Lodging and have them -- or have Randy Baker issue a check to him?

A. Absolutely, the same week.

Q. Is this a copy of that check made out to Capital Transport in the amount of $61,385.62?

A. Yes, and at the bottom it says "reimbursement."

MR. PEPPER: Your Honor, in connection with the witness's testimony, I'd like to offer and file, introduce into evidence Exhibit 5, which is a copy of the check for the reimbursement of Chad Denton through his entity, Capital Transport.

MR. COCHELL: No objection, Your Honor.

THE COURT: Exhibit P-5 is received. So tell me again, this is money paid to Mr. Baker, who owed 60 grand to Mr. Denton.

22

THE WITNESS: Well, Your Honor, what happened -- and again, all this happened so fast. I had -- you know, when I looked at the deal on July 15th, I asked him when I had to make the decision. He said, "Today." I said, "I have to make a $6 million decision in ten minutes?" He said, "Yeah." He said, "What do you think?" I said, "I'm going to do it." He said, "What?" I said, "I'm going to do it." So I've done things like this, you know, in the past.

But what happened, as far as the money goes, when Mr. Denton, you know, again started saying that these gentlemen owed him money, you know, for housing out there, for moving the rigs and some other stuff, I didn't want any hard feelings with anybody, and so I actually felt sorry for Mr. Denton, if he was trying to do something out there and it didn't work.

Mr. Baker and them, if they owed the money for whatever it is, living expenses or whatever they did, had to do, and they confirmed it, I said, "I want to start a clean slate here. I don't want any hard feelings with anybody. I'll lend you all the money, and then I'll take it out of your salaries." Because Mr. Denton seemed like a nice guy when I met him with his girlfriend. So I said, "If you all owe this gentleman money, let's pay him," so I put "reimbursement" on the bottom. I had them put reimbursement for anything that they did owe so there was no discrepancy on anything that -- who was who in this deal. You know, and --

THE COURT: So you meet a guy one time with his girlfriend and talk about a project up in North Dakota, and you're willing to send him 61,000 bucks just on a --

THE WITNESS: No, I asked Mr. Baker -- because I gave him the money, I asked Randy Baker and Myer Stabinski, was he -- was he owed that money? And they said yes, and I just put it in as part of the cost of doing business.

THE COURT: All right.

Q. (MR. PEPPER CONTINUING) And did Mr. Baker and Mr. Stabinski pay you back?

A. In a roundabout way they're doing it now. I just take it out from whatever they're going to get.

Q. So you've been taking it out of their salary from --

A. Not quite at this point because what happened is Mr. Stabinski and Mr. Baker -- Myer still works on a full-time basis. Mr. Baker works as a consultant because he got real bad diabetes, so he's being paid as a consultant, so we just -- we're going to work it out.

Q. Okay. And at that point did you think that you had resolved any business dealings that Mr. Denton had with your now consultants, Baker and Stabinski?

A. Well, personally I didn't think I had any dealings with Mr. Denton at all because there was no partners. When I -- when I told Mr. Baker and Mr. Stabinski -- there was no partnership. There was no operating agreement. They were not

24

a part of this. If they could do what they said they could do, we would talk about some sort of bonus, a split at the end of the project because, again, I didn't know -- neither one of these guys had a job, no money, and they didn't have any profession. It was just an idea they had.

I've been in business in real estate for 30 years. I wasn't going to put $6 million, which I knew was probably going to be more, for somebody just with an idea and a whim. And they wanted 50 percent of the deal. I said, "I'm not giving any partnership any -- you know, any ownership to something and it doesn't work. I'm stuck out in North Dakota. You all have nothing to lose. You live in an apartment and you live in a house that, you know, is -- you might not have." And they all agreed, said, "We just want the opportunity to show you and to work for you," because they had no money. They had no jobs.

Q. And getting into your experience in the real estate business, is it typical when you buy a piece of property, to put it in your name directly, and if so, why do you do that?

A. Well, I did this purposely because if I sold the company, the land would be in my name. It could be a real estate play where I could keep the land and lease the land too if somebody wanted to buy Capital Lodge.

Q. And have you done this in the past with success?

A. Many times.

Q. When did you first find out about the filing of the notice

of lis pendens?

A.   Well, I didn't know about the lis pendens, but the lawsuits showed up about a year, or so, after Randy Baker told me he was served with a lawsuit.  I hadn't heard it from Mr. Denton or anybody, you know, claiming he owned anything, and all of a sudden he sues Mr. Baker.  And then after that they were trying to serve me, but I was out of town, and I saw Mr. Baker's lawsuit.

But then I was trying to merge with my 10 percent partners, with another gentleman out of New York, and they ran an abstract on the property, so before we could get any monies or sell any part of my ownership, the abstract showed that there was a lis pendens, so two things happened.  We tried to get a $5 million line of credit that was approved, and they found out about it right after the Moraleses found out about it.

Q.   Okay.  And did you have an attorney in North Dakota file a state court action to have the notice of lis pendens canceled?

A.   I did, Mr. Evert.

Q.   I'm going to show you, Mr. Lobell, a document identified as Exhibit Number 1.  Is this a copy of the lawsuit that you had Mr. Evert file on your behalf?

A.   I believe it is.

Q.   In North Dakota state court?

A.   I believe it is.

26

MR. PEPPER: Your Honor, in conjunction with the witness's testimony, I offer and file and introduce into evidence P-1, which is, I believe, already part of the official record, but for purposes of this hearing, P-1, a copy of the original North Dakota lawsuit to cancel the notice of lis pendens.

MR. COCHELL: We have no objection, Your Honor.

THE COURT: P-1 is received.

Q.  (MR. PEPPER CONTINUING) In this suit, Mr. Lobell, is it true that you seek cancellation of the notice of lis pendens and injunctive relief in the form of a temporary restraining order?

A.  Yes.

Q.  How has Mr. Denton's filing of this lis pendens harmed your ownership in the property?

A.  Well, again, it's -- Mr. Morales just walked in, if you need him to step out. Sorry, Your Honor.

Well, it just keeps harming it. We had, first of all, a merger of $45 million that was -- that we have affidavits to that effect that they said they absolutely could not go any further unless the lis pendens was lifted. Then --

THE COURT: But what do you mean, merger of $45 million?

THE WITNESS: Well, they were going to buy some of my stock and input money. See, we're still building the camp. We

still had to put up backup generators for the winter. We had amenities building that we were building, about a 10,000 square foot amenities building. We had boot rooms, mud rooms around the whole thing.

THE COURT: What?

THE WITNESS: Boot rooms, mud --

THE COURT: Boot rooms.

THE WITNESS: Boot rooms, mud rooms, we had all this in the ongoing -- every penny I've made -- I'm not taking a dime out of this thing -- we've put back into the camp. We haven't paid dividends. We haven't paid anything, so we knew that this was an ongoing thing.

Hess Oil Company came to us and said, "We need more rooms. Could you please do something?" We put Phase 3 in effect. Well, putting Phase 3 in effect, they had a $5 million line of credit, knowing it was taking that income to live through the slow months, which was November, December, January and February with this $5 million line of credit. By taking income and building out for Hess because they had to be in, I want to say, by September or late August, we took every penny, so we didn't have any cash flow. And so what happened, we had the amenities building and all that, but I -- and then all of a sudden the lis pendens came. The $5 million line of credit was pulled because they couldn't take the land as collateral.

So now what it's done -- we had three blackouts,

28

complete blackouts for six hours, and we didn't have the backup generators. We could only put the backup generator into the dome. And we have a -- Your Honor, it's a dome, and if you look at the picture, it's 70 feet wide by 20-some feet high by 300 feet long. Everybody has to go in the dome in emergencies because that's the only thing we could do instead of putting in a generator for the whole camp, so he's basically took any form of refinance.

Even the First International Bank and Trust in Watford has given us a line of credit, but they will not go any further. We have 7 million. They were going to do -- we were going to refinance the whole camp, but since this has happened, I had two people that wanted to buy and merge that I've lost. And I had financing, two -- my bank in New Orleans, First NBC, had pulled a $5 million line of credit; and First International Bank and Trust, I can't do anything until I get it lifted. We're trying to do a $15 million refinance right now.

THE COURT: Fifteen, one-five?

THE WITNESS: Fifteen million, mm-hmm. We have seven, and we're going to try to do the whole thing. And I have a gentleman from New York that is trying to purchase it at a reduced price because of the lis pendens, but I may have to do it if we can't resolve some financing.

THE COURT: All right.

Q. (MR. PEPPER CONTINUING) And is it true, Mr. Lobell, that

29

all this financing requires your personal guarantee?

A.   Every loan I have, I'm personally guaranteed on.

Q.   And so as it's your personal guarantee, you have to put up as collateral, property, not just here that's in your name, but property wherever you have it that's in your name.

A.   Because of the missed budget, the budget not being correct, I now have my house up, company. I had to sell part of another company. I had to bring a $10 million partner in to buy some shares, and if I don't get the refinancing, I'm on personally 10 million, 12 million -- I'm on $19 million of personal debt between First International Bank, Fleetwood, and the lines of credit I have in New Orleans.

Q.   But you are -- despite all that, you're still committed to the state of North Dakota to make sure that this project is a success, that you're willing to take on another seven, or so, million dollars?

A.   Oh, yes, we're still building. We can't stop really because we have projects that are partially unfinished right now.

Q.   Has this lis pendens stopped your ability to grow the camp, to fulfill the needs of the drillers seeking to house workers?

A.   We have Phase 1, 2, 3 and 5 completed. We have 4 that we put the infrastructure. We paid about $500,000 in infrastructure and electrical, but we can't put the homes in

30

Phase 4, which are another 500 men, 480 men, and the generators and the amenities building and the mud rooms.

Q. And in your opinion, does this pose a threat of irreparable harm if the defendants are not restrained from further filing any lis pendens on your property?

MR. COCHELL: Objection, calls for legal conclusion.

THE COURT: Overruled.

THE WITNESS: Well, what it's done is that the amenities building was promised. You got to understand, when we first did this -- and you can look in the ads, and even when we did the advertising in the first part of doing this, we have -- we have a weight room. We have things. We had to put it all into the dome because these guys are stir crazy. They have nothing to do, so the pool tables, the little games and the physical workout plant is inside where the guys eat because now all we have is the building. I just got the rest of the money to put a slab in the amenities building, but these guys constantly ask, "Where is the amenities building?" And that's all they're worried about.

What I'm more worried about is in the winter months, when the power goes down and you have these guys sitting in these -- now, nobody really claimed -- you know, filed anything, but the head of each agency, like the Hess personnel calls and say, "What's going on? You know, what happened with the power?" So it's a little embarrassing that you got someone

31

-- you know, it's 12 below zero and they're in there and they're all going to their cars to start their cars to be warm. Now, they could go -- it's not life-threatening in a way it would kill them because they could go in the dome, but it's actually halted the expansion.

And things were promised to these people that are paying $115 a day for these guys, you know, expecting a workout facility and, you know, TVs and all this kind of stuff, but because we have the other services -- you know, we have separate cabins for them and better food and we take care of them. They really want to stay there. They're not going to leave for the amenities building, but when you promise them something, don't think for one minute the head of these Hesses are not asking whether it's coming.

Q.   So if a restraining order is not granted, it will affect the goodwill of your business in a negative manner, wouldn't it?

A.   Well, it would be a definite negative manner as far as the clients go, but there's a lot more serious problem with the money, to keep the cash flow going because, again, you're in the slow months, and without the money here -- we're funding the camp besides still building. Everybody's leases ran up, Your Honor, November 31st. We had like 1,200 people in there. When November 31st came, Hess pulled out --

THE COURT:  November 30th?

32

THE WITNESS: 30th. Okay, 30th. The end of November came. Everybody stops. Now, they'll keep skeleton crews in there, but they won't commit to any long-term leases because if it gets too cold, they still got to pay for that room. So what they do, they might keep 200 people there, but they'll go week to week, month to month, so you have no income and no -- you can't have -- you can't project your cash flow. So by stopping us with all these loans, it's actually -- it's stifled the camp. It's basically strapping us because we can't -- we had to stop building to a minimal. We've worked out deals with the construction people because they know we pay, so I asked some of the guys to give us a favor.

But if this lis pendens is not lifted, it could -- it could actually throw us into a Chapter 11. We would never, ever not pay anybody, and they know this. I've already talked to Sodexo, the big national company that runs our camp. I talked to Fleetwood Homes. I said, "We may have to do it. We're going to protect you all in this, but we just may need a little help." And so if we can make it through maybe the end of March -- the summer it starts picking up again -- we're going to be fine, but we got that little time frame that's very crucial.

THE COURT: So when you say everybody's leases have expired, you're talking about Amerada Hess and who else?

THE WITNESS: Well, we have Hess. We have -- Sanjel

has -- they move out and they come back. We have Sanjel. We have -- we had Nabors. We had Superior. We had -- Reliance has come in. The pipeline company has come in and kind of saved us a little bit. We have Woods. We have -- well, Halliburton moved out and they're coming back in March because they go down -- everybody goes down to skeleton crews, so they go to their own camps, and then they come back into our area. They'll inconvenience the people just because they don't want to -- because you figure if somebody puts in a hundred people, it's millions of dollars. I mean, it's -- it might be a million dollars a month for these people and -- or three million, so they don't want to commit to me, and I understand that. So what we made a deal with them is, listen, you can go week to week, you go day-to-day, don't sign anything. And because we did that and some of the competitors like Target didn't work with them like that, they actually moved over to our camp because they --

THE COURT: Competitors like?

THE WITNESS: Target Logistics.

THE COURT: Target Logistics. Okay.

THE WITNESS: So we try to treat people like -- not so much like a business, but they're helping us and we're helping them.

Q. (MR. PEPPER CONTINUING) So, Mr. Lobell, it's your testimony that because of the cyclical nature of your business,

34

that a line of credit is essential.

A. Well, absolutely. Again, this is my first time I've ever done a man camp, so I don't know how it's supposed to be, but all I do know is that when I first did it with Mr. Baker, he alluded that in the winter months you have more people because they couldn't keep the people out in the snow. And this is one of the things I was trying to tell Mr. Stabinski and Mr. Baker when they did this. I said, "Look, you all never built a man camp. I've never built a man camp, so nobody knows what's going to happen here."

So what does happen, instead of them doubling the crews in the winter -- because they said they're going to work less hours, they don't want to shut the well down. That's not true at all. They shut the well down and they work a skeleton crew, and they put minimal people out in the winter.

Q. To this day, to your knowledge, has Chad Denton ever shown you a written document indicating that he has a claim on title to the property that you bought for the man camp?

A. There's no way he could have anything written from me.

Q. Do you think the public and the oil exploration industry would be better served if Mr. Denton or any of his entities would be restrained from interfering with your property?

A. They would be, and I sure would be too.

MR. PEPPER: Your Honor, we tender the witness.

THE COURT: You may inquire.

MR. COCHELL: Yes, Your Honor.

CROSS-EXAMINATION

BY MR. COCHELL:

Q.   Mr. Lobell, if the lis pendens is lifted, that still doesn't solve the fact that you've been sued in Texas for fraud, breach of fiduciary duty, inducing Mr. Stabinski, Hansen and Mr. Baker for breaching their fiduciary duties to Mr. Baker, isn't that right, sir?

A.   Well, I say the lawsuits, they have put all the allegations.  You all are doing that.  I never did fraud.

Q.   I'm sorry?

A.   I said that's you all's allegations on the fraud.  That's the lawsuits you're claiming, but, yes, the lawsuit will still stay in place.

Q.   And you expressed surprise that this lis pendens showed up, is that correct, sir?

A.   Absolutely.

Q.   Okay.  And with respect to your surprise, you remember the process servers that tried to serve you with this lawsuit over a year ago?  You remember them, don't you, sir?

A.   No, I don't know if it was a year ago.  I travel and do other things in Biloxi, Mississippi, and I told the processor server to meet me there one day, and I didn't go.  That was the only time he was going to meet me, and so if he was supposed to be there -- and he never called back the second time.

**Q.** So you don't recall the process server calling you back a second time and arranging to meet you, and you failed to show that time, sir?

MR. PEPPER: Objection, Your Honor --

THE WITNESS: He may have.

MR. PEPPER: -- relevancy.

THE WITNESS: I don't remember.

THE COURT: Overruled.

**Q.** (MR. COCHELL CONTINUING) He may have, but sitting here you just don't recall?

**A.** Mm-hmm.

**Q.** Fair enough. And do you remember the e-mail that I sent you asking you to waive service of the citation and lawsuit approximately three or four months ago? Do you remember that, sir?

**A.** I do remember that.

**Q.** You do?

**A.** Mm-hmm.

**Q.** Okay.

THE COURT: What does that -- what does it mean, service of the citation? That's a summons?

MR. COCHELL: It's equivalent of a summons under Texas -- and it's accompanied with the lawsuit.

**Q.** (MR. COCHELL CONTINUING) So you didn't execute that waiver of summons, is that correct -- waiver of citation?

**A.** No, actually, I didn't.

**Q.** You did not?

**A.** I did not.

**Q.** Okay. And you had been told after either Mr. Baker or Mr. Hansen were served, that there was a lawsuit pending in Texas, is that correct?

**A.** Well, I knew there was. Mr. Baker called me.

**Q.** And you got a copy of that lawsuit, didn't you, sir?

**A.** No, I had parts of it.

**Q.** What's that?

**A.** I had a page or two of it.

**Q.** A page or two. Okay. And you've been represented by Mr. Pepper for some time, isn't that correct? He's represented you in other matters before this one?

**A.** I did. I do.

**Q.** And Mr. Pepper was aware of the lawsuit because Mr. Pepper represents Randy Baker, isn't that correct, sir?

**A.** He does.

**Q.** Okay. And so you got a copy of the lawsuit when Mr. Pepper undertook representation of Mr. Baker, isn't that correct, sir?

**A.** No, I didn't. I asked Mr. Pepper what it was about, and he told about what Mr. Denton was alluding to, so I knew what was coming.

MR. PEPPER: Your Honor, I object. He's starting to

38

get into lawyer-client privilege. This is a hearing on a cancellation for a notice of lis pendens. This has absolutely nothing to do with what we're seeking here in terms of trying to overcome our proof that they had no interest in the property. What the Texas lawsuit or service of process of Mr. Lobell or my conversations with Mr. Lobell has to do with trying to overcome our proof, I do not see a shred of relevance, Your Honor.

THE COURT: Well, the relevance is somewhat suspect, but the witness already answered the question after the objection was made, so the objection is overruled.

MR. COCHELL: Thank you, Your Honor.

Q. (MR. COCHELL CONTINUING) With respect to -- and so, in fact, we had to get alternative service of process and post that process -- that citation and lawsuit on your door, isn't that correct?

A. I don't remember that. I remember the girl coming up the back steps dressed in short pants and a halter top come to my house.

Q. Okay. And so -- and she served you with the lawsuit then?

A. Mm-hmm.

Q. And did you read the lawsuit?

A. No.

Q. And when did that happen, about four months ago?

A. Yeah, about four months ago.

39

Q. So you got served with the lawsuit, but you didn't read it, sir, is that correct?

A. I read parts of it.

Q. Did you send it on to anybody?

A. I sent it to Mr. Pepper.

Q. Fair enough. Okay. So with respect to this lawsuit, you're saying this is the first time that you ever heard that Mr. Denton was partners with Mr. Baker, Hansen and Stabinski?

A. I didn't say that. I always knew that they had a relationship. Not with me. He does have a partnership or something with Hansen and Baker. I don't know if he had it with Stabinski, but that doesn't pertain to me. Just as I told Chad Denton at lunch, "It's not my deal if Mr. Baker and them owe you money. This is my company. If they do, I can ask them to give it to you, but I can't make them." I did not make a deal with this gentleman.

Q. All right. And so you're suggesting -- you're conceding that there -- that there probably was a partnership between Mr. Baker, Denton, Stabinski and Hansen, is that correct, sir?

A. No, I'm not saying there's a partnership. There's something going on over there because when you ask them, there's no document signed with that gentleman. They think they have partnerships, but there's no paperwork. Mr. Stabinski is livid that every time he says a partnership, there's no paperwork. And if there was paperwork, he wouldn't

have run over there after I talked to him to get him to try to sign something when I was going to do the deal, so I don't know if there's a partnership. That's not for me to say.

Q. And there's -- and it's your testimony, sir, that you didn't enter into a partnership with Mr. Baker, Hansen and Stabinski, is that correct?

A. No.

Q. Okay. And you didn't enter into an agreement whereby you would pay them 68 -- you would -- you would pay them 20 percent -- or 32 percent profit while your debt was being repaid, and you would have 65 percent for a period of time?

A. No.

Q. You never entered into any such deal?

A. No.

Q. You never discussed any such deal with them, is that correct?

A. I discussed the deal, but you have it all wrong.

Q. I'm sorry?

A. I discussed the deal, but you have it all wrong.

Q. Okay. Tell us what the deal was.

A. Okay. The deal was, they came to me on July --

THE COURT: When you say "they," now --

THE WITNESS: Mr. Baker.

THE COURT: Mr. Baker.

THE WITNESS: I'm going to calm down here, okay?

41

They came to me on July 15th. Mr. Baker asked me to go into business. He said there was a gentleman that was supposed to put up the money. I said, "Okay, so what happens now?" He said, "He can't do it. The money man is gone." They brought Mr. Baker to three or four people with Mr. Denton, and I didn't know his name at that point, but the gentleman with the money, and he couldn't put the money together, so he said they would like to work and do a deal. They would like 50 percent of the deal, and I said -- first of all, they came to me and said they wanted $6 million.

Let me back up. Myer called at the end of June and said, "Listen, we have a proposal for you. Would you put up $6 million, get interest rate and get 20 percent of the deal?" I said, "Don't even come, Myer. I won't do it. I'm not a bank. I'm not going to lend somebody money that doesn't know what they're doing and never been in this business." He said, "Well, okay, can we just come down and talk to you?" I said, "Well, if you want to do it, but if you're coming for $6 million, I won't do it." He said, "No, no, we'll do something different. Just look at it. Help us out. You might know somewhere to raise the money."

Mr. Baker came on July 15th. Like I said, he came to me, says, "Kenny, this is the deal. You know, we'll pay you the money. After it's paid, we'll all get 20 percent." I said, "Randy, save your oxygen. I won't lend the money." He

42

said, "What would you do?" I said I'd open my own company. I'd put up $6 million. He said, "We would like 50 percent of the deal." I said, "I know you would, and I would like -- I would like a hundred percent of the deal. I would not put up money if you all don't even have the wherewithal to do this. I tell you what I'll do. I'll give you a job. I'll pay you each $10,000 a month, and let's see who everybody is and what they can do, and if $6 million is all I got to pay up, we'll do some sort of split if we make some money." I said, "But if I got to put up more money, I'm going to fire you," just kidding with him. I said, "So let's see what happens."

Well, as you see, February I got over $15 million with no income coming in. The houses went doubled -- doubled up, so the deal that they projected never was anywhere. And I said, "Listen, you don't have ownership. You'll never have ownership. We may do some share in profits." And you'll see Mr. Baker and Mr. Stabinski, the only two people I talked to about the deal, are going to confirm that, and they confirmed that in the affidavits. I never, ever talked to Mr. Denton about any type of partnership, proposals, 20 percent. That must have been in their book, and it was in their book. That's the deal they wanted to do, but that would never fly. I would not put $6 million for people that don't even have jobs and I got to put 20 million, $30 million in a project. I just don't do that.

43

Q. (MR. COCHELL CONTINUING) So you knew that there was some relationship between Mr. Baker, Mr. Stabinski and Mr. Denton, correct?

A. Yeah.

Q. And you decided that whatever their relationship was, it didn't matter to you. You were going to ignore that relationship in going forward with them.

A. It had nothing to do with me.

Q. Okay. So you knew of the relationship, but you decided to ignore it because you didn't think it had anything to do with you.

A. I didn't ignore it. I didn't -- I didn't -- when I tell them I would go open up a camp of my own, do they want to work for me, they said yes. They had no relationship with anybody.

Q. Now --

A. They became employees, so I had no obligation to worry about whatever they had. They were moving rigs. They were not opening up a man camp. They couldn't do the man camp.

Q. Understood. Now let me ask you, sir, with respect to information, did you get any information from them before you met them on July 15?

A. Yeah, they gave me a book that's all wrong.

THE COURT: They gave you a what?

THE WITNESS: A book, a budget book, project book, a nice pretty book with pictures.

44

**Q.** (MR. COCHELL CONTINUING) I'd like to show you, sir, what's been marked as Defense Exhibit 1 for identification. I'd ask you, sir, if you recognize that document.

MR. COCHELL: One moment, Your Honor.

MR. NYHUS: Your Honor, would you like a copy of these exhibits as well?

THE COURT: Yes, it would be nice.

**Q.** (MR. COCHELL CONTINUING) Do you recognize that document, sir?

**A.** I recognize some of this, but I also see a purchase agreement here made out to Capital Riggers Lodge, and it has $40,000. I never saw that. That has nothing to do with me.

**Q.** You never saw that?

**A.** No.

**Q.** You never heard of Capital Riggers Lodge?

**A.** Capital Riggers Lodge was the name that they put on the application when they needed a name. Mr. Baker said they had to have names. Ms. Jill, or whatever, at the commission office said they had to have a name of something, but it was just a name they came up with. It's never been incorporated. It's nothing.

**Q.** Okay. Do you -- do you understand that that was the predecessor name of Capital Lodging?

**A.** That's the name they were using. My license in Capital Lodge. You can have a -- you can have names, but if you don't

have a company or have -- where did that go to? That doesn't go to anything.

Q. I wasn't asking to argue the point, sir.

A. Okay.

Q. I was just asking you if you understood that to be the name that the -- a predecessor name to what ultimately became Capital Lodging.

A. Mm-hmm.

Q. Okay. And on this particular document --

A. It didn't become a -- it didn't ultimately become Capital Lodging. My company was Capital Lodging. Capital Riggers did not become Capital Lodging. My company is out of Louisiana. I don't know where this company is.

Q. One moment.

A. And let me just tell you about these documents.

Q. Let me just -- let me just ask the questions if you --

A. Okay.

Q. -- would, sir.

A. You asked me about the documents.

Q. This is a -- this is a document that's dated July 11th, 2011, is that correct, sir?

A. Wait. Wait. I'm sorry, what? This document here?

Q. Yeah, Defense 1.

A. Well, you know, I don't know what this is, I mean, because --

46

**Q.** Do you remember getting the e-mail that's sent to you, khlobell@cox.net? That's your e-mail address, isn't it, sir?

**A.** Yeah, it's my -- it came, but I don't remember seeing this because this is the same thing they brought me in a -- in a book.

**Q.** Okay. So but do you believe it's probable that you received this document, D-1 -- marked D-1?

**A.** Yeah. Myer Stabinski, I see, sent it to me. Chad Denton didn't send it to me. Myer Stabinski sent me this evidently.

**Q.** Right, but Chad Denton's e-mail address is on this particular document, Defense 1, isn't that correct, sir?

**A.** Sure.

**Q.** Okay. And so you did know who he was when you first met with him on July 15.

**A.** No, I didn't pay -- I mean, they may have said his name, but it was no -- they never -- they never brought anybody's name up. They were more -- Chad Denton's name did not come up. Randy Baker came to me, said that this was their idea, he and Myer Stabinski. I don't know what happened to anybody in the past. They pitched this thing as that they had the opportunity to open a man camp. I don't even know these people. I know Mr. Stabinski, so I got to believe what they're saying is true. Now, they could have had Chad Denton. They had Chad Hansen. I didn't even know Chad Hansen's name until I got to the bank and they said I had to write him a $10,000 check.

47

Q. Well, let me just invite your attention to the last page of Defense Exhibit 1, where it says "List of Assets."

MR. PEPPER: Your Honor, for clarity's sake, I would ask that the defense mark each page alphabetically maybe at the bottom so there's no confusion as to which page he's talking about.

MR. COCHELL: I think the last -- referring to the last page of the document is pretty clear, Your Honor. We're not --

THE COURT: As long as it remains the last page.

MR. COCHELL: Yes, sir. That's -- that's about all that I plan to ask the witness about.

THE COURT: All right.

Q. (MR. COCHELL CONTINUING) Do you see that list of assets, sir?

A. You're talking about 80 acres of land on Highway 2?

Q. Eighty acres of land on Highway 2, Williams County, North Dakota?

A. Sure.

Q. Okay. And so that was listed as one of the assets of the investment package being proposed by Mr. Stabinski and, to your knowledge, Mr. Baker, is that correct?

A. Well, I didn't look at this, but I'm looking at it now. It says assets. Assets are usually something that's owned. I mean, that was something they were trying to buy or put

together as assets. It wasn't their assets, is what you're saying?

Q. My question was, this was listed as one of the assets in the investment package. Can you answer that yes or no, sir?

A. I see it here, but I didn't see it when I looked -- I didn't see this before. This is the first time I'm seeing this.

Q. With respect to the -- and this is very similar to the document that they gave you, is that correct, when they visited you on --

A. You know, it might be in the book. Even to this day I didn't even go through the whole book because it would just tell me what they needed. And they said they had to buy a dome. They had to buy 80 acres of property, so, yeah, these are things that you have to buy if you're going to do a camp.

Q. I'd like to show you a copy of what's been marked as Exhibit 2 for identification. I'm going to ask you, sir, if you can recognize that document.

MR. COCHELL: There's a copy of the document for Your Honor. Actually, I believe this is the wrong copy. Sorry. No, it is the wrong copy. I'm sorry.

THE COURT: How many exhibits do you have, sir?

MR. COCHELL: I have about -- probably about 15 or 16 exhibits for this witness, Your Honor.

THE COURT: All right. Well, why don't we start

renumbering early in the game and start defendants at 50.

MR. COCHELL: At 50?

THE COURT: Fifty, and you can just scribble it on the document if you're going to offer those exhibits.

MR. COCHELL: What we refer to as Exhibit 1 is now Exhibit 50, and this exhibit is 51. All right.

THE COURT: Well, it's probably easier if we start with D-51.

MR. COCHELL: Oh, D-51, yes, Your Honor.

THE COURT: Then you can at least maintain one of the numbers for each of the exhibits that will be the same.

MR. COCHELL: Okay. So I show you what's been previously marked as -- by the way, Your Honor, we'd move the admission of 51.

MR. PEPPER: Your Honor, I didn't hear anything from the witness clearly identifying the conglomeration of exhibits as something he recognized as the book, only parts of it, so again, we come to the problem of clear identification of which parts of the exhibit that could be admitted based upon the witness's testimony.

MR. COCHELL: The witness did say that he probably got it by e-mail, and he's also ignored a couple -- he's also indicated that he seems to ignore documents when they come in. We believe it was received by the witness.

THE COURT: Well, is Exhibit D-51 the same project

book that you're contending Mr. Lobell received, or is this something else?

MR. COCHELL: It is.

THE COURT: It's the project book? The objection is noted and overruled. I'll receive Exhibit D-51 for whatever purposes it's intended.

Q. (MR. COCHELL CONTINUING) Mr. Lobell -- Mr. Lobell, if you could, please tell us if you recognize this document.

A. Which one?

Q. Fifty-two.

A. Well, as it starts off -- well, you got to understand, at this point it just confirms what's going on. My relationship is with Myer Stabinski.

Q. That's a yes or no question.

A. Okay.

Q. Can you identify this document?

A. I saw the first page from Myer Stabinski. Myer Stabinski sent this one, correct?

Q. Do you -- do you recall getting this e-mail from Myer Stabinski on or about July 11, 2011?

A. From Myer Stabinski, yeah, absolutely do.

MR. COCHELL: Okay. And so we move the admission of 52, Your Honor.

MR. PEPPER: Your Honor, we object inasmuch as I think the witness has only testified as to receiving the first

page. I don't believe there's any testimony being elicited on any other parts of the document that's been listed as D-52, which looks like a conglomeration of --

THE COURT: Well, I don't have the Exhibit 52 in front of me, so I don't even know what it is.

MR. COCHELL: Oh, I'm sorry, Your Honor. I thought I gave you a copy. I apologize.

THE COURT: You gave me a copy of Exhibit 51.

MR. COCHELL: That's 52. I have it remarked, Your Honor.

THE COURT: So, Mr. Lobell, did you see all seven pages of Exhibit --

THE WITNESS: Well, Your Honor --

THE COURT: -- 51 -- or 52 I should say?

THE WITNESS: And again, this -- I'm not saying this isn't it. It looks like it is, but this is dated July 11th. This is when they were trying to get me interested in a deal, so, yes, they could have sent this. This is parts of their pitch book that I didn't agree to because I see it right here on the first page, so I'm assuming it's all the same because I didn't even go through all -- a budget is only as good as you want to make it to be, so, yeah, this is probably it.

THE COURT: Objection is overruled. Exhibit D-52 will be received.

Q. (MR. COCHELL CONTINUING) And, of course, on page -- on

52

the third page of that document, 52, that refers to startup financials; land cost, $816,000, is that correct, sir?

A. Yeah, it is. It says it.

Q. Okay. And, Mr. Lobell, you did not ask any questions on July 15th about whether they had a partnership that included Mr. Denton. That was just something that you decided that wasn't your problem, is that correct?

A. No, I didn't ask the question, but they told me there was -- you know, there was no partnership.

Q. They told you they didn't have a partnership with Mr. Denton?

A. No, they said -- no, they didn't tell me they had a partnership. There was no partnership that was coming to me. I'm sorry. I misunderstood your question. I don't know what they had with Mr. Denton. They were just looking for somebody to do this opportunity with them.

Q. I see. And so did you ask them -- did you have an understanding of how long they spent up in North Dakota developing or getting the groundwork laid for this project?

A. No.

Q. You didn't realize that they had spent two-and-a-half or three months getting -- identifying the land, getting the water permit, getting a conditional use permit, pulling together marketing information such as the information you got here? You have no understanding of that one way or another?

53

A. I don't know if they spent two months or two years. They came to me with an opportunity and they needed money, and they were going to lose their opportunity, so I don't know how long it took them.

Q. All right. And so with respect to all of that, you entered into this deal with them where you had no obligation to them, but you got all the benefit of all the work that they had done prior to approaching you, is that correct, sir?

MR. PEPPER: Objection to the form of the question. The predicate assumes facts not in evidence or testified to, Your Honor.

THE COURT: Overruled.

THE WITNESS: If I had to do over again, I wouldn't do it because what they brought me -- you're saying I had all the upside? I had $34 million in here. They said I needed 6, so what opportunity -- I wish Mr. Denton were to come in and participated. I was looking for investors, so there's no upside in here. I don't get money for two-and-a-half years.

Q. (MR. COCHELL CONTINUING) All right. But my question, sir, is that these -- you're telling the Court that these gentlemen did substantial work as far -- you don't know one way or the other --

A. No, I didn't say that.

Q. -- if they did substantial work.

A. I don't know what they did.

54

**Q.** Okay. But if the evidence showed they did substantial work and they came to you and said, "Please give us a job," that's -- that's how you viewed the situation, that they weren't --

**A.** No, I viewed the situation that if I'm going to put $6 million into something with somebody I don't know, I'm not giving them a partnership. They have -- they have to prove themselves. At the very end of everything, neither one of them proved themselves, nor did Mr. Hansen. They went millions over budget. Mr. Baker had to quit. I had to bring in other people. Every sub they had, I had to redo two and three times. We're probably $5 million over budget because these guys knew what they were doing? No, they didn't, and I knew because I've been in business long enough that this stuff happens, just because somebody has a good idea.

So if Mr. Denton would've wanted to come in and if they would've said, "I'll hold this and I'll pay you, Kenny, anything over," in hindsight -- like I said, being in New Orleans and putting $34 million into a city, you know, this whole budget -- that's why I didn't look at this, because I knew it -- I put my own budget together. I do subdivisions now. I knew they were wrong, but they had a good idea.

But I don't know what they did because let me tell you, we had to get our own permit. The water bill is in our name. The electric bill is in my name. Just because Mr.

55

Denton did all this and couldn't do it, that doesn't mean -- that's the price of doing business. I do this every day of my life. I put hundreds of thousands and it doesn't work, so you can't be rewarded if you can't do it. Now, Mr. Baker still, just so you know -- when he comes, you can ask him. He was the guy who brought the deal. It wasn't Mr. Denton. Mr. Denton was supposedly a money man. Mr. Baker alludes he was the project. I don't have any reason not to believe this gentleman.

**Q.** Let me ask you something, sir. Don't you use people to negotiate deals for you or to, you know, break the ice in trying to discuss deals with other partners?

**A.** No.

**Q.** Okay. But your lawyers negotiate the details of deals for you, right?

**A.** Ask my lawyer if he negotiates. No.

**Q.** Okay. And so you never use agents acting for and on your behalf when you do business?

**A.** You know, I might use an agent, but I don't know if Mr. Baker -- he never alluded that he was agent of Mr. Denton. Mr. Baker said he was the deal, and Mr. Stabinski said he was the deal. I don't have -- I don't know these people. I don't have any -- like if I want to buy a house -- I don't know if Mr. Denton tried to buy the house before I did. The house is for sale right now.

56

Q. All right. And so let me ask you this. You met with these fellows on July 15th, and then would you say that you reached an agreement with them about a week later? Is that correct?

A. I would say so.

Q. Okay. And so at that point, on or about July 23rd, a deal -- a firm deal, you know, going forward where you would be the owner of everything and you would give them money if you felt at the end of the day that they deserved some money --

A. No, they had to prove themselves because, again, you have two guys that are unemployed, talking about a $34 million operation that haven't made $100,000 a year. I mean, so -- I mean, I know what I'm dealing with, but I'm the kind -- look, I went into BP and spent $22 million and didn't know what I was doing, but it ended up being okay. I don't -- I don't mind taking chances, but I also know what I'm dealing with, so the opportunity was good. I had some free time. The way I was going to invest in it seemed like a good idea, but I knew I'd have to go in here and it was a lot of risk, and there still is a lot of risk.

Q. With respect to this relationship with Mr. Baker and Mr. Stabinski, before you jumped into this deal, you didn't conduct your own due diligence to see who Mr. Baker was or to really figure out whether that deal was real, other than just talking to them, isn't that correct?

57

A. No, that's not true. I looked at Mr. Baker. I Googled him, and I -- and Mr. Stabinski vouched for him, that he was a fair guy. I met him. He seemed like he was honest. He was in the construction business. I knew I could do the -- I knew I could take it over. I mean, I didn't give them full rein. I'm in the -- I'm in the real estate business. He just had an idea, knowing -- I knew he couldn't do it probably and I knew I'd have to come probably do it. And I brought Mr. Boudreaux in to run the whole company when I had to -- when Mr. Stabinski got sick -- I mean Mr. Baker.

Q. With respect to Mr. Baker, you did not have him enter into an agreement with you for employment or consultation with you, did you, at that time in July of 2011?

A. Yeah, they both got ten -- before they walked out of New Orleans, I gave $30,000 because they had no money. They each wanted $10,000, so I think that was an agreement. They worked for me.

Q. So it's not a written agreement where they say --

A. No.

Q. -- Kenny Lobell is taking over this project and we waive any right, title or interest in the project. You didn't do that, isn't --

A. They didn't ask me that --

Q. -- that correct, sir?

A. -- because I owned the company. I bought the land. I

opened my company. I gave them a job, so why should I have to ask them. They have rights to what? They don't -- they didn't give me anything. They gave me an idea. That's what they gave me. Everything they gave me was not right anyway. They almost jeopardized us with the permit and everything else, so you think this is a finished package. Here, go get $6 million. You still -- they say we make 43 million a year.

Q. I'm not trying to argue with you, sir. I'm just --

A. Well, you --

Q. -- asking you a question.

A. Okay.

Q. You know, I just asked, you did not clarify in writing what your relationship was with them for bringing you an idea that had multimillion-dollar potential, isn't that right? Isn't that right?

A. No.

Q. Okay. You did not have anything put in writing in July of 2012 or August of 2012 or September of 2012, indicating to Mr. Baker and Mr. Stabinski or Mr. Hansen, I am taking over this project in its entirety. I appreciate you bringing the deal to me, but you don't share in any profits. You'll be my employees, or words to that effect?

A. No, I didn't.

Q. Nothing like that.

A. No, because --

MR. PEPPER: Objection, Your Honor. Objection to the form of the question in terms of relevancy. Again, we're talking about a cancellation of a notice of lis pendens. What Mr. Lobell decided to do when he paid Mr. Baker, Mr. Hansen and Mr. Stabinski has nothing to do with Mr. Denton or for that matter any one of the entities that he is claiming have an interest in that property.

MR. COCHELL: If one takes a one-sided view and just prejudges that everything they say is true, then that might be a relevant objection, Your Honor. The issue of relevance is broader, however, because we allege and have alleged for some time that there was a partnership by Baker, Stabinski, Denton and Hansen, that this partnership came to him with an investment package listing this property as an asset, and he accepted that deal going forward. He agreed.

And we haven't gotten to a couple things, but he agreed to, you know, an alternative arrangement where he would be listed as the owner. However, they would have an operating agreement, and we contend that he reneged on that agreement and that he cut out Mr. Hansen -- Mr. Denton as soon as he got all the permits and licenses and all of the benefit of the work that he had funded and so on, so while I understand counsel would like to continue this objection, we'd like to continue asking the witness questions which go to our case.

THE WITNESS: I'm okay answering that.

60

THE COURT: Objection overruled.

Q. (MR. COCHELL CONTINUING) All right. Now, Mr. Lobell --

THE COURT: Are any of these so-called partnership agreements in writing anywhere, or are we just talking about e-mails and thoughts and plans and ideas?

MR. COCHELL: E-mails, budgets, plans, verbal agreements between people and people performing on those agreements, which is quite important, as I'm sure Your Honor understands that. And I think the evidence will show that there was reliance on the promises made and the conduct that was consistent. This is a de facto partnership, Your Honor, which is recognized in Texas, and I also believe in North Dakota as well.

THE COURT: De facto partnerships?

MR. COCHELL: De facto partnerships.

THE COURT: Continue with your questions.

MR. COCHELL: Thank you, Your Honor.

Q. (MR. COCHELL CONTINUING) Now, Mr. Lobell, you currently have an agreement with Mr. Baker, is that correct?

A. I have an agreement with Mr. Baker. He got sick, and I got an agreement with Mr. Baker that would still pay him his consulting fee. I do have that agreement. That was the only agreement, but I'll go back to your other question. I had 250 people working for me. Not one has an agreement when I pay them as an employee or a consultant. There's no contract. I

have Mike Boudreaux I paid $150,000 a year. He doesn't have a contract with me. He works for me.

Q. Okay. Thank you. With respect to Mr. Baker, have you entered into a written agreement with him as a consultant?

A. Yes, I do have that. No, that's --

Q. So he's the first one out of 250 employees to get a written agreement. Is that what you're saying, sir?

A. No, he wanted an agreement because he was sick, and so what I told him, that he doesn't have right to come back and sue me or do anything. This is -- he got sick. He wanted something in writing to protect him, so I did, so I'm paying him his $10,000 a month for a year-and-a-half. I forgot exactly, and he gets his truck, because when they came to me, Mr. Stabinski and Mr. Baker, I told them that they could have their trucks. The company would pay for their trucks if they worked, and when they got paid off, I would give them their trucks.

Q. I see. Have you had occasion to -- but you do have this in writing, is that correct?

A. Mr. Baker?

Q. Right.

A. Not the first one, the second one. Not his employment when he came to work.

Q. I understand.

A. Okay.

**Q.** Okay. The second agreement is in writing and it provides for release of all claims against you, to come back against him for any reason.

**A.** No, I don't know if that's what it says. I don't know if that -- I got to see what it says. I want to see that.

**Q.** Why were you concerned with Mr. Baker suing you?

**A.** I'm not -- I'm not concerned about him suing me.

**Q.** Okay. With respect to Mr. Baker, have you ever threatened Mr. Baker --

**A.** No.

**Q.** -- if he didn't -- if he didn't come here to testify today?

**A.** No. You ask Mr. Baker that. I don't threaten anybody.

**Q.** Okay. And have you promised anyone money in exchange for their testimony here today?

**A.** Absolutely not.

**Q.** Okay. And did you make any offer of compensation, either directly or indirectly through Mr. Baker or through Mr. Pepper, offering to pay $20,000 to Chad Hansen --

**A.** No.

**Q.** -- if he signed one of your affidavits that you filed with the Court?

**A.** No. May I explain?

**Q.** Well, I asked --

**A.** Okay.

63

Q. -- the question.

A. Well, Mr. Morales, the gentleman that's going to be here with the gentlemen that are in here right now, their lawyer prepared an affidavit for Mr. Hansen because they are trying to work a deal with you and that gentleman right there. You know they've been trying to do it for the last month. They had Mr. Hansen -- I fired Mr. Hansen because there was something going on with the landscape and things like this. I didn't feel comfortable with it. I found out something, so I terminated him because I was paying money to everybody that I didn't know I was paying, and it was up to hundreds of thousands of dollars a month. Mr. Hansen was fired, okay? And so -- terminated, but I still paid him after he was terminated, just so you know too.

Q. How long?

A. I don't know. Maybe four months, five months.

Q. So you paid him $10,000 for four or five months?

A. No. No, I only paid him 2,000. I paid him $10,000 for months and months, and then I started finding out -- when I finally could see who could do what, I was asking Randy what's -- he was basically Randy's secretary. I mean, there was no value to these people, and you can see that I'm writing, you know, a million-three a week -- a week.

So what happened was Mr. Morales' lawyer prepared an affidavit to give to Mr. Hansen because they didn't want

64

Mr. Hansen -- just like they're trying to get Mr. Denton not to sue them if I sell them the company. You can come sue me. So they were saying they didn't want Mr. Hansen -- that affidavit was prepared by them, and Mr. Morales will attest to that, and I sent it to Randy. I wasn't paying -- I didn't care if Mr. Hansen testified or didn't because he's got to tell the truth. I never talked to Mr. Hansen about this deal, by the way. It was only Myer and Mr. Baker.

Q. All right. Now, so you paid -- you terminated Mr. Hansen for what you thought might be -- might be theft or might be --

A. I just wasn't comfortable with everything.

Q. Huh?

A. I just terminated him because I wasn't comfortable with what was going on. There was too much money going back and forth. And the last thing was I called the landscape company. As soon as I questioned Mr. Hansen that it was too expensive, the bill went down by $5,000. I felt uncomfortable, so I don't know if he did something, but I told Randy -- Randy will attest to this. He was going 300 miles an hour. Randy could not run the project. People were overcharging us. There were kickbacks. I took charge of my own project and I said, "Randy, it's got to stop." He had a maintenance man making a $150,000 a year. I said, "It's got to stop."

Q. Did anyone send him a letter saying, "You're terminated for cause"?

65

**A.** No.

**Q.** Okay. Did Randy -- was Randy instructed to tell him that he was terminated for cause?

**A.** I told Randy, I said, "We don't need Mr. Hansen anymore. We can't keep spending $10,000 a month."

**Q.** So a guy who did a terrible job for you and may have even been stealing from you, you continued to pay him $2,000 a month for several months after he was terminated, is that correct?

**A.** That's exactly how I paid him the $61,000. Yes, I did.

**Q.** All right. And he has been gone from the project since about November or December of 2011, is that correct, sir?

**A.** I believe. I don't know.

**Q.** Okay. It sounds about right to you?

**A.** It does.

**Q.** All right. Then all of a sudden out of the blue, Walter Morales is concerned about whether he was terminated for cause over landscaping? Is that what you're telling the Court, sir?

**A.** No, I'm not saying that at all. Walter Morales is worried about everybody suing him if -- it's okay for Chad to sue me, okay? I don't care, but if I sell the company, they're worried about everybody in -- Chad and Mr. Hansen, the hostile guy that's going to be against me because I let him go, and Mr. Denton, who I don't even know, suing these gentlemen, coming back and suing them and me. That's what they're worried about, so they want an affidavit signed.

66

**Q.** Okay. So you're laying this off on Mr. Morales, but isn't it true, sir, that Mr. Pepper drafted that affidavit and forwarded it to you?

**A.** Mr. Pepper took their -- their draft and forwarded it to us.

**Q.** I see.

THE COURT: Somebody needs to tell me who Mr. Walter Morales is because that name just surfaced.

THE WITNESS: He's -- Your Honor, he's my 10 percent partner that they're recovering -- they're 10 percent partners. They're trying to buy me out right now and make the camp bigger because they have a hedge fund or some investors that are coming in.

THE COURT: When you say "they," who are you referring to?

THE WITNESS: Well, they had BlackRock, a big hedge fund out of New York. They had White Oak. They have --

THE COURT: They have these entities in line. Who is "they"?

THE WITNESS: They, Moraleses. The Moraleses have these funding agencies in place.

THE COURT: All right.

**Q.** (MR. COCHELL CONTINUING) Now, when he forwarded it to you, did you ignore the e-mail or did you read through it?

**A.** I'm sorry. What are you talking about, the affidavit?

67

Q. When Mr. Pepper sent you the e-mail -- let me mark the document, if I may. For the record, this is an e-mail chain that starts with Mr. Pepper to Mr. Lobell and then on to Mr. Baker and then to Mr. Hansen, and then he forwards it to Mr. Denton. I show you this document, sir, and ask you if you recognize that document.

THE COURT: What document is it?

MR. COCHELL: This is Number 53, Your Honor, Defense Exhibit 53, which purports to be an affidavit that looks very similar to some other affidavits filed with the Court, as well as a release and settlement agreement.

THE WITNESS: This was a document drafted by Jose Canseco that was sent to Mr. Pepper, and it was not my idea about $20,000 because I knew Mr. Hansen was not going to be friendly to me. They wanted to help Mr. Hansen to try to get him not to sue them.

Q. (MR. COCHELL CONTINUING) So why -- why would they think that Mr. Hansen is going to sue them?

A. Why would they think Mr. Denton would sue them? Because he does sue.

Q. But does Mr. -- has Mr. Hansen filed a claim against you or against them?

A. No.

Q. In fact, he's a defendant in the Texas case, isn't that correct, sir?

68

**A.** And he's a witness for you all.

**Q.** Yep. Okay. So -- and this doesn't say anything about any problems with the landscape. It's just very general, this settlement agreement, that there's a disagreement for payment of services and issues surrounding his services that have never been resolved.

**A.** That was one thing. There was a lot of other things. There was no -- there was no value to Mr. Hansen.

**Q.** Oh, I see.

**A.** I was paying a million people that -- I finally caught on to like nobody was doing anything, and Mr. Baker -- these were friends of Mr. Baker, and I don't think he wanted to tell me.

**Q.** I see. Now, with respect to this -- a couple issues with respect to your testimony, you mentioned earlier that you had paid Mr. Denton after you met with him in New Orleans, is that correct?

**A.** I believe -- I didn't pay Mr. Denton. Mr. Baker paid Mr. Denton.

**Q.** Okay. I see. But you authorized the payment. You wanted him to be paid, correct?

**A.** Yeah, because the gentleman said he was out the money and he felt like he was -- you know, it wasn't fair that he supported them and he -- but again, that's their partnership, but I did do it because I didn't want any hard feelings with any one of these guys.

Q. During -- you met with him on August 31st of 2011, is that correct, sir?

A. I don't know the date.

Q. Okay. But it's around that time frame?

A. I would say so.

THE COURT: Met with who?

MR. COCHELL: Met with Mr. Denton. I'm sorry, Your Honor.

THE WITNESS: He insisted a meeting.

Q. (MR. COCHELL CONTINUING) All right. And so you met with him and his girlfriend, Tammy. Do you recall that?

A. They were very nice.

Q. And you admitted to him -- do you recall admitting to him that you had agreed to a 68 percent, 32 percent deal with Mr. Stabinski and with Mr. Baker, and that the 65 percent would go to you while your debt was repaid, and after repayment, each of the five partners would get 20 percent of the net profit? Do you remember admitting that to him, sir?

A. No, I didn't say -- that was never the deal. You got part of it right. If they could do what they said they could do, we would do a 68/32 split. It was me -- I actually participated in the 32 also. It was Chad Hansen. It was Myer. It was Randy, and it was myself. It was never Mr. Denton, and I -- and Mr. Denton was mad because he said, "They owe me. I should be partners." And I told him, and he will say this today, "If

70

they owe you money, all I can do is ask them to pay you money. You're not in their partnership because they don't have a partnership with me. I own the company."

So to go back to your question, it was never once it was paid they're going to get 20 percent. I never said that. What they would do is that when the bills were paid, if there was profit and they did what they said they could do, we would do some sort of split. There was nothing signed. That's why I didn't sign anything, and I did tell him it would be sort of like that. And his question to me says -- he said, well -- I told him, I said, "These guys are not businessmen and they don't know -- they can't run a company. They don't know what they're doing, but if they -- if they happen to do it and they come close, I'll give them some money."

Well, what happened was they all quit -- or, I mean, it was somebody's idea, and he said -- and then he used that against -- they weren't in business and I took advantage of them. That wasn't what I was saying. It was that I knew they couldn't -- once it started -- by the time August came, I was already 500,000, 600,000. The next month I was $4 million, the next month, and so right off the bat what they told me I had to do out of this supposed budget book was already blown by the first two months, and that's what I told him.

And he -- and he met me to tell me how bad they were, not how good they were and how they were partners, how they

were -- they were no good, they were unethical, they would steal, they would cheat, they robbed him of money, and that's when the money came up. I said, "Look, if you have this hard feelings, let me know what it is. I'll make them pay you," and I did.

Q. So you're testifying here today that Mr. Denton told you that these are -- he used the words that they cheat and they steal?

A. In so many words he said -- he said that they -- they basically were not treating him fairly and that you had to watch them. He did say that.

Q. Okay. Well, I'm just asking, what specific words are you saying --

A. I don't know what specific words. He alluded that they were no good and why am I going to hire them, and I acted like, well, why did you hire them.

MR. COCHELL: I see. And with respect to Exhibit 53, we offer Exhibit 53 into evidence, Your Honor.

MR. PEPPER: Your Honor, again, it's a multipage document. I think there's been no testimony as to the first page of the document as being received by Mr. Lobell, actually, and as to the affidavit, actually, that he saw these or had these documents, so, you know --

THE COURT: The objection is overruled. D-53 will be received.

72

**Q.** (MR. COCHELL CONTINUING) With respect to -- with respect to Mr. Hansen, to your knowledge -- strike that. The terms of Mr. Baker's agreement with you, you said he got sick. How is he sick, do you recall?

**A.** Well, what happened, the stress got to him because I think he realized he was way in over his head when -- when I was writing $4 million a month and it kept going on and on and on. And I think part of that, his nerves got -- he has Number 2 diabetes and he couldn't fulfill the job, so part of it was nerves, part of it was he was over his head, and part of it, he had to get the hell out of there.

**Q.** Let me ask you this. Do you know if the offer to Mr. Hansen for $20,000 went up to 30,000 like a day later?

**A.** I never made the 20,000, so I don't know.

**Q.** You never participated in authorizing the 20 or the 30 thousand dollars?

**A.** I never offered him anything. Mr. Morales just -- Randy Baker alluded that Mr. Hansen needed some money. He told me that. I told Mr. Morales that. He says, "Well, maybe we'll compensate him because if he needs money, we don't want him to come back to sue us."

**Q.** So 14 months after he left the job, there was a discussion about Hansen needs some money, so let's -- just as you're coming up on this hearing, there's a discussion, let's -- let's get this affidavit and let's get a release from him. Is

73

that --

A. Yeah, 14 months later --

Q. -- what happened?

A. Fourteen months later I talked to Mr. Baker, and Mr. Morales asked me if he would sign an affidavit because he was tired of just people putting arbitrary lawsuits against everything, and this was another one that could be lingering out there, so he asked me -- and he said we'll compensate him. And the 20,000 is not for the affidavit, as you see. The 20,000, if you should have any such future claims, they didn't want him to sue.

Q. But they sent him the affidavit along with the offer, so that they knew -- he knew that he had to sign an affidavit to get the release and settlement, isn't that correct, sir?

A. He didn't have to sign anything. He doesn't have -- he didn't sign it, as you can see. I didn't make him. Mr. Morales didn't make him. He doesn't have to sign it.

Q. Fair enough. So he didn't get the money because he didn't sign the affidavit, is that correct?

A. Well, I don't know. I mean, he never got back to us. He just didn't do anything.

Q. Isn't it true that he communicated with Mr. Baker that he wasn't going to perjure himself or give false testimony in a courtroom proceeding?

A. Well, I don't know if he did that, but we don't want him

74

to perjure himself. If that affidavit wasn't right, he shouldn't sign it.

Q. Isn't it true you told Mr. Baker to make that offer of $20,000 to get the affidavit from him?

A. They had, I think -- I don't even know what it says. I think it says it in there, that he has $20,000 for any -- any future claims. That's what they're buying. They're not buying for the affidavit. I think it says it. Hold on.

Q. And when he didn't immediately accept the $20,000, you authorized Mr. Baker to offer him $30,000, isn't that correct, sir?

A. I don't know if I did, but if Mr. Morales wanted to give him more -- Mr. Morales is tired of being sued. He's involved with this lawsuit at ten -- he doesn't even know about Mr. Denton. I asked this man for $10 million. A year later Mr. Denton comes and sues us.

Q. Let me ask you something, sir. You've made it sound like you're getting nothing out of this refinancing and that you all have been trying, through Mr. Morales, to come to some arrangement with us, but have been unsuccessful. Let me just kind of --

MR. PEPPER: Objection to the form of the question.

MR. COCHELL: Let me rephrase the question. Let me just withdraw that, rephrase the question.

Q. (MR. COCHELL CONTINUING) In fact, there is a major buyout

of your interest in this property and -- which is going to --
the property and the land is going to be transferred to another
group called, I believe, MC (sic) Credit or something like
that? What's the name of the group?

A. Well, they're trying to do that. I'm not -- they're
trying to do it. I'm not saying I'm accepting this.

Q. I understand that, sir. What's the name of the group?

A. M6 Partners.

Q. Okay. And so they're going to take over the ownership and
the operation of the man camp under this agreement, isn't that
correct?

A. Well, they want to because I may have to sell it.

Q. My question, sir, is, they are taking over the operation
and the ownership of this group, which includes the land and
the man camp.

A. If I sell it.

Q. Yes.

A. If I sell it.

Q. Okay. And you want to sell it, correct?

A. No, I don't want to sell it. I'm not saying that. I may
have to sell it.

Q. All right, so -- and the major reason that we're here
today is that there's a lis pendens, and you weren't able to
consummate the sale with M6 Partners, isn't that correct?

A. No. One of the main reasons is I lost the $5 million and

I can't refinance. I had to go to them to see if they wanted to buy it because I'm going to be negative cash flowing because of the lis pendens, so I offered it to them, and we had a $45 million opportunity. They're down to 25, which at the 25 I walk away with like $6 million, and I'm making 3 million -- I don't want to sell it, but if I have to sell it so they -- you all are making me sell it at a loss. The value is way more, but nobody wants to touch it with this lis pendens, the bank or anybody. These are the cheapest guys on the block.

Q. So at the time of closing you get $12.5 million directly transferred to you, isn't that correct, under this deal with M6 Partners?

A. Absolutely, and how much do you get out of $12.5 million? Would you like to know?

Q. And my next question, sir, is, you get paid another $12.5 million over a period of five years from M6 Partners, is that correct?

A. Absolutely.

Q. And you have claimed --

MR. PEPPER: Objection to the line of questioning, Your Honor. For the most part it's all speculative because the deal has never been done.

THE COURT: I understand that. The objection is overruled.

Q. (MR. COCHELL CONTINUING) Okay. And one of the -- one of

77

the requests was that you come forward with documents to show -- because what -- what loans you have, that personal indebtedness to which you have to devote the $12.6 million that's transferred to you --

A. Yes.

Q. -- isn't that correct?

A. Absolutely.

Q. You've been asked for those documents, but you haven't given them to us, correct?

A. No, I didn't.

Q. And that's why a deal hasn't been done, isn't that correct?

A. No, absolutely not.

Q. I see.

A. Let me tell you what happened. You have the documents. You have audited statements. I spent $30,000. It says I have 8,000 -- $8 million in there. The other 3 million, 3-and-a-half million I got to pay taxes. Out of the 12-and-a-half million dollars, if I sell it, I get zero. I get money over five years. Do you know if I keep it, I make millions of dollars? But your lis pendens is either making me go into Chapter 11, sell it, or I've got to get it refinanced.

Q. Sir, apparently you're not aware that we requested copies of the underlying loan documents.

A. You didn't request -- I gave them everything. Let me tell

78

you what happened here, and you --

**Q.** You don't know one way or the other whether those loan documents have been provided to us, isn't that correct?

**A.** Because I -- you didn't ask me for them.

MR. PEPPER: Your Honor, as far as I know --

THE WITNESS: You asked if the gentleman is trying to buy the camp.

THE COURT: You know what, this court reporter can't take down --

THE WITNESS: I'm sorry. I'm sorry.

THE COURT: -- speaking and talking from three different people at the same time, unless she's superhuman, and she's super, but she's not that good, so let's slow down. Let's ask questions. Let's wait to answer the questions until the questions have been completed. If there's an objection, let's hold off on talking while the objection is made so that I can rule on the objection, please.

MR. PEPPER: Your Honor, in this proceeding we object as to this line of questioning as to relevance because there has been no request for production of documents in this proceeding. And as far as discovery in the Texas case, the case is in limbo because there's a question of whether they have jurisdiction in Texas at all, so there's been no discovery transferred.

THE COURT: Well, the objection is overruled, but I'm

79

wondering how much time we're going to spend on a hopeful $25 million project with M6 Partners and what that has to do with the issues in this case.

MR. COCHELL: Your Honor, I got into it because Mr. Lobell was portraying himself as someone who is a victim, that we're holding up the project and that the lis pendens couldn't have been removed. It could have been, and that's -- that's the point I'm making, that I made those requests, and he's suggesting that I should have made those requests to him, and so we're going --

THE COURT: Are you representing M6 Partners as well?

MR. COCHELL: No, Your Honor, I'm not, but I'm --

THE COURT: So why would you be requesting financial documents from Mr. Lobell in connection with a deal with M6 Partners?

MR. COCHELL: Because they were making representations to me that he had outstanding loans that weren't listed in the company books that they had no copies of, and therefore, they couldn't verify the amount of the debt that he claims he has to pay off in the wake of a closing, and we're not filing a lis pendens to tie everything up. We're not trying to be unfair to Mr. Lobell. What we're trying to do, if we were able to reach an agreement, is to reserve an amount that will cover our damages. And if he's got huge debt, let's see proof of it rather than somebody making representations,

80

which obviously we have concerns about. And so we're here in court, and for the first time we get a lot of information from Mr. Lobell. That's fine, but for him to come in and portray himself as a victim -- he's been in constant touch with his partner, Walter Morales, about this. Mr. Morales has been representing Mr. Lobell.

THE WITNESS: No.

MR. COCHELL: Not representing him formally, but through Mr. Canseco.

THE COURT: Mr. Morales is an attorney?

MR. COCHELL: Mr. Morales, I think -- I don't know if he is or not, but Mr. Canseco is an attorney and I have talked to --

THE COURT: Jose Canseco, is that who we're talking about?

MR. COCHELL: Exactly. Exactly.

THE COURT: Well, let's get back to this case in North Dakota.

MR. COCHELL: Yes, Your Honor, we'll move on.

Q. (MR. COCHELL CONTINUING) With respect to the check that was paid to Mr. Hansen -- Mr. Denton, I'm sorry, that was paid on August 2nd of 2011, isn't that correct, sir?

A. I think it was.

Q. That's the date of the check, right?

A. Then it was.

Q. And then you subsequently claim that you learned for the first time that he had money that should be reimbursed, is that correct?

A. Yes, sir.

Q. Now, you've taken reimbursements from the company, haven't you? You've taken draws?

A. The only thing I took was a hundred thousand dollars, and the reason I took that is the Moraleses were going to put in $10 million. They put in seven, and I had two-and-a-half million dollars coming to me. It was my own money. I didn't take draws. There's not disbursements. I took money owed to me. The only thing I took was the $100,000 when they owed me two-and-a-half million. There's no money to take.

Q. And with respect to your deal with the -- with M6 Partners, you are going to be reimbursed all of your capital expenses, isn't that correct?

A. What do you mean, "capital expenses"?

Q. Reimbursement of capital expense, the loans to the company, what you invested in the company moneywise.

A. Correct. Correct.

Q. You get that back. In fact, that's what Mr. Baker and Stabinski were proposing to you, that you get 65 percent of net proceeds to pay you back, and then after that there would be 20 percent net profit distributed --

A. There's a little difference. These guys are writing me a

check. I'm paying this on my deal, so there is a big difference. And just so you know, the propose, what they're making, is 25 million. I have 34 million, so add that number up. Why would I sell something for 24 when I got 34 in it?

Q. So there's a difference between them and you in terms of how much money you have and how much money they have. There's a difference between you and Mr. Denton in terms of how much money he has and you have, correct?

A. I don't know what you mean.

Q. As far as you know?

A. I don't know what you mean by that.

Q. Okay. Well, it's perfectly appropriate for Mr. Denton to be reimbursed what's a relatively minor expense to this overall project, $61,000, isn't that right? You've been reimbursed funds. You're going to be reimbursed funds?

A. I haven't gotten reimbursed.

MR. PEPPER: Objection, he's --

THE WITNESS: This deal is not even close to being done.

MR. PEPPER: Objection.

THE COURT: Well, here we go again. There's three people talking and a court reporter that's got to take it all down. The objection is?

MR. PEPPER: The objection is he's assuming facts not in evidence, Your Honor, and it's irrelevant because there's

been no testimony as what Mr. Denton has put in other than that 61,000.

MR. COCHELL: That's all the questions we have, Your Honor.

THE COURT: All right. Do you have any follow-up, or -- we're at a time where my court reporter has been sitting for a long time, and we're close to the noon hour and --

MR. PEPPER: Very short redirect, Your Honor.

THE COURT: Short would be?

MR. PEPPER: Short would be 5, 10 minutes, if that.

THE COURT: Well, we're going to take a recess because I think five minutes from a lawyer, no matter who the lawyer is, it usually turns out to be 15 or 20 minutes, so --

MR. PEPPER: Fair enough.

THE COURT: So we are going to recess until 1 o'clock, and please tell me how many more witnesses that we have because I don't have all day today and tomorrow and the next day to deal with this case. I've got criminal cases that are stacked on top of criminal cases here.

MR. COCHELL: Yes, Your Honor. We have testimony from Mr. Denton and from Mr. Hansen, who have both traveled here today to give testimony.

THE COURT: And what does the plaintiff have?

MR. PEPPER: Your Honor, we have Mr. Denton, Mr. Baker, and Mr. Stabinski and Mr. Morales.

84

THE COURT: Okay.

MR. PEPPER: But they'll be significantly shorter than this witness.

THE COURT: They'll have to be or we'll never get done. All right. We'll see you back at 1:00.

(A lunch recess was taken from 11:49 a.m. to 1:04 p.m., the same day.)

THE COURT: Good afternoon. We will continue with the testimony. We had Mr. Lobell on the stand. I don't know if there were any further questions that --

MR. PEPPER: Yes, Your Honor, just one question on redirect. And in light of Your Honor's concerns as far as time constraints, we're going to try to truncate our case just to the simple issues. And if your Honor would maybe give me a heads up if we see that the thing is coming toward an end or when you see an end date -- or an end time towards the end of the day.

THE COURT: All right. Mr. Lobell, if you could resume your seat on the witness stand.

THE WITNESS: Yes, sir.

REDIRECT EXAMINATION

BY MR. PEPPER:

Q. Mr. Lobell, earlier during the day opposing counsel showed you Exhibit D-51, in which he showed you a list of assets that were part of the pretty booklet that you had referred to, and

one of the assets that he has listed as an asset is 80 acres of land, and this is on the last page of the document. Do you see that here? Can you identify that?

A. Yes, sir. Yes, sir.

Q. When you began to do your due diligence and you investigated this proposal, did Mr. Denton or any entity that bore his name actually own this asset at the time that they sent this to you?

A. On that page there's not one of those assets. It's a dome. It's housing. That's just a list of items needed to be bought. No, there's no ownership in -- there's nothing, nothing at all. This was a concept. There was no assets.

Q. At the time that you were shown this document, who owned the property at the time?

A. A gentleman, Mark -- the farmer that had it for a hundred years, or so.

Q. Is that ultimately the person who you bought it from?

A. Yes, sir.

Q. So they didn't -- the document misrepresented this as being an asset of Capital Investment according to the e-mail?

A. I would say so.

MR. PEPPER: No further questions.

RECROSS-EXAMINATION

BY MR. COCHELL:

Q. Mr. Lobell, you understood at the time you got this

86

document and talked to these gentlemen, Mr. Baker and Mr. Stabinski, that ownership of many of these assets were not established by purchases, that these were planned assets of the partnership that they were proposing to you? You understood that, didn't you?

A.   Well, yeah, there was not assets. Yeah, there was the concept that they had to go purchase these things to make a man camp.

Q.   That's why they were coming to you for money, right?

A.   Correct.

MR. COCHELL:  Thank you.

MR. PEPPER:  Your Honor, as our next witness we'd call Walter Morales.

THE COURT:  You may step down, sir.

THE WITNESS:  Thank you.

THE CLERK:  Please raise your right hand.

WALTER MORALES,

having been first duly sworn, was examined and testified as follows:

MR. COCHELL: Just for the record, Your Honor, we were unaware -- Mr. Morales was not identified as a possible witness at the pretrial. I don't know how strict the Court wants to be on that sort of thing. In most circumstances, if we're in a pretrial and witnesses are identified, I would move to exclude a witness, but I leave that to the Court's

discretion.

THE COURT: There was no real clear consensus as to who was going to be called as witnesses, and this isn't a trial. It's just a hearing on preliminary motions, so --

MR. COCHELL: Yes, Your Honor, I agree.

DIRECT EXAMINATION

BY MR. PEPPER:

Q. Mr. Morales, could you please state your full name and address for the record?

A. Walter A. Morales, 1195 South Cloverdale Avenue, Baton Rouge, Louisiana 70808.

Q. Mr. Morales, what is your primary occupation?

A. I'm an instructor at Louisiana State University. I'm the managing member of M6 Partners, a family partnership, and I'm a president and CEO of Commonwealth Advisors, an investment management firm.

Q. How did you get involved with the Capital Lodge man camp in North Dakota?

A. My family office, M6 Partners, was negotiating with Kenny Lobell to buy a part of -- property he owns in New Orleans called Jack's Brewery, and in the course of that conversation he approached us about making the investment in or partnering with him in North Dakota. He had already sunk a lot of money in the property up there and he was -- he was running out of money to complete it and approached us about partnering with

him.

**Q.** When you investigated the ownership of the actual property on which the man camp sits, did you do a full due diligence search?

**A.** We did a title search on the property. We got all the corporate documents that we could. There was -- there was not an operating agreement in place. There was land and a title. We did onsite visit of the property. We did -- we canvassed the area. We did due diligence on foot and via plane. We went into -- we did a lot of research on the crew housing situation in North Dakota, so we did -- we did what we would normally do when we make an investment, as much due diligence as we can do, as we can put our hands on.

**Q.** And did you do all of this prior to the filing of the notice of the lis pendens?

**A.** Yes.

**Q.** In fact, you guys had been looking at purchasing the man camp long before the issue of the lis pendens came up, hadn't you?

**A.** That's correct.

**Q.** Okay. And prior to that time, did you find any ownership interest by Mr. Denton or any of his entities?

**A.** No.

**Q.** As to the -- as to the real property.

**A.** Correct.

Q. What effect do you think that the lis pendens has on the price of the property of the man camp?

A. Well, it lowers it from our perspective. I mean, first of all, it makes it very hard to finance a property. You know, any lender who comes in right now is not sure what the title is to that property if they were to have to repossess, so most lenders aren't -- even nontraditional lenders are not going to put a loan and take that -- you know, with the lis pendens outstanding. And we can't move forward in our plan to recapitalize capital with the lis pendens. We -- without some type of a settlement that would let us move forward without being dragged into litigation, you know, we -- even though we've kind of lowered the -- the price has been lowered to us, we legally are struggling to close it.

Q. Did you suggest and in order to do the deal -- you're still interested in doing the deal, correct?

A. Yes.

Q. Did you suggest that Mr. Lobell send to Mr. Chad Hansen an affidavit and settlement agreement?

A. That document that you're referring to, I don't believe I've seen, but what I understand that we've sent to -- Chad Hansen you're referring to? It's a settlement offer, but not on behalf of Mr. Lobell. It's on behalf of us.

Q. Did your lawyer -- is your lawyer Jose Canseco?

A. Yes.

90

Q. Is he the one --

A. Who is not the baseball player.

Q. Right. Did he prepare that document and then send it to me?

A. Yeah, he did.

Q. And was it you that were going to fund -- you and your group that was going to fund the settlement?

A. Yes.

Q. And was it the purpose of that to essentially free you from being sued by Chad Hansen?

A. Yes.

Q. And was -- in your mind, was that one more piece of the puzzle that was resolved that would allow the deal to go through despite the lis pendens?

A. Well, we wouldn't settle with Chad Hansen alone. We need a settlement with all the people that are -- that are involved or named in that suit, so we need Randy Baker, Myer Stabinski, Hansen, and Mr. Denton, have to come to some kind of a settlement with us for us to be able to move forward, so Chad alone would not -- we would not settle or be able to give consideration for a release from Chad alone. It wouldn't help us.

Q. So it's your intention to get all parties agreed to before you would allow the loan to --

A. I haven't talked to Randy Baker about a settlement, but

91

Kenny told me that he believes that whatever deal we could have reached with Hansen, that Baker would agree to it as well. We've talked to Myer and told him whatever we offered Chad, we'd offer to him. And we've had discussions with the Denton -- Denton's lawyer about trying to reach some kind of a settlement with them that would allow us to close the transaction.

MR. PEPPER: Okay. No further questions, Your Honor.

THE COURT: Any cross?

MR. COCHELL: Yes, Your Honor. I wanted to make sure you had no questions before I started. It looked like you were about to say something.

THE COURT: I was, but --

CROSS-EXAMINATION

BY MR. COCHELL:

Q. Okay. Mr. Morales, my name is Steve Cochell. I represent Chad Denton. Do you remember talking to me once before?

A. I do, yes.

Q. Good to put a face with a name?

A. Yes, sir.

Q. Isn't it true, sir, that you never even heard of the lawsuit in Texas until you became aware of it a couple of months ago?

A. That's correct.

Q. Okay. Mr. Lobell, your partner, never told you that

Capital Lodging had been sued, is that correct, sir?

A.   That's correct.  I thought he had been, that Mr. Lobell had been sued.

Q.   Oh, he just said, "I've been sued," but not Capital Lodging, not his other companies, is that correct?

A.   That was my understanding, yes.

Q.   All right.  And so when you saw the lawsuit, what was your reaction, when you learned that he hadn't shared that with you?

A.   Well --

Q.   Were you a little disappointed or angry?

A.   I was certainly -- well, I was disappointed I didn't get it, but more -- but my reaction really was more to do with the transaction that was being contemplated and how we could proceed.  And the issue on the -- for the lawsuit is -- removing the lis pendens helps secure a lender, but it doesn't help us move forward with the transaction alone.  You know, the lis pendens being removed doesn't make the suit go away, so the suit would still be out there.  And so, you know, my reaction is that I need some resolution, at least with regard to me and my partner, the Finebergs (ph), and Capital, to move forward with or without the -- you know, the lis pendens alone, removal doesn't help.

Q.   And so your partner, Mr. Lobell, knew of the lawsuit and was negotiating a $25 million sale of his interest in the property to you at the same time.  Is that a fair statement,

93

sir?

**A.** That's right, but the -- just to be fair, to make sure that I'm correct on the record with the answer, I don't know when Mr. Lobell got notice of the lawsuit. And I got notice of the lawsuit roughly -- well, roughly around the time of the lis pendens is when we first saw the lawsuit, so I don't know how -- if that's a day or a month or -- you know, just so you understand, I got it when -- when I got the lis pendens is when I knew about it.

**Q.** Let me represent to you that Mr. Baker was served with the lawsuit almost a year ago and that Mr. Lobell was put on notice of the lawsuit on that occasion and some other subsequent occasions. Would that surprise you, sir?

MR. PEPPER: Objection to the form of the question, Your Honor, actually, the relevancy of it. When Mr. Baker got sued had nothing to do with Mr. Lobell being sued or any notice.

THE COURT: Objection is overruled, but in Texas, do you have to file the action when the -- when it's been served?

MR. COCHELL: Yes, the -- we file the action and then service is made, just like in the federal system, and --

THE COURT: The pleadings I've seen indicate that the Texas action was commenced in June of --

MR. COCHELL: Of 2011, Your Honor.

THE COURT: -- 2011.

94

MR. COCHELL: Yes, sir. Maybe 2012, I believe, off by a year, Your Honor.

THE COURT: So then nobody could have been served a year ago.

MR. COCHELL: I'm sorry. I stand corrected. It would have been served about six or seven months ago.

THE WITNESS: I didn't know Randy had been served six or seven months ago. I actually don't have any contact with Randy Baker.

Q. (MR. COCHELL CONTINUING) And the only reason you've learned of the Texas lawsuit is because of the lis pendens, is that correct?

A. That's correct.

Q. And as you understand it, that's one of the purposes of the lis pendens law, if you know.

A. Well, I'm not a lawyer, but if that is a purpose, it worked in my case.

Q. And it saved you, you know, some heartache down the road if you bought the property without knowing of the existence of the lawsuit. Isn't that a fair statement?

A. Yes.

Q. As far as you know sitting here today, you could have done that deal, transferred the money, and then learned of the lawsuit, is that right?

MR. PEPPER: Objection, hypothetical, Your Honor.

95

It's not --

THE COURT: It is, but I'll overrule.

THE WITNESS: The document, the purchase agreement, would have required that disclosure prior to closing, so Kenny would have had to make that disclosure prior to closing.

Q. (MR. COCHELL CONTINUING) That's assuming that he would have made it at some point prior to closing on the sale, correct?

A. Yeah.

Q. Okay. So you are -- I understand that you had a discussion with Mr. Lobell about doing some sort of settlement with Mr. Hansen, is that correct?

A. Yes.

Q. Okay. And you never saw the documents that were prepared for the settlement?

A. No, I -- I don't -- I don't know if we marked up an affidavit that Kenny was using or if we prepared something, but it's been referred to as an affidavit. I didn't know it's an affidavit. I thought it was just a release document.

Q. Okay. And so you're not aware that an affidavit was prepared?

A. By my -- by my lawyer?

Q. Right.

A. No, I'm not.

Q. And you're not aware one way or the other whether your

lawyer prepared a settlement and release agreement for Mr. Hansen to sign, is that right?

**A.** I am aware of that. We did prepare that.

**Q.** Okay. And do you know if M6 Partners is listed as a party on that settlement?

**A.** I don't know who would be. I mean, it should have listed the recovery fund. It should have listed the entity buying it, but I haven't seen it, so I don't know who's listed on it.

**Q.** So it should have listed M6, but sitting here you don't know.

**A.** I don't think it actually should have listed M6 because M6 itself is not the buyer, so it should not have listed M6.

**Q.** Was that release supposed to buy out Mr. Hansen's -- any of Mr. Hansen's interest in any alleged partnership?

**A.** Yeah. My understanding is that -- first of all, that document would have been used with the -- with Stabinski and with Randy Baker as well, and my understanding is, what the document is supposed to say is that in the event you -- you own something of this, whatever it is, you're conveying it to us and releasing us from claims going forward.

**Q.** Okay. So sitting here today, you don't know if it said that or not, is that correct?

**A.** Yeah. No, my testimony is I have not seen that document.

**Q.** Okay, and -- but it was supposed to talk about releasing any right, title or interest in any part of the man camp or the

property, is that correct?

A. That's right because, you know, I understand -- I understand there's a dispute about whether or not there's ownership. From our perspective, we don't have a dog in that fight. You know, in other words, we didn't -- this isn't designed to settle the litigation. It's only supposed to keep us out of it and allow us to close the transaction --

Q. Right.

A. -- recapitalize the camp and move forward.

Q. So the only reason you suggested that there be an approach to Mr. Hansen was to make sure there was a release of any interest -- right, title or interest in the man camp, correct?

A. To make sure that, yeah, that we don't have a jury down the road come to some conclusion that he has an ownership and then we discover that what we thought we bought we now have other people who claim ownership.

Q. And you don't remember the particulars of whatever your lawyer may have sent over there, is that correct?

A. I didn't see it.

Q. And you have no idea whether -- of what was actually sent to Mr. Hansen.

A. No, I've testified that I have not seen the document.

Q. Okay. Did any of you look at the Answer filed by Mr. Hansen in the Texas case?

A. I have not seen the Answer.

98

**Q.** Do you know it was a matter of public record as of the time he filed it, which was July 9th, that he believed that there was a partnership between the partners, Mr. Stabinski, Hansen, Denton and Mr. Lobell? Would that surprise you?

**A.** Again, you know, I wouldn't say it surprises me, but I tell you that I really don't -- I didn't read the Answer to it. I wish Mr. Denton and Mr. Lobell good luck, you know. I mean, they can fight this thing out. I would just like to keep this camp out of bankruptcy and buy it and recapitalize it, and that's what I'm trying to do.

**Q.** I understand.

**A.** I don't -- I don't really have an opinion one way or another on the suit, the merits of it, and -- and I didn't read the Answer to it.

**Q.** Now, your deal with Mr. -- your proposed deal with Mr. Lobell is that you would be purchasing the real estate to go with the man camp, what's located on the real property, fair?

**A.** That's correct, yeah.

**Q.** Okay. That's because the man camp is not worth much if you don't have the property. Isn't that a fair statement?

**A.** To me it's not, yeah.

**Q.** Now, did Mr. Lobell indicate to you that he had tried to get a $5 million line of credit prior to coming to you?

**A.** Yes, there were some discussions. I don't remember the

amount, but there were some discussions about him trying to -- about borrowing on the facility, yeah.

MR. COCHELL: That's all the questions we have for this witness, Your Honor.

MR. PEPPER: Just one question on redirect, Your Honor.

REDIRECT EXAMINATION

BY MR. PEPPER:

Q. Mr. Morales, isn't it true that Jose Canseco, your lawyer, had asked Mr. Lobell prior to the notice of lis pendens being filed for a hold harmless agreement because he was aware of the suit?

MR. COCHELL: Objection, hearsay.

THE COURT: Overruled. It's hearsay, but I can sort it out.

THE WITNESS: No, I am aware of that. The question that was directed to me was whether or not I knew Capital was named in the suit, and my answer to that was, I didn't know Capital was named in a suit, but I was aware of the suit, that Kenny was in it. And we did ask to be released and have a hold harmless in our purchase agreement related to that suit so that we wouldn't be brought in. That's correct, what you're saying.

Q. (MR. PEPPER CONTINUING) And it was five months ago, at least, wasn't it?

A. That was in -- that was in -- well, we first started

negotiations to buy this in April, and the first pass of documents would have been around June or July.

MR. PEPPER: Okay. No further questions, Your Honor.

MR. COCHELL: Nothing further, Your Honor.

THE COURT: Thank you, sir. You may step down.

MR. PEPPER: Your Honor, we call Chad Denton to the stand.

THE CLERK: Mr. Denton, could you please raise your right hand?

MR. DENTON: Sure.

<u>CHAD CHRISTOPHER DENTON,</u>

having been first duly sworn, was examined and testified as follows:

<u>DIRECT EXAMINATION</u>

<u>BY MR. PEPPER</u>:

Q. Mr. Denton, please state your name and address for the record.

A. Chad Christopher Denton, 3904 Palmer Drive, Round Rock, Texas 78664.

Q. Mr. Denton, in your original Texas action, you filed a suit for -- a claim for damages against Mr. Lobell, Mr. Baker, Mr. Hansen and Mr. Stabinski, for damages for failing to honor a partnership, correct?

A. Yes, sir.

Q. I'm going to show you a document that we've marked as P-6.

Do you recognize this document as the original petition that you filed in Bell County?

A. Yes.

Q. Sir, I'm going to ask you to look through that document and to see if you can see where anywhere your lawyer made a claim for a -- to clear title to the property, which is -- which the man camp is situated on.

MR. COCHELL: Your Honor, we respectfully object to this line of questioning because an amended petition, as I'm sure under North Dakota law, under Texas law amends it as of the date of the original filing, and Texas allows liberal amendments during the course of investigative or deposition discovery, so this is irrelevant.

THE COURT: So what are you saying, there's been an amended petition filed?

MR. COCHELL: There has been an amended petition filed. We've been asking -- well, we have a copy of it we can show to the Court.

MR. NYHUS: Your Honor, if I may, it's also included -- this is Chris Nyhus. It's included with our response brief. I believe an exhibit of the amended petition was included as Exhibit -- I believe it was A there.

MR. PEPPER: Your Honor, we offer the document for purposes of comparison so that the Court can see what the original petition included as pertains to what the amended

102

petition included --

THE COURT: Overruled.

MR. PEPPER: -- and the small differences thereto.

THE COURT: Overruled. You can answer the question if you're able to, if you can remember what the question is.

THE WITNESS: I don't -- since I'm not an attorney, I don't really know what you're asking me, but --

Q. (MR. PEPPER CONTINUING) Did you make a claim for ownership of the property that the man camp is situated on in your original Complaint?

A. I don't think so.

Q. Okay.

A. I don't -- like I said, I don't understand exactly when it comes to the wording of everything, but --

Q. Did you read your Complaint before it was filed?

A. Yes, quite a few -- quite a bit.

Q. In fact, you signed a verifying affidavit that everything in there was true and correct.

A. It is.

Q. Okay. And yet you still don't know whether you made a claim for a title or an interest in title to that property?

MR. PEPPER: Objection, misleading questions, Your Honor. He didn't verify this particular petition. He --

THE COURT: I don't know whether he did or he didn't. I don't know what Texas Civil Procedure requires in that

regard, but the objection is overruled. You can answer the question as a layperson, who had a 35-page Complaint drafted by your attorney. Go ahead and answer.

THE WITNESS: I don't think so.

Q. (MR. PEPPER CONTINUING) Did you have an opportunity to buy the property yourself prior to Mr. Lobell purchasing the property which the man camp sits on?

A. Yes.

Q. Did you sign a Uniform Offer to Purchase Property dated May 9, 2011, on behalf of Capital Riggers Lodge?

A. Yes. I don't know if it was May 9. I know there was another one, but to -- also, but it could have been May 9, but, yes, I did sign one, definitely.

Q. I'm going to show you a document which has been marked as P-9, and I'm going to ask you to identify -- is this your signature at the bottom of the document?

A. That is it. That's the one I signed.

MR. PEPPER: In conjunction with the witness's testimony, I'd like to offer and file and introduce both Exhibits P-6, which is the original petition, and P-9, which is the Uniform Offer to Purchase.

MR. COCHELL: Your Honor, we have no objection to that, although we would request that the Court also admit and consider the amended petition.

THE COURT: Well, if it's offered and received, I'll

do that.

MR. COCHELL: Yes, your Honor.

THE COURT: But nothing has been offered yet, but I'll receive Exhibits P-6 and P-9.

Q. (MR. PEPPER CONTINUING) Then, Mr. Denton, let's take a look at Exhibit P-9. It says that you're supposed to give an initial deposit on this document, doesn't it?

A. Yes.

Q. And the initial deposit is $40,000, correct?

A. That's correct.

Q. Did you ever give the real estate agent the deposit?

A. Didn't need to because the real estate agent knew what we were doing, and we didn't -- they needed to get the water secured and the conditional-use permit. And Mark Schmidt, the owner of the property, was working with us, and Craig, and was fine with us doing that because there was no need for me to put $40,000 down if we can't build a man camp, can't get water to it, and lose $40,000. That's why it took all the way through June and all the months that we did working with Williams County getting a conditional-use permit, going in front of the board, flying back and forth, doing everything it took to make sure this property would work and would be approved. And luckily I bought the water rights, put a thousand dollars down and secured the last bit of water that they had, and if I wouldn't have done that that week, this opportunity would have

105

never happened.

Q. Do you know that with a conditional-use permit, you're required to own the land for which you get the permit?

A. No, sir.

Q. Is that your position, that you don't -- you're not required to own any land for which you have a conditional-use permit?

A. No, I'm saying I didn't -- I don't know personally if you have to own the land to get the conditional-use permit.

Q. Is this the first time that you've ever developed any property?

A. No.

Q. You've never run across this before in all your dealings?

A. Usually my situation is the land is already owned by someone else and then we're developing it together, so, no. But to answer your question, Randy Baker, on my behalf, went and got the conditional-use permit, went to the meetings, and so on and so on, and got it. As far as did I have to have title to the land, did I know that personally, the answer is no.

Q. Okay. Did you ultimately pay the purchase price of $800,000 for the purchase of this land?

A. No, it was never intended for me to ever go out and purchase the land for 800,000, and Craig, the realtor, knew this. Everybody knew this. That's why we had marketing and

investor packs made up by May 9 and going to investor meetings, showing them the list of our assets, the property, everything to make this opportunity happen. I didn't have the $20 million to build this thing up, but we had it shovel ready to that point for the investor of three months of work with everything ready to go, which Mr. Lobell agrees, and he -- it only took him a day or two to make the decision, and three days later we were having a ground breaking with equipment.

Q. Do you understand, sir, that your agreement here was going to terminate on -- or did terminate July 15, 2011, if you didn't put up your deposit?

A. Sure, and we talked to Craig about that and told him we're working with Mr. Lobell and it was going to take a couple of weeks because he was working with his bank to get his line of credit when I sent Randy up to see Mr. Lobell twice, and we told Craig about it. He goes, "Chad, the land is not going anywhere. It's 100 -- 80 acres of farmland out in the middle of nowhere." We're the only person that -- they were hoping we could make a deal happen. Craig was going to make a big commission off of it.

THE COURT: Who's Craig?

THE WITNESS: I'm sorry. The realtor who was working with us for the property who knew Mr. Mark Schmidt.

THE COURT: Okay.

THE WITNESS: I mean, this --

**Q.** (MR. PEPPER CONTINUING) Do you know the difference between a solid -- an offer to purchase property versus an option to purchase property?

MR. NYHUS: Your Honor, I'm going to object to the extent it calls for a legal conclusion from the witness.

THE COURT: He can respond as a layperson who's been involved in real estate transactions.

THE WITNESS: Again, Craig was working with us, knew what we were doing, helped us get some of these permits, and he never pushed and said -- he knew exactly what we were doing, and he was representing us, my group, me, Randy Baker, Buster, Chad Hansen. Me, Buster and Randy went in his office many times. We went out the same day, found the property that he directed us to, which was this, and there was never any pressure to -- and when he told me to sign this, I signed it. He's representing me and telling me what to do, and everything is fine. That's all I can go off of, and I was shocked to see -- I'm sorry.

**Q.** (MR. PEPPER CONTINUING) And that was a lot of information, but it was unresponsive to the question that I asked you --

**A.** Okay.

**Q.** -- which is, do you know the difference between an option to purchase property versus an offer to purchase?

**A.** I couldn't explain it to you.

108

**Q.** Do you realize that before you have an interest in property, that you have to purchase it or purchase an option?

**A.** Again, we were working with the realtor to get an investor on board. That was our whole position from the beginning of working with the man camp.

**Q.** So you knew back then, when this was put together, and it was never your intent to own any of this property, correct?

**A.** Not to pay $800,000 and build a man camp, no. We were all --

**Q.** No, this is not $800,000 for a man camp. This is $800,000 for a piece of property.

**A.** The 80 acres, yes, sir.

**Q.** It was never your intention to buy that property.

MR. COCHELL: Objection, Your Honor. We're going to object to the lawyer standing over the witness. To the extent that he needed to approach the witness, we think that time has ended. I think it's rather intimidating. He's standing there lecturing the witness at this point and arguing with him.

MR. PEPPER: I'll stand over here closer to the microphone.

THE COURT: Well, he wasn't arguing. He got three words out of his mouth to -- with respect to his next question before there was an objection raised. You can back off a little bit, speak loudly so the court reporter can hear.

MR. PEPPER: Yes, Your Honor.

109

**Q.** (MR. PEPPER CONTINUING) Do you realize --

THE COURT: We're in a court proceeding rather than a jury trial, so I don't -- I'm not so concerned about a lawyer intimidating a witness as I might be if there was a jury there.

MR. COCHELL: Yes, Your Honor.

**Q.** (MR. PEPPER CONTINUING) So do you understand that the $800,000 was for the purchase of this property, not the man camp?

**A.** Yes.

**Q.** And is it your testimony that you never intended to pay that or to own that piece of property?

**A.** Correct. We were going to find an investor and be partners on the whole housing facility, Capital Lodge, on the 80 acres.

**Q.** Okay. Were you ever informed by the broker that you needed to put down a deposit in order to have your contract be valid?

**A.** I know we talked about the deposit, and we told him that we were a couple of weeks away with getting a deal together, and he was fine with that and he didn't push it after that. And I think we even told him we would have Mr. -- we told him that he was working with his bank to get the line of credit, and I believe Mr. Lobell even contacted him around the end of July and worked the details out. Mr. Baker even told me that Mr. Lobell was talking to Craig and getting it lined out with

110

Chase Bank, I believe, out of New Orleans.

**Q.** On the purchaser on the contract, you have Capital Riggers, is that correct?

**A.** Yes.

**Q.** Capital Riggers was never formed as a corporation anywhere, was it?

**A.** No.

**Q.** So you submitted through your agent an offer to purchase real property from the seller for a corporation that didn't exist.

THE COURT: Well, it says Capital Riggers Lodge. I don't know if that's a corporation or partnership or what it is.

**Q.** (MR. PEPPER CONTINUING) Capital Riggers Lodge, was it ever formally incorporated?

**A.** That was the name we were going to call the lodge, and then we changed it to Capital Lodging. When we met Craig the first -- maybe the third day I was there, we were going under the name of Capital Riggers Lodge.

**Q.** But is it true that you submitted this contract to purchase, knowing that you never intended to purchase it?

MR. COCHELL: Objection, Your Honor, asked and answered.

THE COURT: Overruled.

**Q.** (MR. PEPPER CONTINUING) Knowing that you or Capital

111

Riggers Lodge never intended to purchase it, is that correct?

A.   We knew we were going to need an investor to come in with us to complete the whole project, purchase the land and complete the partnership.

Q.   How did you think that you were going to get an interest in this property if you didn't put up any money for it?

A.   Craig, the realtor, knew what we were doing.  The landowner knew.  Mr. Mark Schmidt knew that we had to make sure we could get water, a conditional-use permit, the property would work.  That's why we went off and got architectural plans, housing plans, and put this whole deal together to hand over to an investor with us, to be the money side of it and make it successful, which ultimately it did.

Q.   But you never did end up owning any interest in that property, did you?

A.   I was told we were five partners in the interest of Capital Lodge, which is the 80 acres, which is a partnership asset and an asset that we listed to every investor to purchase it.

Q.   Do you realize that when you list it as an asset, you're representing that you own it?

A.   No, because if the investor is going to buy it, it's going to be an asset in our partnership together.

Q.   So you represented an asset that you -- that you had something as an asset that you never purchased, is that

correct?

A. Every investor, when we're talking to him with the list of assets, knows, just like Mr. Lobell said earlier, we got to pay for it, so that's what we were doing.

Q. But you never intended to pay for it, did you?

A. No, we were looking for an investor to partner with and do the whole project together.

Q. So you never acquired any interest in that property, did you?

A. I was told I had interest in it. We went off of the faith that we had interest in it. We worked like we had interest in it.

Q. Who told you you had an interest in that property?

A. My agents, Buster Stabinski and Randy Baker. I flew them to see Mr. Lobell twice and we've had telephone conversations. I called Kenny on July 23. He was waiting for my call. We talked about setting up the Chase Bank -- the checking account, running the trucking, all the MSAs I had, everything.

Q. Did they ever provide you a document showing where either Buster Stabinski, Chad Hansen, or Randy Baker had bought an interest in that property?

A. No.

Q. As a matter of fact, didn't they tell you they were not interested in doing a deal with you?

A. No.

113

Q. Didn't you, in fact, come up to North Dakota and ask them to sign a partnership agreement with you?

A. Yes.

Q. And did they refuse?

A. Yes.

Q. Okay. Did you and your attorney file an amended petition for damages in the state of Texas?

A. Yes.

Q. I'm going to show you a document that's marked as Plaintiff's Exhibit 7. Does this appear to be a copy of that petition?

A. It does, yes.

MR. PEPPER: Your Honor, and in conjunction with the witness's testimony, I offer and file and introduce into evidence P-7, which is a copy of the first amended petition filed in the state of Texas.

MR. COCHELL: No objection, Your Honor.

THE COURT: Exhibit P-7 is received.

Q. (MR. PEPPER CONTINUING) I want you to look at that for a minute. Would you please turn to paragraph 34 of your amended complaint?

A. Yes.

Q. Can you read that to the Court, please?

A. "On July 23, 2011, Capital Oil Field Services, LLC, was formed by Chad Denton on behalf of the partners."

114

Q. Okay.

THE COURT: What paragraph is that?

MR. PEPPER: Paragraph 34, Your Honor.

Q. (MR. PEPPER CONTINUING) And then please turn to paragraph 64 of the amended petition.

A. Okay.

Q. Can you read that to the Court?

A. "Mr. Denton drafted an agreement and provided it to his partners: Randy Baker, Buster Stabinski, and Chad Hansen."

Q. Okay. And those were your partners, correct, or your alleged partners?

A. They were my partners.

Q. Okay. And Mr. Lobell was not one of those partners, was he? In paragraph 64, you do not list Mr. Lobell as a partner, do you?

A. That date is within days of us making a deal, so I can't tell you exactly if we were partners at that time and a deal was agreed to. No, I'm sorry. I'm sorry. We were not. That was July. I'm sorry. No, we were not partners on June 23rd.

Q. Okay. And ostensibly, when you filed for Capital Oil Field Services, LLC, you filed that with the state of Texas, correct?

A. Yes.

Q. I'm going to show you a document that I'm going to call P-8. Is this a copy of the filing that you made with the state

115

of Texas with regards to the formation of Capital Oil Field Services, LLC?

A. Yes, sir.

Q. I'd like you to read for the Court -- it says in paragraph B, "The limited liability company will not have managers." It says "Governing Persons." Who is listed?

A. I am listed.

Q. Did you list any of your partners in that?

A. We talked about this, and I didn't list them because there was credit issues and some tax liens issues with some of the partners, and for us to be able to get credit with my good credit rating and personal income statement, it would have stopped Capital Oil Field Services from moving forward, so they agreed at that point not to be on the LLC.

Q. Didn't you just testify that it was never your purpose or never your intent to use your money or your credit for this deal?

A. We were doing other services in North Dakota. We were doing rig moves. We were going after trucking. We were doing all sorts of services in the investment pack that Mr. Lobell has, so we were doing other business. So that would have stopped us from going forward with credit and other issues and financing and lending with other applicants that might not be up to par.

Q. Isn't it -- isn't there space on the application or ample

space to put your other partners, yet you chose not to do it?

A. Again, when you go out to get lending, like Mr. Lobell knows, they look at every partner in the corporation. We've run into that in the past, where I've had people on LLCs and I've had to take them off just to get myself approved, and then we've been fine. And again, we had some credit issues and some tax issues with some of the partners.

Q. This was done back in June 23, 2011.

A. Yes, sir.

Q. Have you ever gone back and listed those guys as your partners?

A. All the documents and e-mails and everything back and forth we're partners.

Q. The truth is that you've never done it, isn't it?

A. No. We've got plenty of documentation back and forth as partners.

Q. You've never listed these other gentlemen as your partners with the Secretary of State, have you?

A. No.

MR. PEPPER: Your Honor, in connection with the witness's testimony, I'd like to offer and file, introduce into evidence P-8, the Certificate of Formation of Limited Liability from the state of Texas.

MR. COCHELL: No objection, Your Honor.

THE COURT: P-8 is received. Just out of curiosity,

117

the plaintiffs' amended petition filed on October 12, 2011, in Texas -- or 2012, I should say, Chad Hansen, Buster Stabinski are no longer listed. Did they -- were they dismissed from the case voluntarily, or what happened?

MR. COCHELL: Mr. Hansen has been served. Mr. Baker has been served. Mr. Stabinski has -- we've not been able to serve Mr. Stabinski at his home or at the man camp. And Mr. Lobell we recently served after getting alternative service approved by the Texas judge.

THE COURT: But Hansen and Stabinski were served with the original petition?

MR. COCHELL: I think they were served with the amended. Well, I think --

THE COURT: Well, they're named in the original petition. They are not named in the amended petition. I'm just curious, were they dismissed or did they settle, or --

MR. COCHELL: I think it was an oversight, Your Honor, because their causes of action are clearly against them. It was an oversight in drafting the document.

THE COURT: I would assume you don't have to serve the amended petition, as represented by counsel.

MR. COCHELL: No.

THE COURT: Okay.

Q. (MR. PEPPER CONTINUING) Mr. Denton, please turn to page -- or paragraphs 84 and 85 of your amended petition for breach

of partnership.

A. I don't -- I don't have it anymore.

Q. I can get you a copy.

THE COURT: And you're talking about Plaintiff's Exhibit 7, correct?

MR. PEPPER: Paragraphs 84 and 85 of the --

THE COURT: Plaintiff's Exhibit 7.

MR. PEPPER: Yes, I think it's 7.

THE WITNESS: Okay. I got it.

Q. (MR. PEPPER CONTINUING) Now, look at paragraphs 84 and 85 of your amended petition, please. Do you have those?

A. I do.

Q. In those paragraphs you refer to breach of partnership for purchasing the option to purchase the real property. Do you see that?

A. Yes.

Q. The fact is that you -- the only document you have that even purported to give you an interest in property was our exhibit. It was your Uniform Offer to Purchase, correct?

A. Yes.

Q. Okay. Do you understand now that that document does not give you any interest in that property?

MR. COCHELL: Objection to the extent it calls for a legal conclusion.

THE COURT: So noted. Overruled.

119

THE WITNESS: The property owner and realtor knew we were getting an investor to purchase the property, and they were fine with that. No one else was on the table to even think about buying it. They were hoping we were going to make this deal happen and they were working hard with us to make it happen.

Q. (MR. PEPPER CONTINUING) But the truth is that you never purchased an option to purchase that property, did you?

A. As far as putting money down, no.

Q. Did you ever purchase the property?

A. No.

Q. Yet you've made a claim for breach of partnership. Did you have any written partnership agreement regarding the purchase of that property with anybody?

A. No.

Q. Turn to paragraph 91 of your first amended petition.

A. Okay.

Q. There you've made a claim for breach of fiduciary duty to purchasing the option to purchase real property and obtaining the contract for purchase of real property.

A. Okay.

Q. That Uniform Offer to Purchase Property was never even signed by the seller, was it?

A. I don't think so.

Q. Would you like to look at it again?

**A.** Oh, the one I signed, no. Yeah, it wasn't signed by the owner, that one.

**Q.** Where do you think that you have an interest in this property? Where is your basis for believing that you have a bona fide or you had a bona fide interest of ownership in this property?

**A.** Because we made a partnership deal with Mr. Lobell, turned him on to the realtor, made sure he bought the property and established the man camp.

**Q.** You have yet to show the Court any written document showing a partnership either with your alleged partners or Mr. Lobell, so I ask you again, where do you think that you get an interest in this property, Mr. Denton?

MR. NYHUS: Your Honor, I object. That's been asked and answered.

THE COURT: Well, I'm going to overrule, but are both -- I mean, I generally don't have two attorneys on the same side making objections. I mean, I deal with one. If you change attorneys with respect to which witnesses they're handling, then that's fine, but --

MR. COCHELL: Yes, Your Honor.

THE COURT: But the objection is noted and overruled. I would ask that whatever attorney is handling this witness make the objections or any other commentary, and the same holds true for the plaintiffs' side of the case.

121

MR. COCHELL: Yes, Your Honor. Objection, it's been asked and answered several times in several different ways.

THE COURT: Overruled. I'll let you answer it if you can.

THE WITNESS: I am not on the title of the property.

Q. (MR. PEPPER CONTINUING) And even though you're not on the title of the property, you made a claim in paragraph 127 of your amended complaint for conversion, where you claim that you had owned the right to purchase real property and that you had obtained the contract for purchase of real property.

A. Yes, we gave the contract to Mr. Lobell to purchase.

Q. Do you understand what conversion is?

A. I would need to hear your definition.

Q. I'm asking you, do you understand?

A. No.

Q. Do you understand to ask or claim conversion, that you have to own something that you -- that you claim that somebody took from you? Do you understand that, in very simplistic terms?

A. And it was took and it was purchased and the deal was consummated.

Q. But you never did own it. You just admitted that you didn't have title to it.

A. I didn't own it on paper.

Q. You didn't even have a signed purchase agreement, yet you

122

made this claim in Texas state court. Do you understand that?

A. The purchase agreement with my signature on it?

Q. Yes.

A. Okay.

Q. Do you realize that that agreement was not valid because it wasn't signed by the seller and you never put any money down on that?

A. I can't be a hundred percent sure that the seller didn't sign it because once I signed it, Craig took care of dealing with the seller.

THE COURT: And Craig was the real estate agent.

THE WITNESS: Yes, sir.

MR. COCHELL: Craig McIvor, Your Honor.

THE WITNESS: Craig McIvor, yes.

Q. (MR. PEPPER CONTINUING) But you also stated earlier too that it was never your intent to purchase it. It was for somebody else to do, right?

A. We needed a partner.

Q. Okay. So nobody really converted anything of yours, did they, because you didn't own anything to begin with, did you?

A. I guess you're right. I mean --

Q. And then in paragraph 135 of your amended petition, you claimed theft, theft. Do you understand what theft is?

A. I don't have the same petition, but --

THE COURT: Well, it's the Texas Theft Liability Act.

123

I have no idea what -- how they -- what they define falls within the terms of that particular act, but I assume theft means theft as most people understand it to be.

MR. PEPPER: Correct, Your Honor.

Q. (MR. PEPPER CONTINUING) And for acquiring the real property, you didn't have anything for Mr. Lobell or your partners to steal or take from you, did you, in that property? You didn't have any title to it.

MR. COCHELL: Objection, mischaracterizes the allegations in the Texas Theft Liability Act, Your Honor.

THE COURT: Overruled.

MR. COCHELL: There's other --

THE COURT: You can answer. Overruled. You can answer it if you feel that you can.

THE WITNESS: I'm sorry. Can you say it again?

Q. (MR. PEPPER CONTINUING) You didn't have anything for your partners or Mr. Lobell to steal, did you? You didn't have any interest in that property for them to steal, did you?

A. Yes, we had the whole project ready to go, all permits in place, a management company, Morgan Chase Management, who ran the operation totally for Mr. Lobell. Everything was in place, ready to go. Like I said, three days later the ground breaking with equipment started. There was nothing for Mr. Lobell to do to get the thing started, and we all made that happen.

Q. With regards to the real property?

**A.** That is the real property with all the manufactured homes on top of it.

**Q.** The real estate. You testified earlier you had no title to it, correct?

**A.** We passed it on to Mr. Lobell, to purchase the property to make the man camp, which is Capital Lodging, which the land is an asset of Capital Lodge, which was in the list of our assets in our marketing and investment plan to every investor. That never changed.

**Q.** Mr. Denton, do you own a home?

**A.** Yes.

**Q.** Do you understand what it means to own the real property that the home is on?

**A.** Yes.

**Q.** And that home is your asset, isn't it?

**A.** Yes.

**Q.** But you owned it and you paid for it, didn't you?

**A.** Yes.

**Q.** You didn't pay for this property, did you?

**A.** No, Mr. Lobell did.

**Q.** But you can't claim theft if you never owned it, isn't that correct?

**A.** Yes.

MR. PEPPER: Okay. No further questions of this witness, Your Honor.

BY MR. COCHELL:

Q.   Mr. Denton, when you talked to potential investors -- and you did talk to a number of potential investors yourself, is that correct?

A.   Oh, yeah, we went on meetings with them, flew around different -- flew around Texas, different oil company guys I knew.

Q.   Okay.  And you were continuing to do that in July, is that correct, when Mr. Lobell came up as a potential investor?  Is that correct, sir?

A.   Oh, yes, sir.  We were doing it all the way into early May.

Q.   And with respect to investors, when you talked to them, did you tell them that their money was needed to purchase the list of assets in the investment package?

A.   Absolutely, the same investment pack that Mr. Lobell looked at that had it in it.

Q.   And so, in essence, you were selling them an opportunity to participate in an idea that had been developed over a three-month period.

A.   Correct.

Q.   Now, with respect to the property, at the time that you filed the original lawsuit, did you know that the property had been purchased individually by Mr. Lobell?

A. No.

Q. Is that why it wasn't mentioned in the original petition?

A. Correct.

Q. And after you learned of the purchase by Mr. Lobell, that's when the amended petition was filed and --

A. Yes.

Q. -- the lis pendens was filed?

A. Yes.

Q. With respect to your testimony about Mr. Lobell, you had -- how many trips did you go on with -- to talk to potential investors using the investment package?

A. For the man camp only, two.

Q. And you -- you have a number of businesses, is that correct?

A. Yes, sir.

Q. Have you previously --

MR. COCHELL: I'm going to go into what our direct examination would be, Your Honor.

Q. (MR. COCHELL CONTINUING) Have you previously had partnership ventures with Mr. Baker, Hansen or Stabinski?

A. Yes.

Q. Without going into detail, how were those partnerships pursued by you and these other gentlemen?

A. Some of them were on LLC documents, and most of them we just went out and did them and split the profits three or four

127

ways, depending on how many of us were together.

Q. If you funded a project, how -- and you invested 50, a hundred thousand dollars or something into a project, how was the -- how were the profits or the proceeds of the partnership to be divided as among the three or four of you?

A. Always equally.

Q. And that's after you would recoup and be reimbursed your expenses?

A. Yes, sir.

Q. And were there occasions where -- and did it matter whether there was an agreement signed or not between you guys?

A. Did not.

Q. And did you trust Mr. Baker?

A. Absolutely.

Q. How long have you known him?

A. Since '09, 2009.

Q. Did you ever have a dispute, like a real angry dispute with him over the running of a partnership?

A. No.

Q. Now, when you learned of Mr. Lobell, was there a discussion about whether you should go to see Mr. Lobell or one or more of the other partners?

A. Yes. Me, Chad Hansen and Randy Baker got on a conference call two nights before we were supposed to go see Mr. Lobell, including myself. I bought him Southwest -- I bought Randy a

Southwest airline ticket, and I was going to get one too, and the night before we had a conference call and decided let's just send Randy so there's not a distraction with a second person being there, since Randy had all the construction quotes, had all the bids put together, and let them deal with that one on one, and I agreed. Mr. Hansen agreed. Baker said, "Great. I can handle it." And I sent him on to see Mr. Lobell in New Orleans.

Q. And then there was a subsequent trip, is that correct?

A. Yes, a second meeting on the -- about a week later, and on that meeting I sent Buster Stabinski and William Baker together on airplane flights.

Q. And why did you send the two of them?

A. Because Mr. Stabinski knew Mr. Lobell from his hometown and just figured, you know, it's more of the -- they knew each other and it was going to be a more comfortable setting.

Q. Now, did you -- how long have you known Mr. Stabinski?

A. Oh, Buster, I met him, I believe, 2010, a couple years.

Q. And you had done projects with him before?

A. Yes.

Q. And did things go smoothly in those projects?

A. There was -- it was a loss as far as the project we did together, one of them. Yes, it was a loss.

Q. And -- but when there's losses in these projects, you would absorb the risk of the loss, is that correct?

**A.** All of them, yes.

**Q.** And you would be supporting them and giving them a draw or living expenses?

**A.** Yes.

**Q.** Is that what happened in this particular project?

**A.** Yes.

**Q.** How did you ensure that they had living money while they were up in North Dakota?

**A.** Well, each of them -- I mean, each of them had one of my debit cards for Capital Transport and they were living in rent trailers. I had rent vehicles for them, living and paying lot rent, and they bought fuel, all their food, everything. I mean, I just -- they had free rein to live and make this project happen for three months.

**Q.** And so you paid for the mobile homes that they lived in?

**A.** The -- yeah. Yes, like 15 -- I forget. It was over 1,500, I think, a trailer with the lot rent every month --

**Q.** Oh, I see.

**A.** -- per person, including rent vehicles and --

**Q.** You used a term earlier call an MSA. Can you tell the Court what that means?

**A.** That's master service agreement. We went out and collected master service agreements with the oil companies where Capital Oil Field Services could work for these companies and be in the system. Example is moving rigs, trucking,

building pads, housing them, everything that had to do with oil field services, which we marketed to them.

Q. And did you, in fact, get some business as a result?

A. Yes, sir.

Q. Okay. And was that profitable business?

A. Yes.

Q. And in approaching this project, it was always your intent to contribute funds through activities with Capital Transport?

A. Yes.

Q. Now, with respect to the time that Mr. Stabinski and Mr. Baker went to -- the second time that they went on -- on or about July 23rd of 2011, did you have a discussion with them after the fact?

A. Yes. Yes, they said --

Q. What did they tell you?

A. To go ahead and call Mr. Lobell. It was in the evening time, and they said he was expecting your call.

Q. And did you do that?

A. I did, yes. He answered the phone, and Mr. Baker, when he told me to call Kenny, he said to call him about all the operational, setting up the bank account, get the LLC established, all that stuff that I do anyway.

Q. So what did they tell you about the arrangement that -- the deal that had been reached with him? What did they -- how did they describe that?

131

**A.** They described it as it was going to be a 65/35 split, meaning 65 percent of the revenues go to Mr. Lobell until his capital is recuperated. The other 35 percent was going to be split between the other remaining partners, and once that was done, we were all going to be 20 percent partners, once he had every bit of his capital back in his pocket.

**Q.** And then -- and so when you called him, did he -- did he say -- what did he tell you? Did he express surprise that you were calling him?

**A.** No, we talked about a lot of stuff.

**Q.** And what was your assumption at that point, when you called Mr. Lobell?

**A.** Excited after the phone call. Called Randy right back. Mr. Lobell was going to call me back tomorrow and tell -- like he said on the telephone conversation, where he wanted to file the LLC because I told him we should probably try to file it in North Dakota because I already tried to file it in Texas with all the partners on that one and there was another company in Texas that already had that name. And Mr. Lobell said, "Let me think about it and I'll call you back tomorrow."

We talked about opening up the bank account at Chase Bank because that's where my businesses are out of, Chase Bank. He agreed. He has his business -- or does business with Chase Bank. I said the advantage to that is we can monitor the funds online together just by putting in your password.

132

We also talked about the trucking, Capital Transport, because he had told Randy and Buster that he was willing to invest in Capital Oil Field Services to move rigs, to build pads, which they did, and supply trucking for these MSAs that I have. Well, I actually told him about the MSAs. We talked about each oil company that had them. He told me he had trucks, he could get trucks. And I said, "Well, let's do this. You understand the MSAs are all in Capital Transport already." I said, "Since I have that existing business going, we will open up a separate bank account in a separate P and L just for our business together." Mr. Lobell didn't have any problem with that.

We also talked -- he wanted to know my history, what I've done in the past. I told him about the mobile home dealerships. I told him about the commercial construction company. He wanted to know what I had done, other deals in the past with Randy and Mr. Hansen. I said we did some of the Pensacola oil spill cleanups, on and so on. Then he talked about his BP Oil experience, how he made millions of dollars in that. And he asked me -- he goes, "Do you really think there is a lot of -- you've been there. Is there that much business when it comes to all these other -- the trucking and the rig moves and the pad building?" And I said, "Yes." I said, "We drove three-and-a-half hours every night to a hotel room." And there was over 5,000 people doing that a day supposedly back in

May of -- early May. And he was feeling me out on the investment, and I understood that. He -- you know, he wanted to have some assurance there from another person too.

And as far as that, that was pretty much -- it was about a 15-minute conversation, and then I went back to filing the LLC paperwork. And he said, "I'll call you tomorrow on that," and that's where the conversation ended. I called my partners back and said, "Yeah, you're right. He's good to go." And we started -- I think the ground breaking was July 27, which equipment was purchased on my card for that, and so that was three days later from the phone call with Mr. Lobell. We were breaking ground and making things happen.

Q. Now, but for Mr. Lobell's agreement with Mr. Stabinski and Mr. Baker and their conveying that agreement to you, would you have shared any of that information about your MSAs and business with Mr. Lobell unless they had told you that there was a deal?

A. I'm sorry. I didn't understand.

Q. If you had thought that Mr. Lobell was not your partner, would you have been calling him that night and sharing specific information about your business?

A. No. Randy had called me and said the deal was done. All I was doing was calling Mr. Lobell to set up the banking information, the LLC paperwork, all the documents that I did after the fact and sent in to the State on our behalf, paid for

134

some of those documents, sent him faxes for some of those documents that he sent back to Chad Hansen, acquired the insurance, everything. We were all going full speed. Everything was wonderful.

Q. Are you aware of Mr. Hansen or Mr. Baker representing themselves to be partners of Capital Lodging after July 27, 2012 -- 2011?

A. Absolutely.

MR. PEPPER: Objection, Your Honor, it calls for speculation.

THE COURT: Overruled. The question was, "Are you aware?"

THE WITNESS: Yes.

Q. (MR. COCHELL CONTINUING) Have you seen documents relating to such communications?

A. Yes.

THE COURT: Before we move on to those documents, I have a question for you. You dealt with Baker, Hansen, Stabinski before, right?

THE WITNESS: Yes, sir.

THE COURT: But you didn't list them on your LLC in Texas because you said there were some credit problems?

THE WITNESS: Yes.

THE COURT: What are -- do you know what their so-called credit worthiness was, those three gentlemen?

THE WITNESS: I was more familiar with Randy's credit situation. Buster I just assumed because he told me the problems he had had in the past and, you know, I had to fund him on a few things, and he didn't have income. And Mr. Hansen said he had had some issues in the past with some other businesses too. And so me and Randy, when we made that decision that him and the other guys shouldn't be on it because that would stop -- I mean, some of these projects get into some pretty decent money that was going to be over my ability, so if we had a commitment and I needed to get lending, which I can because of my credit rating, I was going to be okay. We had ran into a situation on another partnership with Randy where I had to take him off the LLC to get funding, and he said, "Let's not run into that problem again."

THE COURT: So what risk do these three guys have in -- I mean, I'll sign up for a hundred projects where I don't have to put any money upfront and I'm going to split 65/35 with the money man and thereafter a 20 percent cut of the profits. I mean, that's the greatest deal in the world. What risk do these other three gentlemen have in entering into such a project like that?

THE WITNESS: Like I said, they were there for three months living in campers and working 14-hour days and making this whole project from start to finish happen, and --

THE COURT: But they were being paid by you,

136

apparently, during that time frame or at least using your debit card.

THE WITNESS: Yes.

THE COURT: Okay. So what risk do they have? I mean, what a great deal. Do they have any risk other than expending three months of their time to try to get a dream going? Do they?

THE WITNESS: Not really.

THE COURT: Okay. And what was -- according to the discussions that you had with Baker, Hansen and Stabinski and then Mr. -- who was the fourth? I'm sorry -- Mr. Lobell, what was -- what was your risk involved in the project in obtaining this -- a portion of this 65/35 split and thereafter a 20 percent ownership interest in the profits to be realized?

THE WITNESS: When we went to an investor to try to get financing with them, we always told them that I needed to get my initial cost back, reimbursement, and that was what was told to Mr. Lobell, and he paid that reimbursement on August 2nd to me.

THE COURT: That was how much?

THE WITNESS: 61,000.

THE COURT: Okay. So you were made whole at that point.

THE WITNESS: Well, I've got $11,000 out that I haven't been reimbursed.

THE COURT: But at least at the time that you got the check for 61,000 you had been made whole for what monies that you had expended on this project.

THE WITNESS: Yes. That was the agreement, yes, with Mr. Lobell or any investor. I was going to get made whole.

THE COURT: So thereafter what risk did you have associated with undertaking a multimillion dollar project?

THE WITNESS: I didn't have a risk.

THE COURT: Okay. Where do I sign up for those deals?

Q. (MR. COCHELL CONTINUING) With respect to risk, Mr. Denton, part of what you were also providing would be continuing services in the management and financial bookkeeping of the company?

A. Sure.

Q. So there would be sweat equity, correct?

A. Of course.

Q. In addition to sweat equity that you previously invested in the company.

A. Yes, every day.

Q. And, you know, so with respect to Mr. Lobell, he would be investing money and getting reimbursed his money without having to manage everything if he chose not to, is that correct?

A. That's correct.

Q. And then after he was repaid his equity, then he would get

138

20 percent net profit on the man camp.

A. Correct.

Q. I'd like to show you what's been previously marked as Exhibit 56 (sic) for identification and ask you, sir, if you recognize that document.

A. Yes. Yes, sir.

Q. And what is this document?

A. That is a newspaper article out of the Williston Herald dated October 17, 2011.

Q. And do you know if -- with respect to this document, my question had been, did you know if Mr. Baker or Mr. Hansen believed themselves to be partners in Capital Oil Field Services and the new Capital Lodge?

A. Yes.

Q. Now, what was the intended relationship between Capital Oil Field Services and Capital Lodge?

A. They were always working as partners in this whole project and believed they were.

Q. Okay. And with respect to the newspaper articles, prior to this newspaper article, do you know if you and Mr. Baker and Mr. Stabinski worked with any public relations people about providing information about Capital Lodge?

A. Oh, yeah, there was a lot of articles in all those local newspapers about us.

Q. And in those articles -- you know, let's talk about --

were there articles after July 27th of 2011, where the articles referred to these gentlemen as managing partners of Capital Lodge?

A. Yes, it shows them in their interviews here, yes, that they're managing partners, quite a few articles after that time.

Q. And prior to that time were there articles that represented them to be managing partners?

A. Yes, lots of them.

Q. And do you know where the newspaper reporters would have gotten that impression?

A. From the partners.

Q. Okay. Were you ever present or did you participate in e-mails with the public relations lady that handled that project?

A. No. No, I was not involved in the articles of the newspaper.

MR. COCHELL: We move the admission of Number 54, Your Honor.

MR. PEPPER: Your Honor, no objection for the fact that it was published by the paper, but as per the truth of the information, the substantive truth, we do object.

THE COURT: Fully understood. Is it D-56 or D-54?

MR. COCHELL: Fifty-four, Your Honor.

THE COURT: Okay. D-54 is received.

140

THE WITNESS: Can I make a comment again, just -- I wanted to make it clear that my intention was not to work for three months, fund all this and my partners to do all this just to get a reimbursement back and be sent -- and not get any reward, including --

Q. (MR. COCHELL CONTINUING) Right, and so you're talking about the concept of return on investment?

A. Yes, sir.

Q. You don't generally just go around like Robin Hood funding things without some expectation of return?

A. Yes, sir.

Q. And when you met with potential partners, that was explained to them?

A. Yes, sir.

Q. All right. And so have you gotten any return on your -- the time and money that you invested in this project?

A. No, sir. I'm negative on both of those.

THE COURT: Well, he was reimbursed $61,000, so --

MR. COCHELL: I guess, you know, it's a legal axiom. You know, if people enter into a deal, the deal still is still the deal even if it's a bad deal.

THE COURT: Oh, I'm not -- I'm not squabbling about that, but the question was, have you received any return on your investment --

MR. COCHELL: Oh, I see.

THE COURT: -- time or otherwise, and he said no. And five minutes before that he told me that he had been made whole by receiving 61,000-plus dollars for the money that he expended over three months to get this project going.

MR. COCHELL: Well, that's the equity. That's not the return on the equity.

THE COURT: Oh, I see. Okay. We're at 2:30. We're going to take a mid-afternoon break here for about 20 minutes. Tell me, both counsel, how much more we have in terms of witnesses and length of time that witnesses will be testifying. We're not going beyond 4 o'clock today.

MR. PEPPER: Your Honor, I have two witnesses, Randy Baker and Myer Stabinski, and I don't plan to ask them a whole lot of questions, Your Honor.

MR. COCHELL: And I have Chad Hansen and about another ten, or so, minutes with Mr. Denton.

THE COURT: All right. See you in 20 minutes.

(A recess was taken from 2:30 p.m. to 2:50 p.m., the same day.)

MR. COCHELL: Mr. Denton was on the stand.

THE COURT: All right. Sir, if you could resume your seat and we'll continue with the questioning.

Q. (MR. COCHELL CONTINUING) I'm going to make this brief, Mr. Denton. On or about -- I believe it was August 31st of 2011, I believe, you had a meeting with Mr. -- with Mr. Lobell

in New Orleans?

A.   Yes, I met with Mr. Lobell.

Q.   And did you -- did you have a discussion with him about the partnership problems?

A.   Yes.

Q.   And what did he tell you?  Did he deny that he had entered into a partnership with Mr. -- with you and the other partners that you sent down to talk to him?

A.   No, he agreed he did.

Q.   What did he tell you?

A.   He told me that -- sorry, I'm just -- originally it -- the original deal was 68/32, and after he got his capital investment back, it did go to 20 percent.  I asked him about that, and he said, "That was the original deal, but then I didn't like that deal and I changed it and made it a 68/32, where 32 percent is for all of you all."  And he said, "If the guys don't perform, I don't know if I'm going to pay them anything."

Q.   And did -- did you have any further discussion with him after that?  Let me ask you this.  I mean, did you tell him that you thought he had been badly treated throughout all of this situation?

A.   Absolutely.

Q.   And until this lis pendens was filed, there's never been any contact by Mr. Lobell to try and resolve things with you.

143

A. No, sir. He stopped taking my phone call, text messages. Absolutely. We were talking all the way through September.

Q. And were you -- what else were you doing in September for the -- for Capital Lodging?

A. I wasn't doing anything after September.

Q. Okay. In August were you continuing -- after that meeting, you figured that there was nothing else that you could do and you would have to come to terms with him legally?

A. Yes.

MR. COCHELL: That's all the questions we have at this time, Your Honor.

THE COURT: This meeting in New Orleans, when was that?

MR. COCHELL: August 31st of 2011.

EXAMINATION

BY THE COURT:

Q. And you started out and you said the agreement was 68/32, and then you said he changed that to 68/32. I assume you meant 65/35?

A. No, he said the agreement was 68/32, was the original deal, and we did each get 20 percent after he got his capital back. But then he said he changed -- he didn't like that deal and he changed it to a 68 percent for him all the time and 32 percent for the rest of the partners, and then he said, "If they don't perform, I might not pay them anything."

144

**Q.** So in other words, he apparently was not happy with what the other three gentlemen were doing in North Dakota.

**A.** He said if they didn't perform, then they wouldn't get anything.

**Q.** Well, how did you interpret that?

**A.** Exactly. If he doesn't like what they're doing, then he won't pay them.

**Q.** But nothing in writing.

**A.** No. He kept saying we were going to get an operating agreement.

**Q.** Okay.

**A.** I've got e-mails back and forth, and everybody is saying that Mr. Lobell needed another two weeks with his attorney, and that's why we were all working like everything was great.

**Q.** So what did you tell Mr. Lobell about Mr. Baker and Mr. Stabinski and -- I mean, did you express some criticisms of those gentlemen and the kind of work they do and how trustworthy they are?

**A.** Yeah, I was a little perturbed at everybody and the whole thing and not feeling really good because when they wouldn't sign my partnership agreement, they said that Mr. Lobell told them not to sign it, when they told me they would sign it, go ahead and draft it up, and I stayed in North Dakota and made the partnership agreement up. And then they sent it to Kenny, and Kenny's response was, "You all better -- you better not

145

sign it or you're not getting anything," is what I'm being told, so they were forced not to sign it.

RECROSS-EXAMINATION

BY MR. COCHELL:

Q. All right. Why did -- why did you draft the agreement to just have the three of them? Did you believe that time that Mr. Lobell was a partner with you?

A. Absolutely.

Q. So --

A. He told me he was.

Q. Okay. And he was not at -- he was not in North Dakota at that time, is that correct?

A. No, not at that time.

Q. So what was your purpose in trying to get that agreement and asking them to sign it?

A. Making sure that we were all in the deal together.

Q. Okay. And with respect to -- did they ever tell you that they had signed it?

A. Yes. We had a meeting and I -- and they said, "Yes, you go ahead and draft something up. You get it together and we'll look at it." And then they sent it to Mr. Lobell and they said, "Mr. Lobell said don't sign it or you're not getting anything." And he said, "How do you -- how do you sign a deal that you don't own the property to?"

Q. Okay.

146

A.   Is what his response was to those guys.

Q.   Okay.  And with respect to Mr. Lobell, did he tell you that he would make them make good on their promises?

A.   He did.

Q.   Did he -- did he try to suggest to you that he didn't know of all the partnership issues?

A.   Yes.

Q.   And did he say anything to you that -- what made you reject his credibility in terms of, you know, the companies?  Did something happen with Capital Transport?

A.   Yes.  After me and Mr. Lobell had that conversation that -- the evening of the 23rd of July and talked about trucking, getting that running together since I already had the MSAs and the Capital Transport, LLC, already established, I went to the Secretary of State website in Louisiana and Googled Capital Lodging, and Capital Transport Services, LLC, came up.  And when I saw that, my heart kind of dropped.  I was like wow.

Five days later he is establishing a trucking company with my company marketing materials, company name, changed it to "Services," took my MSAs, started trucking with "Capital" all over the trucks right out of the man camp, when we had talked about that was part of our marketing materials to him and he had agreed he was going to invest in the trucking company.

Q.   And do you know if he was doing business with some of the

same companies in which you had master service agreements?

A. I don't know that.

Q. Okay.

A. I don't know that.

Q. But he's using exactly the Capital brand -- the Capital Transport brand. He's just adding "Services" and calling it his own.

A. My exact documents, everything.

Q. So what did you conclude about his honesty?

A. I knew that I was dealing with someone who was not honest, period.

MR. COCHELL: That's all the questions we have. Your Honor, also, just for the record, there is in evidence the amended petition, and we're cutting short our examination of a lot of the detail because it's in evidence.

THE COURT: All right.

MR. PEPPER: Your Honor, I do have some redirect.

REDIRECT EXAMINATION

BY MR. PEPPER:

Q. Mr. Denton, earlier -- you testified this afternoon that -- you indicated that on business ventures that go bad, you absorb all the losses. Isn't that what you testified to?

A. Yes, sir.

Q. You didn't absorb any of the losses in this one. You were paid back by Randy Baker, weren't you?

148

**A.** I was paid up to 61,000, with 11,000 still out, but, you know, we're not -- that's not the big topic here, $11,000.

**Q.** Okay. And so even after you were paid back, you still at that point never turned around and -- let's go back to the date that your offer to purchase the property was set to expire on July 15th. Did you ever ask for an extension?

**A.** Didn't need to. Craig said, "Chad, the land is not going anywhere." We told him Mr. Lobell was working with his bank to get his line of credit, and he said fine. And we said it would take about two weeks and Mr. Lobell would be contacting him, and that is exactly how it happened.

**Q.** But you had the opportunity and you didn't, correct?

**A.** Didn't need to.

**Q.** Okay.

THE COURT: Was this property on Multiple Listing?

THE WITNESS: No. No, Craig knew Mr. Schmidt. It was the one piece of property he knew of. We went and looked at it, and it was the right one.

**Q.** (MR. PEPPER CONTINUING) And other than that offer to purchase, do you ever have -- or did you ever obtain any written document giving you title of any kind in that property?

MR. COCHELL: Objection, asked and answered. It's beyond the scope of my cross.

THE COURT: Overruled.

THE WITNESS: No, I'm not on it.

149

**Q.** (MR. PEPPER CONTINUING) Okay. Did you ever make any capital improvements to the property? Did you ever go on the property and make any kind of construction on the property?

**A.** After Mr. Lobell made the deal with us, Randy went and leased property off of my account and we started breaking ground with that --

**Q.** I'm talking about you, sir, not Randy, you.

**A.** It is me if it's my money being spent.

**Q.** What money of yours was being spent?

**A.** We rented equipment to start breaking ground, the heavy equipment from Hertz Rental Equipment.

**Q.** Wasn't that $61,000 --

**A.** No.

**Q.** -- that you paid?

**A.** No, there's still $11,000 in cost out. And again, I don't want to harp on $11,000. I didn't do this deal three months, set it up, all my guys, spend all this money to get reimbursed. That's not what we're here for. That's not what I did it for.

**Q.** You were the money man in the partnership?

**A.** We all put this whole thing together on top of the money, every day working this thing, but, yes, I was the total money man in this whole deal, yes, sir.

**Q.** And you testified that you didn't want them on the partnership agreement earlier because of their credit problems, right?

**A.** We agreed not to go on Capital Oil Field Services together because of their credit issues. Capital Lodging, I submitted it with every partner on it, every -- all of us.

**Q.** But Capital Oil Field Services was the company that was, according to your own petition -- that was the blanket company that was supposed to own everything, correct?

**A.** Capital Oil Field Services, yes.

**Q.** And is that the partnership agreement that you approached your partners in terms of --

**A.** I think all -- I think it was just Capital -- it could have been Capital Lodge and Capital Oil Field Services.

**Q.** But to this day you have nothing in writing, correct?

**A.** No, they were told not to sign it by Mr. Lobell.

**Q.** And you've never listed them with the Secretary of State, have you?

**A.** I couldn't in Texas because that name was already done, and Mr. Lobell told me he was going to call me back the next day and tell me where we were going to submit it to, where we were going to file it.

**Q.** Capital Oil Field Services, to this day you've never listed them as your partners, have you?

**A.** No. This is Capital Lodge. I'm sorry.

MR. PEPPER: Nothing else, Your Honor.

THE COURT: All right. Thank you, sir. You may step down. You may call your next witness.

MR. PEPPER: Your Honor, we call Randy Baker.

THE CLERK: Please raise your right hand.

<u>RANDY BAKER</u>,

having been first duly sworn, was examined and testified as follows:

<u>DIRECT EXAMINATION</u>

<u>BY MR. PEPPER</u>:

Q. Mr. Baker, can you please state your name and address for the record?

A. William R. Baker, 1514 Cedar Oaks Lane, Harker Heights, Texas.

Q. Okay. And, Mr. Baker, did you -- were you first brought to North Dakota by an opportunity presented by the oil field boom up here?

A. Yes.

Q. And how did you get to come up here?

A. I received a phone call from Chad Denton to come up and pursue some opportunities.

Q. Were those opportunities in trucking?

A. Yes.

Q. Were they also for moving oil rigs?

A. Yes.

Q. Did you have working agreements with Mr. Denton?

A. No, not at the time.

Q. Okay. Have you ever had a partnership agreement with

152

Mr. Baker as to your involvement with trucking?

A. You just said Mr. Baker. You mean --

Q. I'm sorry. Mr. Denton.

A. Yes. Yes. At one time, yes.

Q. Okay. And what became of that opportunity?

A. It never produced any money. It never materialized into anything.

Q. Did he show you any papers where he had made you a partner in that?

A. No.

Q. Did you sign any papers where you were ever made a part in that?

A. Yes, I signed an operating agreement, but never got a copy.

Q. Let's talk about the man camp. Where did that idea come from?

A. That was my idea.

Q. How did you come up with that idea?

A. When we arrived in North Dakota, we were traveling from Bismarck up into the oil play, traveling three, four hours one way in the morning and evening, and realized that we needed to be focused on -- more on housing, and so I started drawing plans and putting plans together for a man camp.

Q. In fact, did you come up with the idea and write it down on a napkin?

153

**A.** Yeah, I sure did. I still have that napkin.

**Q.** Once you had this idea, how did you start to bring it to fruition?

**A.** Started researching the permitting process, starting searching for properties, looking into different types of housing that would need to be, you know, used for the project, just did a bunch of research.

**Q.** And you did this primarily on your own?

**A.** Yes.

**Q.** What role did Mr. Denton play in any of that?

**A.** At first he was working on finding financing.

**Q.** Okay. And was that always his role in any dealings that you had with him? Was he the money man?

**A.** Yes.

**Q.** Okay. Was he supposed to be the money man in the idea, your idea for the man camp?

**A.** Yes.

**Q.** And did you guys ultimately locate a parcel of land on which you thought would be good for a man camp?

**A.** Yes.

**Q.** Did Mr. Denton come up with the money to purchase the land?

**A.** No, he did not.

**Q.** Did he ever tell you that he could and that he was going to?

154

**A.** Yes.

**Q.** Did he ultimately come up with the money to purchase the land?

**A.** No.

**Q.** How did you proceed after that, once you found out that he was not going to come up with the money?

**A.** Started searching for other investments. To be honest with you, I was more involved in the construction permitting and planning, and so I really didn't do anything other than those items. I really didn't do much. I did search for some financing on my own, but wasn't able to.

**Q.** Okay. And who was paying for your living expenses while you were up there?

**A.** Chad Denton.

**Q.** And what exactly did he pay for?

**A.** Paid for a camper, groceries, a rental vehicle.

**Q.** Did he pay you any kind of salary?

**A.** Very limited, you know, on occasion, when it was needed.

**Q.** And when did you or how did you come to know Mr. Lobell?

**A.** Through Myer Stabinski.

**Q.** Okay. And how did you and Myer meet?

**A.** Myer and I had met on a project in Louisiana, and I honestly couldn't remember the exact project. I couldn't tell you that.

**Q.** And at that time were you working with Mr. Denton on

155

another project down there?

A. Yes.

Q. Okay. Whatever became of that project?

A. Basically got dissolved, never produced any positive results, lost money, and basically the whole thing dissolved.

Q. Did you ever receive any partnership papers on that deal from Mr. Denton?

A. No.

Q. Are you currently an independent contractor for Mr. Lobell?

A. Yes.

Q. How did that come about?

A. My health had gotten very poor and I needed to return back home for some medical attention, and so it was decided that I would be able to work from home as a consultant and return to North Dakota as needed.

Q. Did Mr. Denton ever propose to you a partnership agreement with regards to the man camp?

A. Yes.

Q. When did he do that?

A. Once we had started -- I don't know. It would have been, I believe, around September of 2011, yeah.

Q. And it was well after you had already -- you and Buster Stabinski had found Mr. Lobell to put together the financing for the camp, is that correct?

156

A. Yes.

Q. Did you ever -- or to your knowledge, did Mr. Lobell have any knowledge of who Chad Denton was when you had talked to him?

A. Chad Denton himself specifically, no, I don't believe so in the first conversation.

MR. COCHELL: I'm sorry. I didn't hear that answer. Could you speak in that microphone?

THE WITNESS: In the first considerations with Kenny Lobell, Kenny didn't know specifically who Chad Denton was.

Q. (MR. PEPPER CONTINUING) And did you ultimately pay back Mr. Denton for the money that he allegedly claimed was owed to him for your living expenses?

A. Yes.

Q. And did you tell him that you were not going to be his partner in the man camp?

A. Yes.

Q. In fact, was Chad Hansen with you when you told him that?

A. Yes.

Q. Did Chad Hansen agree with you?

A. Yes.

Q. Did Chad Hansen refuse to sign that partnership agreement as well?

A. Yes.

Q. To your knowledge, did Mr. Denton and Mr. Lobell ever have

157

any operating agreement together for the operation of the camp?

A. No.

Q. To your knowledge, did Mr. Denton ever show you a written document showing that he had an interest or title to the property on which the man camp stood?

A. No.

Q. In the very beginning, when you spoke with Mr. Lobell and you had asked him -- and you showed him the -- I guess it's a prospective looking for $6 million, is that what you brought him?

A. Yeah, it was. I don't remember the exact number, but it was around 6 million, yes.

Q. Did Mr. Lobell say that he would loan you the money?

A. No.

Q. Did he indicate that if he did the deal, that he would be the sole managing partner in such a deal?

A. Yes.

MR. PEPPER: No further questions, Your Honor.

THE COURT: Any questions of this witness?

MR. COCHELL: Yes, Your Honor.

CROSS-EXAMINATION

BY MR. COCHELL:

Q. Mr. Baker, with respect to your current situation, you have not been working at the Capital Lodge for about four or five months, as I understand it, is that correct?

158

**A.** On location, no.

**Q.** Okay. And so any work that you do is conducted at home, is that correct?

**A.** Correct.

**Q.** And with respect to that, you have a written agreement with Mr. Lobell?

**A.** Yes.

**Q.** Okay. And how much were you to be paid pursuant to this consulting agreement?

**A.** 8,700 a month.

**Q.** 8,700 a month?

**A.** Mm-hmm.

**Q.** And you have to answer yes or no, sir.

**A.** Yes. I'm sorry.

**Q.** Okay. And how long does that agreement continue, sir?

**A.** It continues until there's a termination date at the end of -- it's coming up here in the next few months.

**Q.** Okay. And I understand that you've acquired new employment, is that correct?

**A.** Yes, I'm actually an independent consultant. I have a consulting firm.

**Q.** All right. Now, this is the first time with Mr. Lobell that you've had employment that's paid you on a regular basis $10,000 a month. Is that a fair statement?

**A.** I guess I don't quite understand the question.

Q. Well, you were paid $10,000, plus he bought you a truck, is that correct, after you started working for Mr. Lobell?

A. Yes, I had a $10,000 a month salary.

Q. Okay. And that's really the first time that you've had a regular salary, you know, for $10,000 a month for an extended period of time.

MR. PEPPER: Objection, Your Honor, relevance.

THE COURT: It's of some suspect relevance, but I'll let you answer.

THE WITNESS: Earlier in my life, yes, I've had positions that paid that much.

Q. (MR. COCHELL CONTINUING) But it's been some years since then, correct?

A. Correct.

Q. And so you have a wife, do you?

A. Yes.

Q. Do you have any children?

A. No. Expecting one today.

Q. Okay. You're adopting a child, is that correct?

A. Correct.

Q. I see. With respect to your agreement with Mr. Lobell, did he threaten to terminate your agreement and sue you for obstruction if you didn't come to today's hearing?

A. No.

Q. He didn't make any threats to you?

A. No.

Q. Did you tell anybody that he made threats to you?

A. No.

Q. With respect to Mr. Lobell, when you went down there, you went down there on behalf of Mr. Denton and Capital Transport and this idea and concept that you and Mr. Denton and Hansen and Stabinski had worked on for a couple of months, is that right?

A. More myself, but, yes, I was primarily the lead on it. The other gentlemen and the parties did help on the project.

Q. I see. And so you walked in and you did propose that there be a partnership where you would get some net profit, isn't that correct?

A. Correct.

Q. And there was an investment package that was sent to Mr. Lobell, isn't that correct?

A. Yes.

Q. And the investment packet, there's an e-mail that has your name and Mr. Denton's name on it, is that correct?

A. I honestly can't recall that specifically.

Q. Fair enough. It's a detail, but let me tell you, sir, with respect to the investment package, everybody understood that these were assets that had not yet been purchased in their entirety, but that there was an interest in purchasing them. And the purpose was to get money to get the man camp, you know,

assets, you know, the land, the other trailers and other equipment. Is that a fair statement?

A. Yes.

Q. Okay. And so basically you were promoting a plan and a concept of a man camp in -- and offering that investment to people in exchange for a return for your developing that concept. Is that a correct statement?

A. Correct.

Q. Okay. And so when you talked to Mr. Lobell, he basically told you that he wasn't interested in giving you any interest in the man camp?

A. No, that's not what I stated earlier.

Q. What did he agree to do?

A. He agreed that he would put the -- because it was an unknown situation. Man camps were new, that he would put all the assets in his name and at which time the -- if the project went the way that we prospected, then at that point there would be a partnership agreement and a split of profits.

Q. Okay. And was there to be an operating agreement?

A. Yes, there would be at some date.

Q. All right. And so did you ask for an operating agreement?

A. Yes, I had.

Q. You asked for it a number of times, isn't that correct, sir?

A. Yeah, discussed it several times.

Q. And during those times, what did Kenny tell you?

A. That it wasn't time yet. We were still -- a lot of unsure things, and the budget had changed several times, and we still didn't know exactly how the project was going to work out.

Q. When you described -- when you described the result of that meeting with Mr. Denton, did you -- did you tell him that it's kind of a -- he's going to invest, but it's going to be a wait and see on whether we get any profits? Is that how you described to him?

A. No.

Q. What did you tell him?

A. I told him if things worked out the way we had all planned, that we would see profits.

Q. Did you tell him that there was an agreement with Mr. Lobell?

A. Yes, we had a verbal agreement.

Q. Okay. And did you tell him that there would be an operating agreement in very short order to memorialize?

A. At some point it would eventually move into an operating agreement.

Q. Okay. And on the night -- on the day that you entered into this oral agreement with Mr. Lobell, did you -- did you tell him -- or did you tell Mr. Denton that -- that there was an agreement, or did you say it was an agreement subject to Mr. Lobell being satisfied with the way things went?

163

**A.** I don't know that I specified either way, to be honest with you.

**Q.** All right. And you sent an e-mail to everybody, including Mr. Denton, isn't that correct?

**A.** I'm sure I did.

**Q.** All right. Let me mark this. I'm going to mark it out of order as Number 58 because I think it makes some sense to talk about it now. I'll show you what's been marked as Exhibit 58 for identification, sir, and ask you if you can identify that document.

**A.** Yes, this is from me.

**Q.** All right. And at that point Mr. Lobell had authorized you to get the camp up and running, is that correct?

**A.** Correct.

**Q.** And so basically you wrote back to Chad Hansen and some other people, including Mr. Denton and Myer Stabinski, that, "Well, guys, we did it. We have full financial backing for the largest crew lodge in North Dakota. Now all we have to do is build it," is that correct, sir?

**A.** Yes.

**Q.** Okay. It doesn't say, "Well, guys, we did it, but subject to whether Kenny is satisfied with their performance in two months or six months or whenever." You didn't say that, did you?

**A.** No, but I also didn't give any kind of specifics on

164

financials.

Q. I see. At that point you don't recall exactly what you told Chad Denton when you called him on July 23rd, is that correct?

A. It's a long time ago, sir. I do remember having the discussion that, yes, we have financial backing and that Kenny will invest in the camp and that the camp would be put into Kenny's name until such time that we could figure out exactly how the project was going to go.

Q. And there was supposed to be an operating agreement, correct?

A. At a future time, yes.

Q. Right. And the operating agreement was to specify 68 percent and 20 percent for each of the five partners, isn't that correct, sir?

A. It was supposed to be -- the original discussion that we had was to be split up 68 percent to be returned to the investment, 32 percent to be split five ways.

Q. Okay. And that's the way you walked into the transaction, thinking that it was going to be 68/32 percent?

A. Well, yes, but then as we were discussing that, Kenny stated if everything goes the way it's stated in this original estimate, that's how we can do this. First we need to see how this is going to go.

Q. So there was never an agreement for 68/32 percent while he

was being repaid the cost of his investment, but then 20 percent for each of the five partners?

A. That was the original discussion, yes.

Q. But he agreed to that initially, didn't he?

A. Yes, as long as everything ran okay.

Q. Okay. And then he changed that at some later point to 68 percent, 32 percent, isn't that right?

A. That question totally confuses me.

Q. In your meetings with Kenny in New Orleans in July of 2011, he agreed to 68/32 percent, 20 percent to the partners after the initial investment was recaptured by him, correct?

A. The question is still confusing. I don't know what you're getting at.

Q. He agreed in your discussions that he would -- he would get paid 68 percent of the proceeds and the other partners would get 32 percent, and then the 68 percent would then change to 20 percent for each of the partners after all of his capital investment, all the money he put into the company was recaptured?

A. Yes, that was originally what we discussed.

Q. Okay. And he agreed to that.

A. If everything ran according to plan.

Q. Okay. And did he ever tell you that he changed his mind and he was just going to make it 68/32 and no net profits?

A. At a later date when we were discussing it, it never

166

really became evident exactly how that was going to work out. Basically there were issues.

**Q.** And so you thought it was a good idea to hand this project over to someone who was going to like let everything kind of percolate over a period of time?

**A.** Well, at the point at that time we had no other option. He was a financial backer. He was willing to at some point pay us a percentage of profits, and that was the best option we had at the time.

**Q.** And you didn't think that there were other investors out there?

**A.** They had been sought many times for many months, and we were at a point where we were going to lose the entire project if we didn't take an investment.

**Q.** When you say "many months," we're talking about a month after you put together the investment package, isn't that right?

**A.** No, that's not true.

**Q.** How many months did you look for investors?

**A.** Around two.

**Q.** Okay. So it's not many months. It's two months, a couple of months, right?

**A.** Two.

**Q.** All right. So you felt that that was the only option, is that correct?

167

A. Yes, at that time.

Q. All right. You didn't discuss that with Chad Denton, about whether it was okay to walk into a deal with Kenny being able to change it at any time, is that correct?

A. Yes, we did, actually. We all discussed it multiple times, of different investors, of whatever we could do to make things happen.

Q. I see. So -- but you didn't discuss it with him that night, is that correct?

A. No, I was the only one there.

Q. All right. With respect to your affidavit, you signed an affidavit. I assume it was at the request of Mr. Lobell's counsel. I show you what's been marked as 55 for identification. Do you recognize that? Is that your signature, sir?

A. Yep. Yes.

Q. That was provided to you by Mr. Pepper or by someone else?

A. Mr. Pepper.

Q. Okay. And so you're saying that neither yourself, Buster, Chad were ever partners or owners with Mr. Lobell in any of the ventures such as Capital Transport, Lodging and so on, correct?

A. Correct, nothing on paper.

Q. But you just testified, sir, that he agreed to a 68/32 percent deal, subject to satisfaction, is that correct?

A. Correct. At some point, yes.

168

Q. All right. So you did have a deal. It just wasn't the deal that Mr. Denton sent you down to get, isn't that correct?

A. There wasn't anything in writing, sir.

Q. Okay. So you're thinking that it had to be in writing in order to be a binding deal?

A. In my understanding in the past, yes, we were looking at a future of having everything on paper, you know, that's what we were working towards.

Q. So with respect to -- so you were -- okay. With respect to if -- and so when you say you've never been in the past nor currently or will be in the future a partner of these various companies, that's based on your understanding that you can't have an oral agreement, right?

A. Correct. It's based on the fact that I don't have a written agreement.

Q. And one of the reasons you went down and you offered to do -- or you agreed to do this 68/32 percent deal is you expected some return on your investment for the concept, for the marketing materials, for all the groundwork that you had worked on over the last two-and-a-half or three months, right?

A. Correct.

Q. Okay. And so that was a considerable amount of work, as I understand it, is that correct?

A. Yes, it sure was.

Q. Everybody lined up. In fact, there were master service

agreements for Mr. Denton's company, the Capital Transport, LLC, is that correct?

MR. PEPPER: Objection, Your Honor, relevance. He's starting to talk about the transportation companies. I think the essence of the affidavit has to do with the man camp.

THE COURT: Overruled.

Q. (MR. COCHELL CONTINUING) There were MSAs in place?

A. Yes. I don't know a whole lot about those. I didn't really handle those, but I do know that there were some in place.

Q. All right. And was it your understanding that Mr. Lobell was going to participate in the transport business? Do you have an understanding one way or the other?

A. Very limited. I didn't deal with that. I dealt with the construction of the man camp, but my understanding was that there was going to be something to do with trucking involved in this deal.

MR. COCHELL: By the way, Your Honor, if I didn't previously move for it, I'd like the admission of -- I believe it's 58.

THE COURT: Fifty-five and fifty-eight?

MR. COCHELL: Yes, Your Honor.

MR. PEPPER: And 58 was?

MR. COCHELL: Was the, "Well, guys we did it" letter.

MR. PEPPER: No objection, Your Honor.

THE COURT: Exhibits 55 and 58 are received.

Q. (MR. COCHELL CONTINUING) Now, sir, I believe the next one in order is going to be 59. I'd like to show you what's been previously marked as Exhibit 58 for identification and ask you, sir --

THE COURT: Fifty-nine.

Q. (MR. COCHELL CONTINUING) Fifty-nine. I'm sorry. I misspoke, 59, and whether you can identify that document. I believe you're a recipient or copied on it. Do you recognize that document, sir?

A. I've looked at a lot of documents. I don't remember it specifically, no.

Q. Do you have any reason to believe that you didn't receive a copy of this document?

A. I have no reason to believe I received it or didn't receive it.

Q. Okay. It says here at the bottom of the second page -- this is like a lot of documents you got from Chad Hansen, right?

A. There's several, yeah. I used to get hundreds of e-mails a day.

Q. Okay. And the second page of this talks about having an NJUN system to be installed at the man camp?

A. Yes.

Q. And Mr. Hansen lists himself as a managing member?

171

**A.** Yes, I see that.

**Q.** Okay. And so obviously Mr. Hansen thought he was a partner, right?

**A.** Yes.

**Q.** And this is as of -- oh, date on the letter is -- well, the e-mail is October 16th of 2011, correct?

**A.** Yes.

**Q.** Okay. Did you or Mr. Hansen hold yourselves out as partners in the Capital Lodge?

**A.** Yes, we fully expected at some point to be a partner in the company.

**Q.** I see. And so you didn't think that was deceptive or dishonest in any way, did you?

**A.** Explain that a little more, please.

**Q.** You fully expected to be partners and treated like partners, correct?

**A.** Yes. On the profit side, yes.

**Q.** Right. And so you didn't -- you didn't think twice about it, is that correct?

**A.** I don't know. I didn't write this letter, so I can't tell you.

**Q.** Okay. But you don't deny that you, yourself, have signed as a member, as a partner of Capital Lodge after Mr. Lobell and you entered into this deal, right?

**A.** Yes. Correct.

172

**Q.** Okay. And you didn't tell him about Mr. Denton in July. When did you tell him about Mr. Denton?

**A.** We discussed Mr. -- well, we discussed that there was another -- there were two other partners. There were two different meetings with Mr. Lobell. In the second meeting -- the first meeting it was brought up that there was basically myself and three other partners. And then in the second meeting with Mr. Lobell, at that point they were named, Mr. Hansen, Mr. Denton. Myer Stabinski was there with me, but we never really spoke about them in any kind of length or depth -- in any kind of depth.

**Q.** Okay. And so in concept, Mr. Lobell didn't have a problem with going into partnership with all of you, isn't that right?

**A.** Yeah, he -- Mr. Lobell looked at it more like himself and then us as an entity.

**Q.** I see. Okay. And you don't deny that you considered yourself Chad Denton's partner along with Mr. Stabinski, Hansen, right?

**A.** No, I've never denied for one moment that the four of us were all together on this from the start.

**Q.** All right. With respect to your agreement with Kenny Lobell, you insisted on that being in writing, didn't you?

**A.** Yes.

**Q.** And that was to protect yourself in case Mr. Lobell changed his mind?

A. Well, several reasons as well. My health was very poor. I very well could have -- may not have been here, and I wanted to have something to secure my wife.

Q. Fair enough. And with respect to the -- is there a provision in that agreement that you have to testify on behalf of the company if you're asked to?

A. No, it's that I'm required to come to North Dakota as needed.

Q. Okay. And so they anticipated litigation at the time that you entered into this contract.

A. That, I'm not sure of.

Q. Now, you gave Mr. Lobell a copy of the petition that you were served with in Bell County, is that correct, sir?

A. Yes.

Q. You sent him an e-mail and attached a copy of it?

A. Yes.

Q. All right. And so did you have a discussion with him about the lawsuit and the allegations in the lawsuit?

A. Yes, I was questioned about it.

Q. And he was fully aware that there was an allegation that Mr. Denton had been cut out of this partnership, isn't that correct?

A. Yes.

Q. And that occurred shortly after you were served, which was -- do you recall when?

174

A. Not exactly. I do not.

Q. It was in the summer of 2012?

A. I think it was closer to the fall. I'm not sure. I honestly don't remember.

Q. Fair enough. Summer or fall, and so he read it, and was he upset with you about it?

A. Yeah, he seemed to be frustrated about it.

Q. And did he tell you that he had lost money on this deal, that he was losing money on the deal?

A. He had stated that the deal wasn't what we had originally planned and that we were way over budget.

Q. Okay. And so even though you were supposed to get some profit from this deal if it -- if it went well, has he told you what the circumstances of his current deal is to --

A. No.

Q. -- sell the -- you didn't know that he was going to make 25 million profit from this deal?

A. No, those numbers --

MR. PEPPER: Objection, Your Honor. It's speculative. There's no deal on the table. There's no evidence of any signed contract for any sale.

THE COURT: I'm not -- yeah. Well, if you know anything about that, you can respond to the question.

THE WITNESS: I mean, I'd heard rumors that it was going to be sold. I don't know what the numbers were. You

175

know, I mean, I'd heard numbers thrown around from several different people, but not from Mr. Lobell himself.

Q. (MR. COCHELL CONTINUING) So whether it's 12.5 million or 25 million, that's making a profit, don't you think?

THE COURT: Depends on how much money has been expended.

MR. COCHELL: After you recoup your return on investment, 25 million is pretty rich.

THE COURT: If all your costs have been covered, that's a good profit.

MR. COCHELL: Yep.

Q. (MR. COCHELL CONTINUING) You would agree with that? That's a -- 12 million is pretty good profit, don't you think?

A. Yeah, I would agree that 12 million is a great profit.

Q. Net of expenses, right?

A. Yeah.

Q. You would agree with that?

A. Yeah.

Q. Fair enough. So he didn't lose so bad, did he?

A. I don't know for sure. I don't know the numbers.

Q. All right. Fair enough. And so what you get is 8,700 a month for five or six months, and you get nothing for all the effort you put in the man camp before and after Mr. Lobell, isn't that right?

A. As far as share of profits, no, I don't get anything.

**Q.** Okay. You think that's fair?

**A.** No, honestly I don't, but deals sometimes turn bad.

**Q.** Sometimes you make a bad deal, but a deal is a deal, isn't it?

**A.** Usually, yes.

**Q.** And you have to -- you have to perform on your deal even if you regret the terms of your contract, isn't that correct, sir?

**A.** Yes.

**Q.** With respect to a couple of other things, you -- pardon me just for a minute. With respect to testimony --

MR. COCHELL: I forget the number of the -- it's 59, Your Honor. We offer 59.

THE COURT: Any objections to P-59?

MR. PEPPER: Oh, P-59, that was the --

THE COURT: Oh, Defendants Exhibit 59.

MR. PEPPER: That was the e-mail?

THE COURT: Correct, e-mail from Rick Watson.

MR. PEPPER: Oh, yes, we do have an objection to that, Your Honor, as to relevance, and it's hearsay.

MR. COCHELL: Goes to the state of mind, Your Honor, and state of facts as they then existed.

THE COURT: Well, that doesn't overcome the hearsay objection, but I'm going to receive it. It's a Court proceeding and I can sort out what I consider to be relevant

177

and what I consider to be hearsay.

MR. COCHELL: Yes, Your Honor. It's also a business record. It's something that he sent in the ordinary course of business.

THE COURT: Business record of Mr. Watson.

MR. COCHELL: I'm sorry?

THE COURT: A business record of Mr. Watson or Mr. Hansen?

MR. COCHELL: It would be business record of that organization, of what it -- what it was at the time and what it was to become because as the successor he took over Capital Lodge under Mr. Denton and Mr. Baker and so it -- it still continues.

THE COURT: I've received the exhibit.

MR. COCHELL: Thank you.

Q. (MR. COCHELL CONTINUING) I don't know if this exhibit is still up there, but it's -- I think it's D-53. I can hand another copy to the witness. Let me show you what's been previously marked as Defense Exhibit 53. Do you recognize that document, sir?

A. Yes, this is the document I forwarded to Chad Hansen. I've never actually read the entire document, to be honest with you.

Q. Okay.

A. The attachments -- I didn't read the attachments.

178

**Q.** Right. Right. And did you have a discussion with Mr. Hansen before you sent it to him?

**A.** Yes, that Mr. Pepper was looking for the affidavit for Mr. Hansen and that we were going to send over -- I believe it was an affidavit and then basically a type of settlement of some sort that was basically saying that, you know, would lessen any possibility of further lawsuit.

**Q.** I see. And with respect to that, what did --what did you tell Mr. Hansen when you talked to him about what you were sending him?

**A.** That as far as for the agreement, not to -- to basically not continue with any type of lawsuit, that there would possibly be some payment there.

**Q.** Okay. So that if he -- if he didn't participate in the lawsuit by Chad Denton, that he would get the 20 percent?

**A.** I don't think it was a lawsuit with Chad Denton. Basically stating that Mr. Hansen was not to file a lawsuit against Mr. Lobell.

**Q.** I see. So he was basically being told, we'll pay you 20,000 if you don't sue Mr. Lobell.

**A.** Yes, I basically agree that that's -- that I didn't read the documents, so I can't really tell you what exactly it says. I just basically forwarded it on.

**Q.** And you offered him $20,000 at the time you talked to him, is that correct?

A. Yes.

Q. Okay. And the purpose of that was for a settlement of any claims against Mr. Lobell?

A. Yes.

Q. Okay. And with respect to that agreement, did -- he had to sign an affidavit. You remember sending that to him, don't you?

A. Yes, I believe it was in the same e-mail. I think that's this one here.

Q. Yeah, and so that was to help Mr. Lobell in this particular hearing that we're having today on the lis pendens?

A. Well, I don't know about the lis pendens, but in the lawsuit hearing, basically any proceedings between Mr. Denton and Mr. Lobell.

Q. And nobody had expressed any interest in getting a settlement from Mr. Hansen before this hearing was scheduled, as far as you know.

A. Not that I'm --

MR. PEPPER: Objection, Your Honor, again, relevance. This is a hearing to cancel a notice of lis pendens.

THE COURT: Overruled.

Q. (MR. COCHELL CONTINUING) Is that right?

A. As far as my knowledge, no.

Q. Now, Mr. Hansen was told that there was no longer any need for him to remain at the man camp, is that correct, sir?

180

**A.** Yes.

**Q.** He was not told that he was terminated for cause, is that correct?

**A.** He was at that time fired, is what I was told to tell him.

**Q.** Okay. Did you terminate Mr. Hansen?

**A.** Yes, I did.

**Q.** Okay. Well, did you tell him that he was terminated for cause?

**A.** I just told him that he was not to come back and that he was basically fired.

**Q.** Okay. And did he ask why?

**A.** Yeah, of course he did.

**Q.** Okay. And what did you tell him?

**A.** I just told him that, you know, Mr. Lobell told me we don't need him anymore, that we're getting too fat on the payroll, and that there was some questions about a couple transactions that had conspired over the landscaping.

**Q.** I see. But did Mr. Lobell have any hard evidence of that, or is that just his -- is that just his speculation?

MR. PEPPER: Objection, Your Honor. The question calls for speculation on the part of the witness.

THE COURT: Sustained.

**Q.** (MR. COCHELL CONTINUING) Based on your understanding, what did you think of those allegations?

**A.** I didn't believe them to be true, but then again, at that

point it didn't matter. Mr. Lobell was my boss.

Q. I see. So you did what your boss told you to do.

A. Exactly.

Q. Okay. And your income has been pretty much dictated by the consulting agreement and basically doing what Mr. Lobell has asked you to do, correct?

A. Correct. He is my boss currently.

Q. And he's asked you to testify today, is that correct?

A. Of course he did.

Q. And with respect to your testimony, if you didn't get paid for the last five or six months, you wouldn't have had the ability to support yourself and your family, isn't that correct?

A. That is incorrect.

Q. You would have had independent means to support yourself, is that correct?

A. Yes, I do. I do very well on my own, as my own consultant.

Q. I see.

A. And have so for several months.

Q. And have you told anybody that you've been hurting financially?

A. Well, yeah, I'm going through an adoption right now. Everybody hurts when they go through that. It's very expensive in a very short time frame.

**Q.** And without Mr. Lobell's financial support the last couple of months, that would have been even more difficult, isn't that correct?

**A.** Yes.

**Q.** And so you offered this $20,000 and sent Chad an affidavit and said if you don't sign this, you don't get any money, is that correct?

**A.** Basically, yes.

**Q.** Okay. And --

**A.** And it wasn't just the affidavit. It was the affidavit and the --

**Q.** Understood.

**A.** -- the other agreement. I never read either one of them, to be honest with you.

**Q.** And then after -- did Mr. Hansen say, "I'm not going to do that"? Did he say that?

**A.** Yeah, he said -- well, first off he said he would think about it. And then he got back to me the following day, I think, or two days later, said he wanted to discuss it with an attorney and that he would get back to me. He got back to me, said he didn't want to do it.

**Q.** Did you ever get back to him and offer to pay $30,000?

**A.** Yes, I think we had a discussion. Chad had mentioned to me that if he was going to do it, he would have required more money than that. And I had told him I would ask, and so I had

183

asked and came back with $30,000.

Q. Oh, I see. And was it your understanding that in order to get the money, he had to sign the affidavit, whatever it contained, right?

A. No, he was able to change it. He was told he could change it to whatever he needed.

Q. Okay. And what is it -- do you know that he had already filed an Answer in the district court?

A. Yes.

Q. And did you know that -- in fact, he had shown you a copy of the district court Answer, isn't that correct?

A. Yes, at one time.

Q. And you know that he contends that he had a claim against Mr. Lobell, isn't that correct?

A. Yeah, that's been his intention (sic).

Q. Okay. So even though he had already filed an official court document, you realize, of course -- I think you testified that you didn't really read the affidavit?

A. Not his, no.

Q. Okay. The one that was proposed to him.

A. Correct. I didn't read his.

Q. Okay. The 20,000 or 30,000 dollar affidavit.

A. Correct.

Q. All right. And so if that asked him to change his position in the courtroom, that would have basically been

asking him to perjure himself, isn't that right?

**A.** I guess it would if --

MR. PEPPER: Objection, Your Honor, again, speculation. It calls for speculation on the part of the witness.

THE COURT: Does filing of an answer by an attorney on behalf of a client equate with a sworn statement under oath under Texas law?

MR. COCHELL: He filed -- he filed a very extensive answer. In fact, why don't I mark that as the next exhibit in order.

THE COURT: It might be an answer, but in North Dakota and in federal court, nobody has to certify or attest to an amended answer that's filed. I don't know what the law is in Texas, but --

MR. COCHELL: You don't have to -- you don't have to certify it, but it is a record that we've heard people cross-examining each other on today. An answer or a complaint, it's an official document and it certainly does state a position.

THE COURT: But is it a sworn statement by somebody to --

MR. COCHELL: It's not a --

THE COURT: So then it wouldn't equate with perjury under any circumstances.

185

MR. COCHELL: That's correct, and I stand corrected, Your Honor.

Q. (MR. COCHELL CONTINUING) I show you what's been marked as Exhibit 60. Do you recognize that document, sir?

A. I can't be sure this is the same one, but it looks very similar to the one that I saw.

Q. And this is Mr. Hansen's Answer in the Texas case?

A. Yes.

Q. All right. And so at the very least, if that affidavit stated that he had never been a partner, never would be a partner, and so on, that would be basically asking him to change his position in the Texas lawsuit, right?

MR. PEPPER: Objection, Your Honor, speculation. He's asking this witness to testify as to --

MR. COCHELL: We'll withdraw the question, Your Honor.

Q. (MR. COCHELL CONTINUING) You can answer the question.

THE COURT: Well, you withdrew the question.

MR. COCHELL: I'm sorry. I couldn't hear you, Your Honor.

THE COURT: You withdrew the question.

MR. COCHELL: I did. I withdraw it. That's all the questions we have for this witness.

THE COURT: All right. Anything else of this witness?

MR. PEPPER: Just a few questions, Your Honor.

**REDIRECT EXAMINATION**

BY MR. PEPPER:

Q. Mr. Baker, have you found Mr. Lobell to be mostly credible and fair with you?

A. Yes.

Q. Did the project go as planned and end up only costing $6 million?

A. No.

Q. How far has he gone over budget, to your knowledge?

A. Well, depending on how you look at the project, the original project was for one phase for around 6 million. That was over budget. Of course, then we've run into several other phases of construction to complete the entire project. Originally with Mr. Lobell, we were only presented one phase, so -- but, yes, that one phase is over budget or was over budget.

Q. And at any time did you have a written agreement with Chad Denton for any kind of a partnership with regards to the operation of the camp?

A. Of Capital Lodge, no.

Q. And did you ever end up having a written agreement with Mr. Lobell since things didn't go as they were supposed to with regards to any kind of partnership in the camp?

A. No.

**Q.** As a matter of fact, he had offered -- if everything went well, that he would offer you perhaps a certain percentage of profits, not an ownership percentage, correct?

**A.** Correct, toward -- yes.

**Q.** But that was only if the project went as planned, correct?

**A.** Correct.

**Q.** Now, did you end up being able to finish the project?

**A.** No, I did not.

**Q.** And did Mr. Lobell keep you on as an independent contractor?

**A.** Yes.

**Q.** And was there any question in your mind that you're either an independent contractor and not a partner?

**A.** At this time, no.

**Q.** And at the time you were asked to terminate Mr. Hansen, when you told Mr. Hansen he was terminated, did he ever tell you that, "I can't be terminated because I'm a partner"?

**A.** Yeah, he did try that, yes.

**Q.** Okay. But eventually he realized that he was, in fact, an employee, correct?

**A.** Yes.

MR. PEPPER: No further questions, Your Honor.

MR. COCHELL: Your Honor, we offer Number 60.

THE COURT: Sixty is what?

MR. COCHELL: That's the Answer by Mr. Hansen.

188

MR. PEPPER: I have no objection, Your Honor.

THE COURT: All right. Exhibit 60 is received.

RECROSS-EXAMINATION

BY MR. COCHELL:

Q. Now, with respect to this discussion that you had with Mr. Hansen, you -- well, he told you that he couldn't be terminated because he had a partnership interest, is that right?

A. That's what he had told me, yes.

Q. Okay. And what did you tell him?

A. I told him, you know, as far as the monthly payroll that he was receiving, that was as an -- basically as an employee of Capital, and so that --

Q. In fact, what he got was draws. He didn't get paid as a salary or an hourly rate.

A. It's been called several different things from draws to income to payment.

Q. And what you got were draws, isn't that correct, draws against profits?

A. Not that I was aware of, draws against profits, no.

Q. But draws against operating income.

A. No, they were to be a salary based on what I -- my performance as a project -- or a project manager.

Q. Were you issued a W-2 in 2011?

A. No, I was a 1099 employee, always have been.

189

**Q.** Okay. You've always been a 1099 employee for Kenny Lobell, correct?

**A.** Correct.

**Q.** So you weren't an employee.

**A.** Yes, I'm a subcontractor, a 1099 employee.

**Q.** Okay.

**A.** Subcontractor.

**Q.** All right. And with respect to budget overruns, in fact, Mr. Lobell insisted that various construction occur on his time frame, which resulted in an increase in expenses, isn't that correct?

**A.** Yes.

**Q.** He started various phases of the project before you would have recommended that he do that. Is that a fair statement?

**A.** Yes, that's fair.

**Q.** Okay. And so the cost overruns in large measure were a result of Mr. Lobell's actions as opposed to incompetence on your part or incompetence on other people's parts.

**A.** I think it was an incompetence on a large number of items and people, a lot of unknown factors.

**Q.** I'm sorry?

**A.** And a lot of unknown factors.

**Q.** I see. All right. And that -- that happens in every project, right?

**A.** Correct, especially in North Dakota.

190

MR. COCHELL: That's all the questions we have, Your Honor.

MR. PEPPER: Your Honor, at this point it's 4 o'clock as we notice, and we noticed -- and we took notice of Your Honor wanting to conclude the day at 4 o'clock. If your Honor has heard enough --

THE COURT: Well, are there how many more witnesses?

MR. PEPPER: We have one more witness, Your Honor.

THE COURT: Who's that?

MR. PEPPER: Buster Stabinski.

MR. COCHELL: Then we have Chad Hansen, Your Honor, and his testimony is important.

THE COURT: Bring them on.

MR. NYHUS: Your Honor, can I go make a phone call?

THE COURT: You can make a phone call, sure, but we're going to continue with the witnesses.

THE WITNESS: Am I dismissed?

THE COURT: Yeah, you may step down. Thank you.

MR. PEPPER: We would call Myer Stabinski.

MYER STABINSKI,

having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PEPPER:

Q.   Mr. Stabinski, please state your name and address for the

record.

A. Myer Stabinski, my address right now is Capital Lodge, 108552, Highway 2, Tioga, North Dakota.

Q. Okay. Mr. Stabinski, how did you get involved with Mr. Lobell and the man camp in Tioga?

A. Well, I called him when we couldn't get some investors to do the deal for us, so the contract was already expired and we had been up here for months, so I called Mr. Lobell to see if he would be interested in doing it or looking at the deal.

Q. And do you recall what Mr. Denton's involvement in your activities in North Dakota was?

A. Well, when we first got up here, we were meeting with Denbury Oil to do trucking, and we wound up doing a rig move with it.

Q. Okay. Was that Randy Baker's idea?

A. No, that was -- actually, I had the contact for Denbury Oil to move the -- to move the rig, the trucking. But for the man camp, Randy came up with that one.

Q. So the -- to do the trucking was actually your connection, not Mr. Denton's connection?

A. It was somebody that I met that said to come up here and he would give us a contract to go to work.

Q. Okay. Did you help him in attempting to get the rig moving business?

A. Well, I mean, I knew the guy and I'd been talking to him

192

on the phone, and we were up here together because the guy that came up here tried to go around us and take it from us. And the guy that I was talking to said for you -- for me to come meet him, and we did.

Q. Okay. And was your involvement -- and was ultimately the trucking business and the rig moving business successful?

A. Yes, we did -- we just did one.

Q. You did one?

A. Yeah.

Q. Okay. And did you ever get paid? How did the money flow in that deal?

A. Through Capital Oil Field Services.

Q. Okay. Did you ever get paid by him for your work in that endeavor?

A. No, the only thing he did was lend me 2,000 or -- it was like 2,000 or 2,500 bucks.

Q. Okay. You ultimately had to pay that back, right?

A. Well, I didn't, no. I mean, realistically it should be I shouldn't have to pay it back because I paid my own expenses up here and paid for my hotel rooms for about 45 days.

Q. Did you get any money from the rig move?

A. No, sir.

Q. Did you ever sign a partnership agreement with him for any of your activities in North Dakota?

A. No, sir.

Q. And that includes the trucking business or the rig business as well?

A. Correct.

Q. Or the man camp?

A. No, sir.

Q. Are you currently an independent contractor for Mr. Lobell?

A. Yes, sir.

Q. Okay. To your knowledge, did Mr. Denton ever buy or execute any documents on behalf of himself or any corporation of his that you know of to buy any real property in North Dakota, specifically the property which the man camp is on?

A. I know because I went with them all to the real estate agent, and he did sign some form saying that he was interested in buying -- that he was going to buy it.

Q. Do you know if he ever bought it?

A. No, he did not.

Q. Who bought the property?

A. Mr. Lobell.

Q. Did Mr. Denton ever come to you at some later date, after Mr. Lobell bought the property, and propose a partnership agreement to you?

A. Yes, he did.

Q. And what agreement was that?

A. It was something saying that we were all partners.

**Q.** And did you refuse to sign it?

**A.** Yes, sir.

**Q.** Why did you refuse to sign it?

**A.** Because I didn't own part of Capital Lodge to sign an agreement saying that I would give a percentage -- a partnership or something that I did not own.

**Q.** Were you there when Randy Baker told Mr. Denton that he would not sign the partnership agreement?

**A.** No, I wasn't.

**Q.** Were you aware that Randy Baker refused to sign the partnership agreement?

**A.** Yes, he told me.

**Q.** How about Chad Hansen? Did he tell you that?

**A.** Yep.

**Q.** And what were their reasons for not signing?

**A.** Because we didn't own anything to give a percentage away.

**Q.** And have you been a 1099 employee consultant for Mr. Lobell since that time?

**A.** Yes, sir.

**Q.** Have you always been a 1099 employee with Mr. Lobell?

**A.** Yes, sir.

**Q.** Did he ever give you the impression that you were anything other than a 1099 employee for the lodge?

**A.** No. I mean, we tried to, but it didn't --

**Q.** Did the project go as planned, according to the $6 million

initial offering that you brought to him?

A. No.

Q. Were the cost overruns bad?

A. It was way over.

Q. Did you realize at that point that pretty much everybody, including yourself, Mr. Baker and Mr. Hansen, were pretty lucky that Mr. Lobell decided to give all of you all a job?

A. Yes, we are.

Q. To your knowledge, did Mr. Denton and Mr. Lobell ever have any operating agreement together for the operation of the man camp?

A. No.

Q. Did Mr. Denton ever have an active part, to your knowledge, in the operation of the man camp?

A. Did he have a part of it?

Q. An active part. Was he up there with you guys doing anything?

A. No.

Q. Did he show up for the grand opening?

A. No, he did not.

MR. PEPPER: No further questions, Your Honor.

CROSS-EXAMINATION

BY MR. COCHELL:

Q. Mr. Stabinski, I'm going to show you what's been marked as Exhibit 61 for identification, ask you, sir, if you can

196

identify that document, which purports to be an affidavit of Myer Buster Stabinski?

A. Mm-hmm.

Q. That's your signature?

A. Yep.

Q. And you signed that. That was prepared by Mr. Pepper, to your knowledge?

A. Yes.

Q. Okay. And how far did you get in school, Mr. Stabinski?

A. Freshman in college.

Q. What's that?

A. A freshman in college.

Q. Okay. Did you serve in the military?

A. No, sir.

Q. Do you have any special expertise that you hold out to the public about what kinds of things you can do?

A. No, sir.

Q. Okay. So you don't -- you don't consider yourself a construction expert?

A. No, sir.

Q. You're not a marketing expert?

A. No, sir.

Q. You're not a salesperson per se?

A. Well, I do sell now.

Q. You sell now?

197

A. Rooms, yeah.

Q. This is the first time that you've been involved in selling, is that correct?

A. No, sir.

Q. Oh, okay. So prior to this job, one of -- one of the good benefits of working for Mr. Lobell is that he gave you a pickup truck?

A. We pay for it.

Q. I'm sorry?

A. I make payments on it.

Q. Okay. And your salary was about 8,700?

A. Yes, sir, after the truck note.

Q. After the truck. So, now, prior to Mr. Lobell coming around, you had had financial problems, is that correct?

A. Did I have financial problems?

Q. Yes, sir.

A. No, I had trucks running.

Q. You had trucks running. Okay. Did you ever borrow any money from Chad Hansen?

A. Up here, yeah, because we didn't get paid. I mean, we were working. We had been up here since the first of May and never got a dollar. I mean, I used all my money for my trucking to pay my way up here and my expenses at the hotels.

Q. Did you ever borrow any money from Chad Denton?

A. Yeah, like 2,000, 2,500 bucks.

198

**Q.** Okay. And with respect to -- isn't this really the first job where you've regularly gotten paid 8,700 or $10,000 a month?

**A.** That's the only job I got paid that kind of money, yeah, but I had stuff that we joint ventured in that I got paid, that we both got paid.

**Q.** Right, so this has been a great thing for you personally, to be able to regularly make that kind of money. Is that a fair statement?

**A.** Yeah.

**Q.** And, of course, you want to continue making that kind of money, is that correct?

**A.** Correct.

**Q.** You don't have a written contract with Mr. Lobell?

**A.** No, sir.

**Q.** And if you didn't sign this affidavit, he may well have fired you, isn't that correct?

MR. PEPPER: Objection, Your Honor, calls for speculation on the part of the witness.

THE COURT: Overruled. You can answer it.

THE WITNESS: I mean, I don't think he would fire me.

**Q.** (MR. COCHELL CONTINUING) You don't think he would fire you if you told him that you thought you were going to be a partner in the enterprise?

**A.** Well, I knew I wasn't a partner from day one when he said

that we weren't going to be a partner because he wouldn't do us on his paperwork of being a partner.

Q. Okay.

A. So it was either take a job, or --

Q. And he never promised you any profit, is that correct?

A. It depended on if we were in the budget, then we would get something.

Q. And isn't it true that one of the primary reasons you never were within budget is that Mr. Lobell was changing the stages of construction so that a lot of construction happened sooner rather than later, isn't that correct?

A. I wouldn't say it happened sooner than later. I'd say we added some more things to the project.

Q. I see. And isn't it true that the cost overruns are due primarily to those additions?

A. Not -- no, that's not true because we've had contractors that we had to do over, work over that they did.

Q. Okay. And, well, isn't it true that you all spent at least $50,000 on something called the Arnegard project for Mr. Lobell?

A. I don't know the dollar amount on that, but we did do work over there.

Q. So you spent a lot of time over at the Arnegard project and then discontinued that project, isn't that correct?

A. I wasn't there. I was at Capital Lodge.

Q. All right. But you knew about that.

A. I knew we did some work over there.

Q. Okay. That turned out to be a waste of money, right?

MR. PEPPER: Objection, Your Honor, it calls for speculation.

THE COURT: Sustained.

Q. (MR. COCHELL CONTINUING) Now, you considered yourself a partner in this enterprise, didn't you, after Mr. Lobell -- I'm sorry. Maybe I'm misstating your testimony. Didn't you say that you knew that you weren't a partner in the enterprise after -- from day one with Mr. Lobell?

A. Well, we were going to be a -- we would get a profit share if we were in that budget. He would not give us a partnership because we wasn't -- not knowing if we were able to be in that budget of that high of a big project.

Q. So he would give you -- he would give you partnership some day if it was profitable, is that correct?

A. He didn't say partner. He said profit share.

Q. Profit share. So from day number one you knew that you weren't Mr. Lobell's partner, is that correct?

A. Correct.

Q. And so from that point forward you were a consultant, but you didn't -- you didn't tell people that you were a partner, right?

A. Well, before he actually -- we did say we were partners

there, yes, we did.

Q. You signed documents as one of the managing partners for Capital Lodge and Capital Transport --

A. Right.

Q. -- isn't that right?

A. Yes, we probably did. Yes, sir.

Q. All right. And so you know that -- so you're signing documents. You're not partners, but you thought you may some day be partners?

A. Because we were going to -- if we were in that budget, we were going to be a profit share, which, you know --

Q. Okay. You knew that Mr. Lobell promised that there was going to be an operating agreement, is that correct?

A. I know we kept -- we asked for it, but we never did get one and that's because of the fact it wasn't -- we didn't get yet to that part to say that we are within that budget.

Q. Well, he could have just given you an operating agreement that really specifically spelled out some detail to this arrangement, isn't that right?

A. Yeah, I guess so, but mostly Randy Baker dealt with him on that part.

Q. But, Mr. Stabinski, isn't it kind of tough to work for Mr. Lobell? Isn't he kind of an emotional guy at times?

A. Sometimes, but everybody is emotional at times.

Q. Right.

202

A. Kind of the day that you're having.

Q. When he's upset, everybody in the room knows that he's upset. Isn't that a fair statement?

A. Yeah.

Q. And he's the boss, and so when the boss gets a little irritated, you pay attention, right?

A. Mm-hmm.

Q. Okay. So with respect to Mr. Lobell, you didn't -- you were not the kind of guy who was going to challenge your boss. Is that a fair statement?

A. Fair.

MR. PEPPER: Objection, Your Honor, again, relevance.

THE COURT: Overruled.

Q. (MR. COCHELL CONTINUING) That's right?

A. Correct, I mean, to a point.

THE COURT: Anything else of this witness?

MR. COCHELL: That's it.

MR. PEPPER: Just two things.

                    REDIRECT EXAMINATION

BY MR. PEPPER:

Q. Mr. Stabinski, is Mr. Lobell pleased with your public relations and your sales work?

A. Yes, sir, as far as I know.

Q. Okay. And you're doing a good job there, right?

A. Yes, sir.

**Q.** Okay. Now, and as far as a managing partner, did Mr. Lobell tell you to use that term on any of those letters?

**A.** No, this was actually -- it was inputted in the computer that stayed at the bottom of the e-mail that was formed up.

**Q.** Okay. So it was a form, right?

**A.** Right.

**Q.** Okay. No further --

THE COURT: You may step down, sir. Thank you.

THE WITNESS: Okay. I think he had one more question.

**Q.** (MR. PEPPER CONTINUING) Were you -- were you upset that things were not being run right?

**A.** Yes.

**Q.** And you let --

**A.** Because I actually called him and told him I was going to leave.

**Q.** And so when he found out about that, he got upset, correct?

**A.** Right.

MR. PEPPER: Okay.

MR. COCHELL: Just one more thing, Your Honor, just because they raised it.

RECROSS-EXAMINATION

BY MR. COCHELL:

**Q.** I'll show you what's been marked as Exhibit 62. There's a

lot of documents in this case, but if you would take a look at 62 for identification, that's a statement of work for Capital Transport Services. That's not a form with your -- that's your signature, right?

A. Yes, sir.

Q. And you put in the term "managing partner," isn't that correct?

A. Yes, sir.

Q. It's because you thought you were a managing partner, isn't that correct, sir?

A. Yep.

MR. COCHELL: That's all the questions we have.

THE COURT: All right. Thank you, sir.

MR. PEPPER: One last question.

THE COURT: One more question per side and no more questions after that.

REDIRECT EXAMINATION

BY MR. PEPPER:

Q. Mr. Stabinski, do you really understand what a managing partner is?

A. It's a partner of an LLC, like a member.

Q. And you weren't, were you?

A. No, we was not.

MR. PEPPER: Okay.

THE COURT: Any more questions?

MR. COCHELL: I'm sorry?

THE COURT: Any more questions?

MR. COCHELL: No, not for this witness.

THE COURT: Thank you, sir. You may step down.

MR. COCHELL: Oh, we offer 62 for identification, Your Honor, as Exhibit 62.

THE COURT: Sixty-one and sixty-two?

MR. COCHELL: Sixty-two and sixty-one, Your Honor.

THE COURT: Any objections to 61 and 62?

MR. PEPPER: No, Your Honor.

THE COURT: All right, 61 and 62 are received then. The plaintiff have any more witnesses?

MR. PEPPER: Your Honor, we have no more witnesses, and all we ask it that we allow Mr. Porsberg at the end of his evidence or however you would like, to summarize the law in regards to the testimony and the evidence presented, Your Honor.

THE CLERK: Please raise your right hand.

CHAD HANSEN,

having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. COCHELL:

Q. Mr. Hansen, if you would, can you tell the Court where you currently live?

206

A. Memphis, Tennessee.

Q. I'm sorry?

A. South Haven, Mississippi, which is Memphis, Tennessee, area for a landmark, I guess.

Q. Right. Okay. And you know Kenny Lobell, correct?

A. Yes.

Q. You see him in the courtroom here today?

A. I do.

Q. And you see Chad Denton, and you see him in the courtroom today?

A. I do.

Q. And how did you -- how long have you known Mr. Denton?

A. I'd say since approximately 2008 --

Q. Okay.

A. -- give or take.

Q. And have you worked projects with him before?

A. Yeah, multiple, many projects.

Q. And with respect to those projects, Mr. Denton would typically fund the projects, and then if there was a profit, the profits would be shared equally among everybody?

A. Correct. Yes.

Q. And that would be after repayment of his initial costs?

A. Sure. Any investment or debt service associated with the project that we were doing would, you know, go to that first. Any monies generated or revenue would go to satisfy any debt or

outlay of finances to make the project go forth, and then any profits after that would be dispersed amongst the partnership that we would have established based on that project.

Q. Now, with respect to this particular project, the man camp and Capital Transport Services, I understand that you were approached sometime in May of 2011 to participate, along with Mr. Stabinski, Hansen and Mr. Denton and Mr. Baker in putting together a man camp?

A. Yes.

Q. Okay.

A. That's correct.

Q. And with respect to construction projects -- had you previously worked on construction projects before?

A. Not to this magnitude. Various projects, but not to -- not something of this size.

Q. And with respect to Mr. Denton, had you enjoyed working with him in the past?

A. Oh, yeah. Absolutely.

Q. Did you find him to be honest and fair?

A. Always.

Q. With respect to Mr. Baker, I understand you know Mr. Baker pretty well?

A. Very well, yes.

Q. How frequently do you talk to Mr. Baker?

A. Maybe four or five times a day.

Q. Even now you do?

A. Every day, yeah.

Q. Okay. And with respect to Mr. Baker, obviously you like Mr. Baker, right?

A. Sure. We have a personal relationship as friends.

Q. Do you consider him to be an honest man?

A. Yes, I do.

Q. Okay. Now, with respect to this project, what -- what was it that attracted you to this project?

A. Well, actually, the project started out as we were coming up here to do trucking and various heavy construction for building rig pads and roads and so forth. And initially Mr. Denton, Baker and Stabinski came up here a week or about ten days prior to my arrival, and within about 48 hours we realized the need or lack of housing that was available and quickly realized that's in our wheelhouse of expertise, with Baker being in construction, home building and development for 20 years, Denton having a mobile home retail sales location. You know, it was something that we could relate to pretty easily.

        And then we actually have a -- Mr. Denton has a friend, an associate by the name of Gates Walcott who was operating a man camp down in Louisiana and then eventually in Texas and was quite successful, so we got some consultation from him and saw the validity of such a project, so then we

started outlining it and putting numbers together, resourcing what it would take.

Q. And you put together a budget and a plan, is that correct?

A. Yeah, at first Mr. Denton and Mr. Baker sourced some property through a realtor out of Williston, I believe, and they were shown a few properties and landed on one specifically and secured the property, but the realtor told us that the main goal would be to obtain a water permit. That was going to be the whole trick, so that was first and foremost, and that was acquired, I think, within the first week of securing the property, so that once we got over that hurdle, we just moved forward from there.

Q. Now, with respect to the camp, did you participate in developing the investment package?

A. I personally created the investment package.

Q. Okay. You're pretty good with computers, I understand?

A. I think I'm all right.

Q. Okay. And Mr. Denton was involved in creating the investment package?

A. He was to some extent and so was Mr. Baker and Stabinski. It was a collective effort. Richard Brown from Morgan Chase Management, he also contributed. It was -- it was something we worked on day and night as we acquired information. We went through several different types of buildings, structure of the camp, and we all collaborated. And, you know, we had to get a

210

lot of information from Mr. Brown based on what services he was going to provide and what they were going to cost, so they would all -- we would all resource all that information collectively to all hours of the night, and I would put them into the package and make it into a presentation.

Q.   Now, with respect to the man camp, did you -- did you participate in any of the investor meetings?

A.   There was -- the only investor meetings were the initial meetings that took place in Louisiana, New Orleans, and I wasn't present for those.  I was still in North Dakota.

Q.   And so you weren't involved in meetings with other potential investors, is that correct?

A.   No, I communicated with them, and we sourced about, I'd say, four to six investors prior to reaching Mr. Lobell. Several of them were out of Texas, and they were presented the information and we were, you know, presenting multiple investors simultaneously because it was a time-sensitive situation, so we were trying to --

Q.   So it was about four to six groups of investors?

A.   Yeah, I would say.

Q.   Okay.  So there were probably other investors out there if Mr. Lobell didn't --

A.   We would not have stopped there.

Q.   Right.

A.   Yeah, we had others to keep going.

Q. Did you have an understanding of what the plan was in terms of getting an investor to agree to a plan, how -- how you all were going to get a return on your investment of time and resources and Mr. Denton's money?

A. Well, initially we were looking at what we call an ROI, which is just a return on investment, which would be a loan towards the project, that we would pay an agreed amount of interest over a certain or specified term, and -- but we were open to a mixture of equity share, partnership, as well as an ROI. We were open to various structures, and that was what was prepared originally. And then Mr. Lobell wanted to be more of a part of it and in -- an actual fixed partner, so we came to an agreement on that.

Q. And what was that agreement?

A. The agreement was that there was five of us, and that's how it was presented to him initially. There was -- well, there were four of us, I should say. The investor would be the fifth partner, and there would be an initial investment to get the camp going.

And the agreement that we had was the -- any revenues generated would, of course, go to paying operations and overhead and services provided to the clients. Any profits that were generated would be a 60/40 split, which was then -- that 40 percent would go as a profit share to the remaining partners, of which there would be five. You take that

212

40 percent, divide that equally over five partners, you got 8 percent left over to each individual partner, so when it settled out, 68 percent in total would go back to debt service and Kenny Lobell, and the remaining 32 percent would be dispersed eventually amongst the remaining four partners.

Q. So that's what your understanding of the agreement was with Mr. Lobell?

A. Yep.

Q. And where did you get that understanding?

A. From Randy Baker and Myer Stabinski, and Chad Denton understood it that way as well.

Q. And so with respect to Mr. Lobell, did you ever have a discussion with Mr. Lobell about that?

A. I personally did not.

Q. You understood that as an accommodation to Mr. Lobell, there would be an operating agreement to memorialize that as opposed to a partnership agreement?

A. Well, the --

MR. PEPPER: Objection, Your Honor. It's hearsay. He said he never spoke to Mr. Lobell, so for him to talk about any deal that was worked out with Mr. Lobell would be hearsay of the first order.

THE COURT: Sustained.

Q. (MR. COCHELL CONTINUING) Did you get an understanding of whether --

213

**A.** Yeah, the understanding that I gathered from the return of the meeting from Randy Baker was that we -- the assets -- when Mr. Lobell agreed to do the project and invest in our project, that the company, Capital Lodge, that was to be formed, all investment would go through that company as far as assets acquired and so forth, and the remaining -- the partnership would be memorialized through a partnership/operating agreement. You can call it whatever you want to call it, and that would define the partnership itself.

**Q.** Okay.

**A.** But that was never provided to this day.

**Q.** And so -- and so after the debt was completely serviced, after all of his debt was repaid, then what would be the profit -- the residual profit be -- how would that be distributed to the partners?

**A.** Well, the profits and assets would go back as a partnership collectively, which we were all equal share partners.

**Q.** Okay. And so that would be a 20 percent of --

**A.** Sure. Amongst the five, yeah.

**Q.** All right. So did you have an understanding, you know, from discussions with Mr. Baker or anyone as to whether the property was supposed to be -- whether the property that was purchased was supposed to be a partnership asset?

**A.** The property was one of the assets of the investment from

214

the beginning.

**Q.** And why do you say that?

**A.** Well, that's how it was presented in the presentation. I mean, it was there from the start. I don't know why it would have changed.

**Q.** Now, with respect to your employment -- well, I guess you were a 1099 employee with Mr. Lobell, is that correct?

**A.** I was not supposed to be 1099. I wasn't supposed to be an employee of any sort.

**Q.** Okay. And did you get draws from Mr. Lobell?

**A.** Well, we got compensation, which was basically to supplement our income while we were continuing to build the project, to take care of personal expenditures and so forth back at home, which is what Denton did prior to Mr. Lobell coming in.

**Q.** Okay. And with respect to Mr. Lobell, did there come a time when you were asked to -- when your employment was terminated?

**A.** What was the question now?

**Q.** Was there a time when your relationship with Capital was terminated?

**A.** I don't know of a relationship being formally terminated. There was no formal termination of any capacity. I went home to visit my family, and before returning, Mr. Baker contacted me and said that Mr. Lobell didn't want to pay my monthly --

monthly supplementation, I guess you can call it, or -- and didn't feel the need that -- to pay me and not to return, but that we would be -- we would be dispersing profits in the very near future, and that's how I understood it, that I was not to -- not to worry.

Q. Okay. And did you continue to get some money after your --

A. Yeah, just a small amount. It was about $2,000 a month.

Q. And how long did that continue?

A. Four or five months, I would say. I'd have to look.

Q. And then did you ever threaten to sue Mr. Lobell?

A. No, because at that time I was still under the impression that, you know, profits were coming, my partnership wasn't in jeopardy. I didn't feel that threat or that need to pursue that avenue.

Q. When is -- when is the first time that you learned that Mr. Denton had filed a lawsuit?

A. I would say it was June of this past year, 2012.

Q. And you were served with that lawsuit, is that correct?

A. Yep.

Q. And you filed an Answer, is that correct?

A. Yeah. Well, I filed admissions and turned over whatever documentation that was subpoenaed, that was required of me, but I had no contact with him, though, at that point.

Q. And after that time were -- prior to that time did you

have any discussions with Mr. Denton, before you filed your Answer?

A. The last time I spoke with Denton was 2011, in August, and we went just over a year, and I think I spoke with him for the first time October of this -- of 2012, so it was maybe a year and two months without having any conversation.

Q. Now, at that point do you know -- had you been contacted by Mr. -- one of Mr. Lobell's lawyers at about that same time?

A. Not in October, no. I haven't been contacted by them, not in October.

Q. All right. And do you recall when you were first contacted by Mr. Lobell's lawyers?

A. I wasn't contacted.

Q. Or by Mr. Baker on behalf of a lawyer.

A. Oh, well, Mr. Baker, yeah. I was contacted by him in November, mid-November, I would have to say, somewhere around the 16th or 15th.

Q. And now I'd like to show you what's been marked as Exhibit 63 for identification. Do you recognize that document?

A. Yes.

Q. And can you describe for the Court what that document is?

A. The top page or the entire document?

Q. The entire document.

A. The entire document is an affidavit for me to sign stating that I was never a partner in Capital Lodge or any of these

other entities, and there's some kind of settlement -- settlement agreement. He was trying to pay me $20,000 to sign, stating that I was never a partner in the company, basically an affidavit, and he wanted to pay me to sign it.

Q. All right. Now, with respect to Mr. Baker, he contacted you about this document --

A. He did.

Q. -- before he sent it?

A. Yes, he did.

Q. Okay.

A. It was verbalized.

Q. If you would, tell the Judge what Mr. Baker said.

A. I was told that -- well, first it was initially by text message. I have big news. Give me a call. So I called him and he said, "Kenny is willing to pay you $20,000 today if you sign an affidavit. You could probably have the money by this afternoon." And I was kind of taken back by it and angered to some extent, and so I said, "Send it over. Let me have a look at it." And it didn't come at that time, and then I told him, "You know what? I'm not interested. I wouldn't do it for that much money, and, you know, that's just being dishonest because I am a partner in this company."

And then later that afternoon Randy called and said, "You need to make a decision on what you're going to do. It's getting the end of the day, and if they're going to attach the

218

money to the wire, the draw that goes out, it needs to be done today, and Kenny is willing to come up and make it 30,000." And if I don't sign it that they'll -- what was the term used? They would sue me for obstruction. That's what it was. It was obstruction. I'd be sued for obstruction for not signing because they were trying to obtain financing to continue on with operations for the camp. It was some financial struggle that I was not aware of, but that wasn't really relevant at the time.

Q. Did you --

A. I was holding up financing, and basically by me -- the financing company was aware of the lawsuit and what was going on, and I was a loose end, basically.

Q. Okay. Did you know at that point whether there was a hearing on a lis pendens?

A. I don't believe so.

Q. Okay. You didn't know one way or the other?

A. Not about the lis pendens, no.

Q. Nobody talked to you about the need for your testimony at this hearing?

A. No.

Q. You didn't know that they filed almost identical affidavits for Mr. Stabinski and for Mr. Baker, almost identical to your affidavit, is that correct?

A. That's correct.

Q. You didn't know that?

A. No, I knew about Baker's affidavit.

Q. Oh, I see. That's because you talked to him on a regular basis.

A. Correct. He told me he was getting pushed into a corner, didn't know what to do, called me all stressed out about what he was going to do.

Q. What was he stressed out about?

A. Well, he's -- he's got an income from Capital. He --

MR. PEPPER: Objection, Your Honor, it's hearsay at this point.

THE COURT: Overruled.

THE WITNESS: That's direct -- I heard this directly from the man's mouth. He -- he was stressed out. He needed employment verification because he's going through an adoption process, and if he was to go against the grain and go against Kenny Lobell, he would lose that and would jeopardize his adoption. I've had extensive conversations with him about this.

Q. (MR. COCHELL CONTINUING) And so when you say he felt pushed in a corner, do you --

A. He felt pushed into a -- Randy Baker felt pushed into a corner, and he -- and he spoke with some of his own legal representation that is close to him where he lives, and they stated that if they revised it somewhat, he could kind of play

220

the middle on this thing and he wasn't admitting that he was, and he wasn't admitting that he wasn't, so that was the path of least resistance that he took to not upset Mr. Lobell and also not jeopardize himself.

Q. Recognizing that he's a close friend of yours, I mean, do you think maybe he might have fudged a little on the truth?

MR. PEPPER: Objection, Your Honor, calls for speculation.

THE COURT: Yeah, it certainly does. Sustained.

MR. COCHELL: Fair enough. I'll withdraw the question, Your Honor.

Q. (MR. COCHELL CONTINUING) You had a number of discussions with Mr. Lobell during the course of your work at the man camp?

A. Sure, we had -- we had some, yeah.

Q. And did you see him as an excitable individual?

A. Depending on what day you spoke with him, he was either excited in one capacity or another.

Q. Can you describe it a bit more in detail, about what his temperament was?

A. Well, we were all going to get fired and sent home one day, and then the next day we were doing a great job. It was -- just depend on when you caught him.

Q. There's been talk about cost overruns?

A. Correct.

Q. And were you ever told that you were responsible or

221

everybody was responsible for cost overruns?

A. Yeah, blame was shared amongst Baker, Stabinski and myself, that there was cost overruns, but, you know, the cost overruns are associated and -- and self-inflicted in many cases. You know, the project was supposed to be a one phase -- we were initially supposed to put one phase in. Well, that phase turned into two phases, and then it turned into installing the utilities for a third phase. And initially we changed the buildings from -- completely and added a significant cost to the buildings.

And then on top of that we decided that we were going to go work on a project in Arnegard and spent an enormous amount of money over there. And every day we didn't know if we were going to actually go through with the project or not, but we continued to spend money. In the end, never did the project.

Q. So no one ever told you that you were terminated for possible --

A. No.

Q. -- fraud?

A. Fraud?

Q. For misconduct?

A. No, but I did hear recently that just -- which infuriated me, but several months ago I was actually informed that a landscaping decision that was confirmed by Randy Baker before

222

we made any decision to even have the installation done, that I spent too much money on landscaping. And then it came out a couple of months ago that supposedly I took a kickback from it, which I barely had my hands on that. I met with the guy. He showed me where he was going to put the trees. He initially wanted to charge us 35,000. I consulted with Randy. I said, "Here's the package. What do you want to do?" He said it had to be -- it's got to be under 30,000, so I think I came in, went back to the guy, negotiated, said, "Listen, you need to take some trees out or whatever we're going to do. We need to get it under 30,000." And I think it ended up somewhere around 29, 30 thousand, so we went forth with it, and I handed the invoice over to our administrator and she took care of the rest.

MR. COCHELL: Your Honor, I'll offer Exhibit 63 into evidence, if it hasn't already been accepted.

THE COURT: What is it? What is it?

MR. COCHELL: I believe that's the -- that's the e-mail with the release, the affidavit and the release. I thought I had offered it earlier in the case.

THE COURT: You might have offered it, but I haven't seen it.

MR. COCHELL: Oh, I'm sorry.

THE COURT: Any objection?

MR. PEPPER: I think he offered that through

Mr. Baker. I don't -- if it's the e-mail where it shows the two attachments and then it's the two attachments that are printed out, we have no objection.

MR. COCHELL: I have an extra copy here for Your Honor. Sorry.

THE COURT: It looks like it's the same thing as Exhibit 53.

MR. COCHELL: That's what I thought, Your Honor. I just wanted to make sure that it was in evidence. There was some uncertainty on my part.

MR. PEPPER: Your Honor, to the extent that it was the affidavit and settlement agreement that was prepared by Morales' attorneys and forwarded to Mr. Hansen by Mr. Baker, it looks like, we have no objection.

THE COURT: Exhibit 63 will be received. It's the same as Exhibit 53, but we'll have them both.

Q. (MR. COCHELL CONTINUING) All right. Just one clarification. This statement on 63 and probably 53 says, "Do you believe this guy? He wants me to lie and he's willing to pay me to do it." Is that your statement, sir?

A. Yes, it is.

MR. COCHELL: That's all the questions I have for this witness.

THE COURT: Cross?

MR. PEPPER: Yes, Your Honor.

224

BY MR. PEPPER:

Q. Mr. Hansen?

A. Yes.

Q. How much were you paid to show up here today?

A. I'm sorry?

Q. How much were you paid to show up here today?

A. I was not paid anything to show up here today.

Q. Were you reimbursed for your travel expenses?

A. For my travel expenses only and hotel.

Q. Did you pay for them personally and then got a check from Mr. Denton, or how was it done?

A. No, in advance we -- we agreed that he would pay for them upfront before I would leave.

Q. Okay. So you're here on his ticket, right?

A. I don't think it's any different than anybody else's ticket that's getting paid on -- to attend.

Q. Well, he did pay for your ticket. Let's just talk about your ticket.

A. Correct. Yes.

Q. Okay. Did you ever get any money from the rig moving experience that you -- that you worked with Mr. Denton on?

A. Yeah, not a -- a couple thousand dollars just to take care of expenses at home.

Q. Did you ever sign a partnership agreement with Mr. Denton,

a written partnership agreement?

A.  No, did not.

Q.  When you prepared the package for the investment in the man camp, you referred and you testified that you listed the 80-acre property that the man camp is now located on as an asset, correct?

A.  I believe so, yes.

Q.  Do you own a house?

A.  At this time I do not.

Q.  Okay.  Have you ever owned real property?

A.  Yes, years ago I had a condo.

Q.  In order to have an asset, you have to pay for it, don't you?

A.  Correct.

Q.  Okay.

A.  And we were looking to have the investor actually pay for it outright.

Q.  Okay.  But in your package it listed it as an asset, correct?

A.  I believe so.

Q.  But at the time you listed it as an asset, Mr. Denton had never bought it, did he?

A.  No, it wasn't paid with real cash, no.  It was secured for the project investment.

Q.  How is it secured?  Who secured it?

**A.** Mr. Denton.

**Q.** How did he secure it?

**A.** Put an offer in to take it off of the market so that we had time to get permits for it and make it a viable piece of land for the project.

**Q.** Do you know if he ever put a deposit on that?

**A.** I couldn't answer that. I'm not exactly sure.

**Q.** Let me ask you this. If he didn't put a deposit on it, would he have an asset or -- in terms of at least a contract?

**A.** I don't know. I don't know if there was a contract for it made with that offer. I didn't see the paperwork.

**Q.** All right. Will you agree that if you don't pay for an interest in property via some kind of written document, that you don't have it?

**A.** You have first right of refusal to it until that -- until you forfeit it.

**Q.** Don't you have to pay for a first right of refusal?

**A.** That depends. That depends. That could mean a lot of things. It could be structured -- depends on the agreement made with the landowner.

**Q.** In this specific case did you ever see a document that purported to be an option on that property?

**A.** I personally did not.

**Q.** Okay. Yet you still listed it as an asset.

**A.** Correct. It was intended to be an asset.

Q. Okay. And you also testified that it was never the intention of Mr. Denton to pay for it, correct?

A. I didn't testify to that.

Q. All right. Well, didn't you say it was for the -- whoever you got as an investor to pay for it?

A. That is right.

Q. So --

A. So what's the question?

Q. So Mr. Denton never intended to buy that property, correct?

A. Personally, no, that -- that piece of land was to be one of the assets of the -- of the project in and of itself. We intended on having an investor come in, pay for the property and the entire project as it stands, which all buildings and everything else would have been assets as well if they were paid for. If there's no debt on those, they are assets, including the land. There wasn't a finance term specified for the land. It was to be paid in full. At that time, when we secured investment and it would have been paid in full, it would have been an asset.

Q. Okay. But that never happened, did it?

A. At what point?

Q. Mr. Denton never --

A. Mr. Denton was not the investor. He was the seed funding partner of the group. He wasn't the investor. That's why we

228

seek Mr. Lobell and others.

Q. And you sought six others, and neither one of them -- not a one of them would do the property with you in a partnership agreement, correct?

A. No, that's not the case. We had guys that -- who's way outside of anything they've ever done and it was far away from what they like to do, where they like to do business. The Texas groups that we -- we spoke to two Texas groups, and both of them only cared to invest in Texas investments. They had -- that's where they focus their attention, so that was their objection.

To be honest with you, those two and then I think we spoke to Gates about doing it at some point, and they were -- Gates Walcott, which is the company that had the other man camp down in Louisiana, they were too busy with what they were doing.

And then another gentlemen that worked with us, he had a friend of his who had a mobile home manufacturing company out of -- I want to say Tallahassee, and he reviewed it, but he was looking at acquiring a couple other manufacturing plants and wasn't able to give it this attention.

So Myer Stabinski had two investors in Louisiana, one being Mr. Lobell. The other gentleman looked at it, liked it, but wasn't able to move as fast as we needed the project to move. And those were the objections of the people that we

presented it to.

Q. So you never saw while you were working there, a document such as a warranty deed giving Mr. Denton any interest in the property.

A. I personally was not handling the relations with the realtor, so I wasn't privy to those documents.

Q. What did you do up there?

A. I'm sorry?

Q. What did you do? What was your job?

A. What was my job? I pretty much procured, resourced subcontractor agreements, compliance, state -- state documents, contractors' licenses, Workers Comp., anything that mixed between out in the field and administrative responsibilities, scheduling --

Q. And when it came time --

A. -- materials.

Q. When it came time and Mr. Denton provided you, Randy Baker and Buster Stabinski a partnership agreement, you refused to sign it, didn't you?

A. We were instructed by Mr. Lobell not to sign it.

Q. Did you speak to Mr. Lobell?

A. No, I didn't personally. Myer and Randy spoke to them, and I was standing right there when they were speaking to them.

Q. So you could have signed it on your own, but you chose not to.

230

**A.** At that time I did, yes.

**Q.** Okay.

**A.** But that's not the operating agreement that we were waiting on. We were waiting for a partnership and operating agreement from Mr. Lobell. That's how this thing was supposed to go.

**Q.** But you never got one, did you?

**A.** That's the point of why we're here.

**Q.** Okay. And you never signed a partnership agreement with Mr. Denton either, did you?

**A.** I've never had to. We've had successful relations for many years. We actually had another previous -- one of our projects we had an operating agreement and we all executed it.

**Q.** Did you personally put any money into the project?

**A.** No, no investment on my behalf --

**Q.** Do you know --

**A.** -- financially.

MR. PEPPER: Okay. Your Honor, no -- no further questions of this witness.

MR. COCHELL: A few follow-ups, Your Honor.

<u>REDIRECT EXAMINATION</u>

BY MR. COCHELL:

**Q.** You mentioned that you were there when Mr. Baker and Stabinski talked to Mr. Lobell?

**A.** That's correct.

**Q.** And did you hear Mr. Lobell on the phone?

**A.** No, he wasn't on speakerphone, but Myer Stabinski was getting an earful, and then the next conversation Randy was as well.

**Q.** And then -- and then what happened?

**A.** We just dismissed it. We actually had a conversation. We had a meeting with Chad after the fact, after we were instructed not to sign it. And Mr. Baker and myself had a face-to-face meeting with Denton, told him that there's nothing to worry about, you know, Mr. Lobell has our best interests at hand and that when we get an operating agreement, you know, we're all going to sign it and we're going to look out for his best interest as a partner. You know, he felt his position was jeopardized based on the feedback he was getting from Lobell, and we told him there would be nothing to worry about and that we were instructed that profit disbursements were going to be coming in the very near future and everything would be all right.

**Q.** Now, is it your understanding that Mr. Lobell is selling the property?

**A.** I believe so. That's what I've heard.

**Q.** Have you heard that the purchase price is $25 million?

**A.** I believe I've heard that.

**Q.** That's $25 million net of his expenses?

MR. PEPPER: Objection, Your Honor --

232

THE WITNESS: I don't know about that.

MR. PEPPER: -- speculation at this point.

THE COURT: What was the question?

MR. COCHELL: Just had he heard that Mr. Lobell was making a net profit of $25 million.

THE WITNESS: I don't know what the exact profit is.

THE COURT: Well, the objection is sustained. I mean, he's --

MR. COCHELL: That's fine.

THE COURT: -- hearing the same thing that I might be hearing out in the rumor mill, so --

MR. COCHELL: Yes, Your Honor. That's all the questions we have. Thank you.

MR. PEPPER: Your Honor, at this point Mr. Porsberg would like to summarize the legal issues in light of the facts that have been elicited here today.

THE COURT: We're done with this witness?

MR. COCHELL: Yes, Your Honor.

THE COURT: Thank you, sir. You may step down.

THE WITNESS: You're welcome.

THE COURT: Anything further from the defense? Well, we're getting pretty late in the day.

MR. PORSBERG: Your Honor, we're prepared to give oral argument, but if the Court doesn't need it --

THE COURT: Yeah, I'd rather give both sides an

233

opportunity to submit something in writing to me if they wish. I'm not going to sit on this and cerebrate on this for weeks and months on end. I'm going to get a decision out quickly, but I want to give both sides an opportunity to summarize what they feel the evidence has shown and summarize how their legal arguments -- I mean, I essentially know what both sides are going to argue, but how much paper do you think that you need to summarize what has transpired here today?

MR. PORSBERG: Our concern is, Your Honor, just that it be done quickly, a really short briefing schedule. I would anticipate an extremely short brief from us.

THE COURT: Well, I'm going to set a short briefing schedule, and I generally like to put limitations on the length of briefs, but you tell me how much paper that you're going to need.

MR. COCHELL: Fifteen pages, Your Honor. Is that --

MR. NYHUS: Well, I have some legal comments as well. As far as the law is concerned in North Dakota, I need about three pages, three to five. I'm not going to summarize what's been presented to the Court here.

THE COURT: Okay.

MR. NYHUS: But if the Court would like a summary of our position on the testimony, we would need more.

MR. PEPPER: We can do it in five pages, Your Honor.

THE COURT: Okay. Well, we'll set a limit of 15

234

pages, and you throw into the 15 pages what you want to throw into it, and I'll read it all very carefully and probably more than once.

Now, in terms of deadlines, I know that everybody has got busy schedules, and I'll try to accommodate those conflicts as much as possible. Tell me, both sides, when you think you could get something in.

MR. PORSBERG: Would they be simultaneous, Your Honor?

THE COURT: Yeah, they'll be simultaneous.

MR. PEPPER: Friday, Your Honor.

MR. COCHELL: You're talking this week?

MR. PEPPER: Yes.

MR. COCHELL: I was thinking perhaps Monday. I mean, today is Wednesday. Monday would really be the earliest, Your Honor.

THE COURT: I'll give you both a week.

MR. COCHELL: I have to travel.

THE COURT: I'll give you both a week. How's that?

MR. COCHELL: Yes, sir.

MR. PORSBERG: That works for me.

THE COURT: Have something filed on or before Wednesday, January 16th, by the end of the normal working day. Fair enough?

MR. COCHELL: Yes, Your Honor.

235

MR. PEPPER: Yes, Your Honor.

THE COURT: All right. Everybody feels that they've had an opportunity to present what testimony and what documentary evidence that they want to submit in connection with this dispute?

MR. PEPPER: Yes, Your Honor, we do.

MR. COCHELL: Yes, Your Honor.

THE COURT: All right. Anything else then for the good of the order?

MR. PEPPER: I think I'll stay after with the clerk to make sure she's got all the documents that we had on our part to make sure that there's no omissions.

MR. COCHELL: Nothing at this time, Your Honor.

THE COURT: Tell me what's -- what the status of the Texas litigation is in terms of trial dates, dispositive motion deadlines, depositions, what discovery has gone on.

MR. COCHELL: The Court will likely do it -- what they call a docket calendaring order, a DCO, when all the parties are served. We've asked for cooperation from the man camp to assist. I didn't want to serve Mr. Stabinski at a courthouse. I thought that was improper, but if he'll cooperate in getting served, he can file whatever motions he's got. Then typically this is a Level 2 case, and so from the date of the DCO, it would be typically one year to trial under a --

THE COURT: From the date of filing?

MR. COCHELL: Sir?

THE COURT: From the date it's filed?

MR. COCHELL: No, I think it would be from the date the last party is served, or that's --

MR. PEPPER: There's some outstanding -- I guess it would be motions, Your Honor, jurisdictional motions that haven't been resolved yet because they sued -- the only person that's actually -- or entity that's actually in Texas is Mr. Baker, so -- other than Mr. Denton, so we have to resolve those issues before we can move forward.

THE COURT: And has there been any discovery undertaken in the case other than a flurry of interrogatories between parties?

MR. PEPPER: There has been a request for production of documents by the other side. I've had them available at my office for him to review. He had asked that I send it to some copy service, but I have one right by the office that was -- that is going to comply, and he can pick up the copies there.

THE COURT: So do the Texas state courts mandate mediation before cases go to trial?

MR. COCHELL: Yes, Your Honor.

THE COURT: They set dates early in the process or later in the process?

MR. COCHELL: This could be set early if the parties

agree. I think this proceeding has cleared some of the strengths and weaknesses of the parties' respective cases, so I would not be opposed to an early mediation. I just successfully mediated a case last week.

MR. PEPPER: Your Honor, in a lot of Texas courts, mediation is mandatory before you can proceed almost with any rule. It just depends on the division and the judge.

THE COURT: Before you can proceed with any what?

MR. PEPPER: Even on a rule sometimes you have to mediate before you can go to have a hearing.

THE COURT: So are either party before me today opposed to my scheduling an early settlement conference with Magistrate Judge Charles Miller or Magistrate Judge Karen Klein in Fargo?

MR. PEPPER: I'd have to check with my client, but generally --

MR. COCHELL: We would agree to it, Your Honor.

MR. PEPPER: Generally we don't have an objection. We don't -- we don't have a problem with a mediation.

THE COURT: It doesn't cost you anything. Probably two of the finest mediators that you're going to find in this part of the country.

MR. PEPPER: I would have to defer to Scott and Jordon on that because I don't know any of the mediators around here, Your Honor, but I trust if the Court would appoint one --

238

MR. LOBELL: I don't want to go to mediation.

THE COURT: Pardon?

MR. LOBELL: I would not like to go to mediation.

THE COURT: You would or would not?

MR. LOBELL: I would not. I don't want to go to mediation at this point.

THE COURT: Okay. Why is that?

MR. LOBELL: Well, because they're going to go through this whole thing of mediation and it's not binding. And what I have done was -- any businessman that would ever put up $30 million with the people that you see as witnesses and plaintiffs and defendants and all this -- this was a situation that I put everything up that I have. As all of them told you right there, that, you know, the houses was wrong. As Mr. Hansen just said, the houses were wrong because they recommended the house. The sewer was wrong because they got the sewer guy. The time it went to happen was wrong, not because of me. I took their lead. They all said they could do this.

Not one of them had a job when they saw me. Not one of them had made $10,000 -- they all attest to that -- in their life. Mr. Hansen lost his house. Mr. Baker had tax problems. Mr. Stabinski had no job. They all made $120,000 a year, and I'm still paying them when I should have fired them. So to go to mediation to try to award somebody for a bogus lawsuit, that

239

I had nothing to do with this gentleman, that I never spoke to -- both Myer and Mr. Stabinski (sic), they all told him he was not a partner. He got mad.

There's a lot on the line, that I put up my house, my businesses. I've been to the hospital twice because I flat-lined at 46. I was up at 3:00, 4:00, 5:00 in the morning, when you have to pay a million dollars a week and you have $300,000 in the checking account, and you have no money and you have to wait. They said they have all these MSAs and people coming? Ask them how many people they had for contracts for the first six months.

THE COURT: Well, my question was simply, are the parties agreeable to mediation. You're telling me they're not.

MR. LOBELL: No, I would not.

THE COURT: Well, the only reason I suggest it is that I'll issue a ruling on this quickly. I don't sit around and wait for six months or a year like some may do on a case of this nature. I'll get a ruling out quickly, but regardless of how I rule on the case, it doesn't put an end to the litigation.

MR. LOBELL: No, but what it would do is if you ruled on the case, I could go finance. At that point I may go to mediation, if I can keep the camp going. I don't want to go to mediation desperate.

THE COURT: And regardless of how I rule, there's

going to be, as I told you all on the phone last week, a minimum of two to three years of fighting and squabbling and spending money and sleepless nights and depositions and discovery disputes, great cases that go on forever. But like I said, it's not my money, so --

MR. LOBELL: I'm not saying I won't. I may.

THE COURT: To me the case cries out for mediation, but that's just my opinion, and usually 50 percent of the people that hear my opinions disagree with them, so -- but we do have, without question, two very fine mediators that would cost neither party anything. And Judge Miller and Judge Klein will go wherever you want them to go to mediate it, and they're going to be as good, if not better, than any retained mediator that you hire to pay 500 to 800 dollars an hour to mediate this case, but that's my two cents for the day.

But I'll await the receipt of your briefs by next Wednesday. I'm trying to think. I will do my best to get a decision out within two to three weeks thereafter. It won't be any longer than that.

MR. PEPPER: Appreciate that, Your Honor.

THE COURT: All right. Thank you. We'll stand adjourned.

(Concluded at 5:03 p.m., the same day.)

- - - - - - - - - -

241

CERTIFICATE OF COURT REPORTER

I, Sandra E. Ehrmantraut, a Certified Realtime Reporter,

DO HEREBY CERTIFY that I recorded in shorthand the foregoing proceedings had and made of record at the time and place hereinbefore indicated.

I DO HEREBY FURTHER CERTIFY that the foregoing typewritten pages contain an accurate transcript of my shorthand notes then and there taken.

Dated this 4th day of February, 2013.

/s/
_____
Sandra E. Ehrmantraut
Certified Realtime Reporter